# 2021 UT 13

IN THE

# SUPREME COURT OF THE STATE OF UTAH

IN THE MATTER OF THE SEX CHANGE OF

SEAN W. CHILDERS-GRAY, F.K.A. JENNY PACE, and
ANGIE RICE, F.K.A. ARTHUR EDWARD RICE,
*Appellants.*

No. 20170046
Heard January 8, 2018
Supplemental Briefing Completed January 6, 2020
Filed May 6, 2021

On Direct Appeal

Second District, Morgan
The Honorable Noel S. Hyde
No. 163500015

Second District, Ogden
The Honorable Noel S. Hyde
No. 163900359

Attorneys:[1]

T. Christopher Wharton, Eric Kyler O'Brien, Bethany M. Jennings,
Troy L. Booher, Beth E. Kennedy, Alexandra Mareschal,
Salt Lake City, for appellants

JUSTICE HIMONAS authored the opinion of the Court in which
JUSTICES PEARCE AND PETERSEN joined.

CHIEF JUSTICE DURRANT filed an opinion concurring in part,
dissenting in part, and concurring in the judgment.

ASSOCIATE CHIEF JUSTICE LEE filed a dissenting opinion.

---

[1] Amicus Curiae attorneys are Sean D. Reyes, Att'y Gen., Tyler R. Green, Solic. Gen. (fmr.), Stanford E. Purser, Deputy Solic. Gen., Salt Lake City, for the State of Utah.

Justice Himonas, opinion of the Court:

## INTRODUCTION

¶1 Appellants, Sean Childers-Gray and Angie Rice, petitioned the district court to change their legal sex designations because the designations do not reflect their identities. Supposing such matters implicate a purely legislative prerogative, the district court denied Appellants' petitions.

¶2 The district court was mistaken in its supposition. A person has a common-law right to change facets of their personal legal status, including their sex designation. In recognition of this right, the Utah legislature has statutorily declared that, as a matter of the public policy of this state, when "a person born in this state has a name change or sex change approved by an order of a Utah district court,"[2] they can file such order with the state registrar with an application to change their birth certificate. Utah Code § 26-2-11(1).[3] If the registrar determines the application is complete, the registrar must change the sex on the person's birth certificate. *Id.*

¶3 Associate Chief Justice Lee's dissent disagrees on all fronts, contesting the relevant legislation and the historical practice of Utah courts. The dissent suggests that it is protecting the interests of the State. *See, e.g., infra* ¶ 195 (suggesting that our articulated standard "will control all future proceedings in our Utah courts and will bind the executive branch of our government . . . going forward"). Yet the State does not argue for the principles

---

[2] To be more exact, the relevant statutory provision also extends to orders of "a court of competent jurisdiction of another state or a province of Canada." Utah Code § 26-2-11(1).

[3] Utah Code section 26-2-11 was originally enacted in 1975. *See* 1975 Utah Laws 222; (originally codified at Utah Code § 26-15-16.5 (1975)). In 1981, the legislature re-codified the entire chapter and re-numbered it, resulting in the current citation— section 26-2-11. 1981 Utah Laws 598. Aside from the renumbering, no material change was made to this section. A change was only made in 1995, which included minor linguistic changes. *See* 1995 Utah Laws 676. Neither the parties nor the concurrence or dissents claim any such changes matter. In this opinion, we refer to the section in its current numbering and language unless we explicitly say otherwise.

the dissent advances. In its amicus brief, the State either opposes the dissent's position or presents arguments for why we should not reach such a resolution. Nevertheless, we take care throughout our opinion to respond to the dissent's arguments, which we firmly reject.

¶4    Today, we provide a plain-meaning interpretation of the duly enacted law allowing individuals to change their sex designations. In the process, we explain that Mr. Childers-Gray and Ms. Rice met the requirements—articulated by us today but rooted in common law and applied by Utah district courts and other authorities—for their sex-change petitions to be approved.[4] Accordingly, we reverse and remand with instructions to enter orders granting their sex-change petitions.[5]

---

[4]    Language matters: We address appellants by their appropriate pronouns. The ease with which we could have misgendered them by using opposite-sex pronouns, despite their appearances and pronouncements, amplifies the importance of matching their government identification documents to their held-out identities.

[5] Again, language matters: Appellants and the district court use several different terms to describe the change to legal status or identification requested in the petition. For the convenience of the reader, and without definitively rejecting other terms, we use in this opinion the terms "sex change" and "sex designation change," rather than "gender change." We also note that the legislature has indicated in another context that in Utah, "'sex' means gender." UTAH CODE § 57-21-2(22). We recognize that these terms do "have distinct meanings. 'Gender' generally refers to a social construct based on psychological characteristics that classify an individual as feminine or masculine, while 'sex' generally refers to biological sex as evidenced by chromosomes, genitals, and other physical characteristics." *Gram v. Intelligender, LLC*, CV 10-4210 ABC (VBKx) 2010 WL 11601035, at *1 n.2 (C.D. Cal. Oct. 8, 2010). In this context, we find it noteworthy that while the legislature said that "'sex' means gender," it did not say the opposite, *i.e.*, that gender means sex. Therefore, we assume that by choosing this equation, the legislature, in its wisdom, conferred broader meaning to the term "sex."

**BACKGROUND**

¶5    Sean Childers-Gray[6] is a transgender[7] man who was assigned female at birth. He "lives 100% as a male" and holds himself out as a male to his family, friends, and the public. He was diagnosed with gender identity disorder[8] and underwent hormone therapy to change his physical appearance. At the time of his petition, he had been treated with hormone therapy for more than three years. This therapy significantly changed his voice, body hair growth, and breast tissue, and caused his female organs to no longer function.

---

[6] Mr. Childers-Gray has changed his birth name to reflect his identity.

[7] The American Psychological Association defines *transgender* as "an umbrella term for persons whose gender identity, gender expression or behavior does not conform to that typically associated with the sex to which they were assigned at birth." *Transgender People, Gender Identity and Gender Expression*, AM. PSYCH. ASS'N, https://www.apa.org/topics/lgbt/transgender (last visited April 21, 2021); *see also Transgender*, OXFORD ENG. DICTIONARY ONLINE, https://www.oed.com/view/Entry/247649?redirectedFrom=tra nsgender#eid (last visited April 21, 2021) (defining *transgender* as "[d]esignating a person whose sense of personal identity and gender does not correspond to that person's sex at birth, or which does not otherwise conform to conventional notions of sex and gender"); *Transgender*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("A person whose physical sex at birth differs from the sex with which the person later identifies.").

[8] Appellants do not define "gender identity disorder," but an American Medical Association resolution defines it as "a persistent discomfort with one's assigned sex and with one's primary and secondary sex characteristics, which causes intense emotional pain and suffering . . . ." AM. MED. ASS'N, RESOLUTION 122 (A-08) at 1 (2008), http://www.imatyfa.org/assets/ama122.pdf; *see also F.V. v. Barron*, 286 F. Supp. 3d 1131, 1136–37 (D. Idaho 2018) (citing the American Medical Association's definition of gender identity disorder). Although Mr. Childers-Gray uses the term "gender identity disorder" to describe his diagnosis, we use the term "gender dysphoria" for the reasons we set forth in ¶ 6 n.10.

¶6     Angie Rice[9] is a transgender woman who was assigned male at birth. She "lives 100% as a female" and holds herself out as a female to her family, friends, and the public. She was diagnosed with gender dysphoria,[10] and at the time of her petition's filing, she had been treated with hormone therapy for five years to change her physical appearance.

¶7     Mr. Childers-Gray and Ms. Rice each filed petitions in the district court, seeking orders to change their names and sex, which would allow them to change the designations on their birth certificates.   The   petitions   complied   with   the   requirements

---

[9] Ms. Rice has also changed her birth name to reflect her identity.

[10] Appellants do not define "gender dysphoria" either. However, another court has explained that it is a "clinical medical condition" that "can result from" the emotional stress produced from a gender identity disorder. *F.V.*, 286 F. Supp. 3d at 1136–37. That court also adopted the definition of the American Psychiatric Association for gender dysphoria, which further explains that "[p]eople with gender dysphoria may often experience significant distress and/or problems functioning associated with this conflict between the way they feel and think of themselves (referred to as experienced or expressed gender) and their physical or assigned gender." *Id.* at 1137 n.7 (quoting *What is Gender Dysphoria*?, AM. PSYCHIATRIC ASS'N (Jack Turban, Physician Reviewer, Nov. 2020), https://www.psychiatry.org/patients-families/gender-dysphoria/what-is-gender-dysphoria).

The American Psychiatric Association found that the term "disorder" suggests a "stigma" that can get in the way of "ensur[ing] clinical care" for those who might otherwise seek it. *See* AM. PSYCHIATRIC ASS'N, GENDER DYSPHORIA (2013), https://www.psychiatry.org/File%20Library/Psychiatrists/Pract ice/DSM/APA_DSM-5-Gender-Dysphoria.pdf (noting that DSM-5 "replace[d] the diagnostic name 'gender identity disorder' with 'gender dysphoria'" to "avoid stigma and ensure clinical care for individuals who see and feel themselves to be a different gender than their assigned gender"). We therefore use the term "gender dysphoria" throughout this opinion. We note that other courts have recently done the same. *See, e.g.*, *Hecox v. Little*, 479 F. Supp. 3d 930, 945 (D. Idaho 2020), *appeal docketed*, No. 20-35813 (9th Cir. Sept. 17, 2020).

outlined in Utah Code section 42-1-1, which governs name-change petitions (Utah does not have a statute governing the express content of sex-change petitions). Specifically, the petitions included the reasons for the name and sex changes and statements that Mr. Childers-Gray and Ms. Rice had been residents of the county where they lived for at least one year before filing. *See* UTAH CODE § 42-1-1. In addition, both petitions included letters from a medical doctor stating that appellants had been treated for gender dysphoria and had undergone "the appropriate clinical treatment" for gender transition. The petitions also stated that appellants were not listed on the sex offender registry, involved in any legal proceedings, placed on probation or parole, seeking to avoid creditors, or seeking the name- and sex-designation changes for any fraudulent purpose. Ms. Rice's petition also documented her personal history, the significant emotional distress that she endured in the past when presenting herself as a man, and the negative treatment she endures now because her "documentation doesn't match who" she is.

¶8 The district court granted Mr. Childers-Gray's and Ms. Rice's name-change petitions, ruling that all statutory requirements had been satisfied. But the district court denied their sex-change petitions.

¶9 The district court gave two reasons for denying Mr. Childers-Gray's sex-change petition. First, it held "there is no statute in the State of Utah that sets forth either standards or procedures under which the court may consider such request." The district court found that such lack of legislative guidance meant that a sex-change matter is a nonjusticiable political question. Second, the district court denied the sex-change petition under the name-change standard. It explained that a name-change petition must be denied if it will "affect the legal rights or duties of either the petitioner or anyone else." Applying that standard to sex-change petitions, the district court found that granting the sex-change petition was undoubtedly bound to affect others' rights. It then gave numerous hypotheticals in which a sex change would affect the "rights and duties of others that interact with" Mr. Childers-Gray.

¶10 The district court did not rely on this second reason when it denied Ms. Rice's sex-change petition. It held only that "[t]he procedure for obtaining a sex/gender marker change must be set forth by the legislature," and because it was not, the district

court found itself "prohibited from invading the legislature's prerogative on this issue."

¶11    Appellants appealed the orders denying their petitions for sex changes. We consolidated the cases.[11]

¶12    During oral argument in January 2018, we noted *sua sponte* that appellants come before us unopposed and questioned whether this lack of adversariness deprived us of jurisdiction to hear the case. In November 2018, we issued an order staying this case pending our decision in *In re Gestational Agreement*, a case that also lacked adversariness and in which we expected to address the impact of such posture on our jurisdiction. We issued an opinion in that case in August 2019, *In re Gestational Agreement*, 2019 UT 40, 449 P.3d 69, and consequently requested supplemental briefing from appellants and called for the views of the State, through the Attorney General, under rule 25A(c) of the Rules of Appellate Procedure. We have jurisdiction under Utah Code section 78A-3-102(3)(j).

## STANDARD OF REVIEW

¶13    Although we have never reviewed a district court's decision to grant or deny a petition for sex change, we have reviewed decisions on petitions for name change "under an abuse of discretion standard." *In re Porter*, 2001 UT 70, ¶ 4, 31 P.3d 519. Because name changes and sex changes are analogous, *see infra* ¶¶ 40–43, we also review for abuse of discretion a district court's decision to grant or deny a petition for a sex change. And we review the legal questions underlying the determination for correctness. *See Taylor v. Univ. of Utah*, 2020 UT 21, ¶ 13, 466 P.3d 124.

¶14    "We review questions of statutory interpretation for correctness, affording no deference to the district court's legal conclusions." *State v. Outzen*, 2017 UT 30, ¶ 5, 408 P.3d 334 (citation omitted). And we review "the constitutionality of a statute for correctness, giving no deference to the lower court's interpretation," *State v. Greenwood*, 2012 UT 48, ¶ 26, 297 P.3d 556, presuming "the statute is constitutional" and resolving "any reasonable doubts in favor of constitutionality." *Brown v. Cox*,

---

[11] For the ease of the reader, we treat the consolidated cases in the singular form.

2017 UT 3, ¶ 11, 387 P.3d 1040 (quoting *State v. Drej*, 2010 UT 35, ¶ 9, 233 P.3d 476)).

## ANALYSIS

¶15 We begin with jurisdiction. Sex-change petitions quintessentially ask for a change in a person's legal status or identification. We have "judicial power" to adjudicate sex-change petitions because they seek changes to a petitioner's legal status or identification, and such "function[] w[as] intended by the framers of our constitution to be included in the constitutional grant to the judiciary." *In re Gestational Agreement*, 2019 UT 40, ¶ 13, 449 P.3d 69. And so, we have jurisdiction to adjudicate them.

¶16 With jurisdiction to hear sex-change petitions, we move to the question of a district court's authority to adjudicate them, i.e., whether there is a framework for adjudicating such petitions. Utah district courts have common-law authority, as codified by statute, to adjudicate petitions for a name change. *In re Porter*, 2001 UT 70, ¶ 8, 31 P.3d 519. Utah law presupposes a district court's authority to order name *and* sex changes, *see* UTAH CODE § 26-2-11(1) (referring to "[w]hen a person born in this state has a name change or sex change approved by an order of a Utah district court"), thereby conferring on sex-change adjudication the common-law authority existing with respect to name-change adjudication. *See Maxfield v. Herbert*, 2012 UT 44, ¶ 31, 284 P.3d 647 ("[W]hen a word or phrase is transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it." (internal quotation marks omitted)). Any lack in a statute to detail the content of a sex-change petition has no effect on a district court's authority to adjudicate and approve such a petition because the district court's authority is based on common law and independent from statute. As such, we find ample authority in the district court to adjudicate sex-change petitions.

¶17 We then examine whether there are any constitutional barriers to our adjudication of sex-change petitions. We hold that neither Utah Code section 26-2-11 nor the adjudication of sex-change petitions run afoul of the Utah constitution or separation-of-powers principles.

¶18 Finding jurisdiction, authority, and no constitutional impediment to adjudicating sex-change petitions, we next articulate and explain the test to decide sex-change petitions. In doing so, we refute the test identified by the dissent. Our test has already been used by our district courts, exercising their common-law judgment. The test we articulate borrows from our common-

law jurisprudence about name-change petitions and is adapted to fit sex-change petitions. We conclude that, as a general rule, sex-change petitions should be granted if (1) they are not "sought for a wrongful or fraudulent purpose," *In re Porter*, 2001 UT 70, ¶ 8 (quoting *Isom v. Cir. Ct. of the Tenth Jud. Cir.*, 437 So.2d 732, 733 (Fla. Dist. Ct. App. 1983)), and (2) they are supported by objective evidence of a sex change, which includes, at minimum, evidence of appropriate clinical care or treatment for gender transitioning or change, provided by a licensed medical professional.

¶19 Finally, we apply the test to the petitions before us and conclude Mr. Childers-Gray and Ms. Rice met its requirements. We accordingly reverse and remand with instructions to enter orders granting their sex-change petitions.

## I. WE HAVE JURISDICTION TO HEAR THIS CASE

¶20 Before getting to the meat of the matter, we address our jurisdiction to hear it.[12] We have jurisdiction to hear matters that are within the scope of the "judicial power of the state." UTAH CONST. art. VIII, § 1. Our case law has "traditionally" limited our judicial power "to the adjudication of disputes." *In re Gestational Agreement*, 2019 UT 40, ¶ 12, 449 P.3d 69. So, when "no dispute between opposing parties exists"—that is, when there is a lack of adversariness—we will often, but not always, decline to hear a case.[13] *See id.* ¶¶ 12–13. Recognizing that this case lacks

---

[12] Following the structure of our supplemental briefing order, in this section we only discuss adversariness concerns. We address authority and constitutionality in Parts II and III below.

[13] This court recently engaged in a debate "regarding the source of [the adversariness principle] and the limits of our judicial power." *Salt Lake Cnty. v. State*, 2020 UT 27, ¶ 37 n.44, 466 P.3d 158. And that was not the first time such a debate was had. Justice Pearce, concurring in *In re Gestational Agreement*, , opined that adversariness might well be a prudential and not a jurisdictional concern because the Utah constitution, unlike the federal constitution, does not expressly include the "case or controversy language" as a limit on our judicial power. 2019 UT 40, ¶ 86 (Pearce, J., concurring). And while we find much to commend in Justice Pearce's analysis, we need not reach the issue today. This case, like *In re Gestational Agreement* and *Salt Lake County*, can be resolved without conclusively deciding this

(continued . . .)

adversariness, we asked appellants and the Attorney General for supplemental briefing on two questions:

> (1) Does the lack of adversariness prevent this Court from exercising jurisdiction over this matter? (2) Is an application seeking approval of an amendment to a birth certificate a matter 'intended by the framers of our constitution to be included in the constitutional grant [of power] to the judiciary'? If not, does it resemble other matters our state courts handled at the time of statehood?

(Alteration in original) (citations omitted.)

¶21 The appellants and, notably, the Attorney General as representative of the State provided identical answers: "no" to our first question and "yes" to the second. We agree with their answers, but, as we explain below, not necessarily with all of their reasoning. We hold that we have jurisdiction over sex-change petitions because, historically, Utah courts adjudicated changes to legal status or identification, and they did so without adversariness. And, as this opinion explains, sex-change petitions seek to change the petitioner's legal status or identification. As a result, sex-change petitions are within the grant of judicial power, and we have jurisdiction over them.

*A. Our Constitutional Power Is Not Limited to Adversarial Issues*

¶22 "[A]dversariness does not completely define the scope of our constitutional power." *In re Gestational Agreement*, 2019 UT 40, ¶ 13. Indeed, Utah courts' judicial power includes "functions" that "were intended by the framers of our constitution to be included in the constitutional grant to the judiciary," even if they are "entirely non-adversarial." *Id.* One function that Utah courts have had since even before statehood is the authority to decide name-change petitions—even when the petition lacks adversariness. Sex-change petitions have an identical function to

---

question. And so, again, we leave the "possibil[ity] that, in a future case, a historical analysis of the original meaning of the Utah Constitution may lead us to rethink the way our case law has described the limits of the judicial power" but "decline to revisit that case law unnecessarily here." *Salt Lake Cnty.*, 2020 UT 27, ¶ 37 n.44.

name-change petitions, *see infra* ¶¶ 40, 42, and so we have jurisdiction over them, too.

¶23     This opinion holds that the constitutional grant of power to the judiciary includes jurisdiction over changes to legal status or identification, regardless of the existence (or lack thereof) of adversariness.

¶24     In arguing against the judiciary's jurisdiction to hear non-adversarial matters, the dissent draws a distinction between adverse "*argument*" and adverse "*interests*." *See infra* ¶¶ 161–180. Though we find no need today to conclusively adjudicate the question of whether the Utah Constitution limits our jurisdiction to issues involving adversariness, we will briefly address this argument. The dissent explains that adverse argument is not constitutionally required, given that arguments may be forfeited or waived. *See infra* ¶ 166. So far, we agree. But the dissent next posits that "adverse interests" are "required as a matter of historical practice." *Infra* ¶ 168 (citing Ann Woolhandler, *Adverse Interests and Article III*, 111 N.W. U. L. REV. 1025, 1032 (2017)). In other words, the dissent insists that the existence of adverse interests—whether stated, waived, or forfeited—is a prerequisite for judicial resolution. According to the dissent, cases with adverse interests but no adverse briefing are not non-adversarial but merely "uncontested." *Infra* ¶ 169.

¶25     We disagree on several grounds. To begin, our case law draws no distinction between adverse arguments and interests when determining justiciability. Rather, it looks to whether the courts have otherwise been granted the substantive power to adjudicate the matter, regardless of adversariness. As recently as 2019, we've held "that the traditional principle of adversariness in our justiciability jurisprudence does not apply" in matters in which the courts have been otherwise granted a substantive power.[14] *In re Gestational Agreement*, 2019 UT 40, ¶ 18 (finding that

---

[14] The dissent states that in *In re Gestational Agreement*, this court "*reinforced* the longstanding general rule that our courts lack jurisdiction in the absence of any justiciable controversy between adverse parties." *Infra* ¶ 175 (emphasis added) (quoting *In re Gestational Agreement*, 2019 UT 40, ¶ 12) (internal quotation marks omitted). We disagree with this characterization of the court's opinion in that case. The court recognized the adjudication of adoption rights "to be a *substantive category* over which Utah

(continued . . .)

courts may validate gestational agreements because the "termination and creation of parental rights [is] a substantive power intended to be included in the constitutional grant of judicial power to the courts . . . despite the lack of adversariness in gestational agreement proceedings" (footnote omitted)); *see also Salt Lake Cnty. v. State*, 2020 UT 27, ¶ 37 n.44, 466 P.3d 158 (noting "that a debate exists regarding the source of th[e] principle [against deciding abstract questions] and the limits of our judicial power").

¶26 Perhaps overlooking this case law, the dissent significantly relies on a law review article from which it draws the distinction and respective jurisdictional requirements of legal argument versus interests. *See infra* ¶¶ 168–72. While we respect Professor Woolhandler's scholarship, it is not binding on this court.

¶27 Further, the dissent's distinction between adverse "argument" and "interests" swallows itself. The dissent refutes the notion that naturalization proceedings are non-adversarial, pointing to *Tutun v. United States*, 270 U.S. 568 (1926), for the proposition that "[t]he United States is always a possible adverse party" in such proceedings. *Infra* ¶ 174 (alteration in original). But a court could always identify a "possible" adverse party for any matter before it. The dissent's examples regarding the societal consequences of today's decision, *infra* ¶ 144, provide an example of how mere speculation of possible adverse interests might result in a judge's unilateral identification of adverse interests beyond the briefing by the parties and amicus curiae. To put it another way, the dissent differentiates between "possible adverse part[ies]" and adverse parties that actually appear to represent their interests, ultimately equating "possible adverse part[ies]"

_____

courts had historical power to preside, notwithstanding the absence of a controversy between adverse parties." *In re Gestational Agreement*, 2019 UT 40, ¶ 13 (emphasis added). To this end, the court explained "that the courts had sufficient power to participate in proceedings that lacked a dispute between opposing parties," *id.* ¶ 16—at least in proceedings involving parental rights—and did not further consider whether such proceedings are non-adversarial or merely "uncontested." And so, we cannot agree with the dissent's belief that *In re Gestational Agreement* reinforced any adversariness requirement.

with adverse interests. This conception of adverse interests is so expansive as to obviate the need for an explicit requirement of "justiciable controversy."

¶28    The State and appellants also argue that we have jurisdiction over this case because there is a *potential* for adverse litigation here, which is sufficient to invoke "case or controversy" jurisdiction under United States Supreme Court precedent. *See Tutun*, 270 U.S. at 577.

¶29    It is true that, unlike the statute in *In re Gestational Agreement*, the statute here does not explicitly require nonadversariness. *Compare* UTAH CODE § 78B-15-803(2)(e) (2008),[15] *with id.* § 26-2-11, *and id.* § 42-1-1. But because sex-change petitions resemble other petitions over which Utah courts had jurisdiction at founding, we have jurisdiction to address this matter and therefore need not address the potential adversariness argument. *See infra* ¶¶ 40–43. We do note, however, the existence of a serious debate on this topic.[16]

---

[15] This statute was amended in 2020, after our disposition of *In re Gestational Agreement*, resulting in a renumbering. The relevant provision is now § 78B-15-803(2)(d).

[16] *Compare* James E. Pfander & Daniel D. Birk, *Article III Judicial Power, the Adverse-Party Requirement, and Non-Contentious Jurisdiction*, 124 YALE L.J. 1346, 1394, 1402 (2015) (arguing that the language in *Tutun* was "a stray statement," only "hypothesiz[ing]" this ground for its decision, and concluding that "it does not make sense to try to explain away ex parte proceedings through the possible adversary theory"), *and* Michael T. Morely, *Consent of the Governed or Consent of the Government? The Problems with Consent Decrees in Government-Defendant Cases*, 16 U. PA. J. CONST. L. 637, 669 (2014) (stating that *Tutun* used the "possible adverse party" language "in passing . . . but did not delve further into the question of adverseness," and that "[t]his approach seems inconsistent with the Court's core adverseness jurisprudence"), *with* Woolhandler, *Adverse Interests and Article III*, 111 NW. U. L. REV. at 1056 (arguing that naturalization petitions, such as those at issue in *Tutun*, "are perhaps Pfander and Birk's best example of non-contentious jurisdiction, but the Court explicitly approved the practice as appropriate under Article III

(continued . . .)

¶30    The dissent appears to overlook this debate, insisting instead that we are establishing that "our courts can adjudicate any case over which we have been granted . . . substantive power *by the legislature*, at least where the decision amounts to a change in a person's legal status or identification." *Infra* ¶ 185 (emphasis added) (quoting this opinion) (citation omitted) (internal quotation marks omitted). Not so. As we emphasized in *In re Gestational Agreement*, this "substantive power" does not flow from the legislature; rather, it was intended and understood "to be included in the constitutional grant of judicial power to the courts . . . despite the lack of adversariness." 2019 UT 40, ¶ 18. In sum, we stand behind our position that adversariness is not a requirement for justiciability in matters involving changes to legal status or identification.

*B. Utah Courts Historically Have Had Jurisdiction to Adjudicate Changes to Legal Status or Identification*

¶31    Having shown that adversariness is not a limitation on the constitutional grant of power to the courts, at least with respect to a person's legal status or identification, we now turn to whether adjudication of sex-change petitions is within the "judicial power" granted to the judiciary by article VIII, section 1 of the Utah Constitution. We first explain why our supplemental briefing order, asking if our framers could have intended courts to have a constitutional grant to approve "an amendment to a birth certificate," was not quite the right inquiry. Then we address the proper inquiry—whether our progenitors understood the courts to have power to hear petitions for sex change. We hold that, while sex-change petitions were not specifically contemplated at the time of statehood, the judicial power nonetheless includes the power to hear such petitions because they "resemble other matters our state courts handled at the time of statehood," specifically name-change petitions.

¶32    Whether anyone around at the time of the adoption of the Utah Constitution intended to include *adjudication of a petition to amend a birth certificate* in the grant of judicial power is the

only after [statutory] provisions for notice to, and potential appearance by, the United States").

wrong inquiry in this case.[17] That is because sex-change and name-change petitions do not ask the court to approve an amendment to a birth certificate. Rather, sex-change and name-change petitions today—like the historical name-change petitions we discuss below—ask a court to approve a legal change to the petitioner's name or sex, *i.e.*, a change of legal status or identification. It is only after the court approves that change that a petitioner may choose to request an amendment to their birth certificate from the state registrar. UTAH CODE § 26-2-11.

¶33    The proper inquiry, thus, is whether a *petition for sex change*—not a petition to amend a birth certificate—is a matter "intended by the framers of our constitution to be included in the constitutional grant [of power] to the judiciary." (Alteration in original.)

¶34    That brings us to the next step of our inquiry. We show that petitions for a sex change "resemble other matters our state courts handled at the time of statehood": petitions for name changes. Crucial to this step is the understanding that "[t]he Utah Constitution enshrines principles, not application of those principles." *South Salt Lake City v. Maese*, 2019 UT 58, ¶ 70 n.23, 450 P.3d 1092. We employ analogies not because doing so is necessary to discern a principle, but because it helps us to better understand those fundamental principles. Accordingly, we discuss Utah courts' historical power to preside over name-change petitions. Then we explain that the adjudication of a name-change petition, when it comes right down to it, is merely one part of a broader "substantive category over which Utah courts had historical power to preside": the adjudication of

---

[17] Neither the framers of our constitution nor the general public specifically contemplated including adjudication of a petition to amend a birth certificate in the judiciary's constitutional grant because, simply put, birth certificates did not exist in 1896. And so, birth-certificate changes were not contemplated at the time. *See Birth Records*, UTAH DIV. OF ARCHIVES & RECORDS SERV., https://archives.utah.gov/research/guides/birth.htm#pre (noting that the Utah Department of Health introduced birth certificates in 1905 for all individuals born in the state and linking relevant databases) (last visited on April 21, 2021).

changes to the legal status or identification of an individual. *In re Gestational Agreement*, 2019 UT 40, ¶ 13. As a result, adjudicating changes to the legal status or identification of individuals was a "function[] . . . intended by the framers of our constitution to be included in the constitutional grant to the judiciary." *Id.* As we explain below, sex-change petitions are petitions to change the legal status or identification of an individual because they are analogous to name-change petitions, and so adjudicating them is a function that falls squarely within the judicial power.

¶35    To put it simply, name-change petitions seek to change the legal status or identification of an individual because a name is one of an individual's numerous legal attributes. These legal attributes, some of which are indicated on a birth certificate, may serve as conditions that shape an individual's opportunities and obligations, such as marital or civil status. *See, e.g., Obergefell v. Hodges*, 576 U.S. 644, 669–70 (2015) ("[J]ust as a [married] couple vows to support each other, so does society pledge to support the couple . . . . [States] have throughout our history made marriage the basis for an expanding list of governmental rights, benefits, and responsibilities."). Or they may serve for purposes of identification, such as name, sex, and age or birthdate. *See, e.g., State v. Chism*, 2005 UT App 41, ¶ 18, 107 P.3d 706 (noting that the date of birth reflected on a state-issued identification card "is reliable and presumptively establishes the bearer's age despite his or her somewhat younger physical appearance"); *infra* ¶ 196 n.94 (noting that a birth certificate "serve[s] as proof of an individual's age, citizenship, status, and identity" (alteration in original) (citation omitted)). Thus, information contained in a government-issued identification document—name, sex, date of birth, permanent address—has legal significance.

¶36    Before evaluating the similarities between sex-change and name-change petitions, we address the history of Utah courts' adjudication of name-change petitions. In Utah, an individual has a "common law right to adopt another name at will." *In re Porter*, 2001 UT 70, ¶ 8, 31 P.3d 519; *In re Cruchelow*, 926 P.2d 833, 834 (Utah 1996); *accord Moskowitz v. Moskowitz*, 385 A.2d 120, 122 (N.H. 1978) ("[A]t common law a person could adopt another name at will."); *Smith v. U. S. Cas. Co.*, 90 N.E. 947, 950 (N.Y. 1910) ("The elementary writers are uniform in laying down the rule that at common law a man may change his name at will."); 57 AM. JUR. 2D *Name* § 16 (2020) ("A person has a common-law right to assume or use any name that he or she lawfully chooses."); G.S.

Arnold, *Personal Names*, 15 YALE L.J. 227, 229 (1906) ("[W]ithout statutes, any person may at will change [their] name.").

¶37 At common law, the right to change one's name did not require state assistance. *See Smith*, 90 N.E. at 950 ("At common law a man may lawfully change his name, or by general usage or habit acquire another name than that originally borne by him, and this without the intervention of either the sovereign, the courts, or Parliament." (quoting 21 AM. & ENG. ENCYC. OF LAW (2d Ed.) 311)). But state recognition, through courts, of a name change gave "greater sanction to it, and ma[de] it more notorious." *Davies v. Lowndes* (1835) 131 Eng. Rep. 1247, 1255. Consequently, courts have long held the common-law authority to adjudicate this individual right. *See*, *e.g.*, *Bearbrook v. Read* (1600) 1 Brownl. & Golds. 47 ("The name of Confirmation must stand, for Sir *Francis Grady* was christened *Thomas*, and confirmed *Francis*, by that name he must be called.").

¶38 State legislatures have enacted procedures for courts to adjudicate name-change petitions. These statutes do "not repeal the common law by implication or otherwise"; rather, they serve as powerful affirmations of, and in aid of, the courts' common-law authority. *Smith*, 90 N.E. at 950 (citation omitted); *see also In re Porter*, 2001 UT 70, ¶ 8 ("Statutes similar to sections 42-1-1 and -2 are recognized to merely provide a codified process to aid an individual's common law right to adopt another name at will." (citing *In re Cruchelow*, 926 P.2d at 834)); *In re Knight*, 537 P.2d 1085, 1086 (Colo. App. Ct. 1975) ("Statutes setting forth procedures to be followed in changing a name merely provide an additional method for making the change."); *Moskowitz*, 385 A.2d at 122 (holding that the statutes did not "abrogate or supersede the common law, but merely affirm[ed] and aid[ed] it").

¶39 Utah's territorial legislature was no different: It formally vested the right to adjudicate name-change petitions with Utah courts. *See* Of Change of Names, § 1128, 1884 Utah Laws 354 ("Applications for change of names must be heard and determined by the district courts."); *see also id.* § 1129; Of Change of Names, §§ 3861–62, 1888 Utah Laws 422. The State legislature did the same. *See* Names, §§ 1545–47, 1898 Utah Laws 394. But, like in all other jurisdictions, these legislative actions were "merely" to "aid" the common-law right. *In re Cruchelow*, 926 P.2d at 834. And our courts have continuously used common-law

standards to adjudicate this right. *See In re Porter*, 2001 UT 70, ¶¶ 7–11; *In re Cruchelow*, 926 P.2d at 834–35.[18]

---

[18] Before 1884, the territorial legislature had heard name-change applications and approved them in the form of "private laws." *See, e.g.*, Change of Names Act Mar. 13, 1884, ch. LII, 1884 Utah Laws 136 (changing the names of six people); Name Change Act of Feb. 20, 1878, 1878 Utah Laws 166 (changing the name of Ephraim Powell to Ephraim Brettel Bolton); Name Change Act of Jan. 30, 1872, ch. I, § 1, 1872 Utah Laws 1 (surname change of five people). But the 1896 Constitution expressly took away any authority that the territorial legislature might have had to change names. UTAH CONST. art. VI, § 26(2) (1896) ("The Legislature is prohibited from enacting any private or special laws . . . [c]hanging the names of persons.").

This historical detail raises the question of whether before 1884, name-change petitions were of a legislative province rather than a judicial one. The answer is no.

Aside from the sources we describe above that point to courts' common-law authority over name-change petitions, we find support for this proposition in our territorial case law about divorce decrees (another personal legal status change). Although we have no case law from the period addressing name changes, we do have case law about divorce decrees—another area forbidden for legislative action in the 1896 Constitution. *See* UTAH CONST. art. VI, § 26(1) (1896). Our territorial supreme court explained that any legislative divorce decree was "granted in the exercise of judicial power; that they were recognized as judicial subjects and not as legislative." *In re Est. of Higbee*, 5 P. 693, 697 (Utah 1885). And our early case law suggests that the territorial legislature had invaded the judicial department's functions on other occasions. *See, e.g.*, *In re Handley's Est.*, 49 P. 829, 831 (Utah 1897) ("If we were to affirm the validity of the law in question, we would, in effect, say that the legislature may exercise judicial powers.").

Building on *Higbee*, it is clear that article VI, section 26 of the 1896 Utah Constitution was meant to respect separation of powers and was mandated by article V, section 1, which established three separate departments of government and forbade any department from "exercis[ing] any functions appertaining to either of the others." UTAH CONST. art. V, § 1. Therefore, if anything can be

(continued . . .)

*C. We Have Jurisdiction to Adjudicate Sex-Change Petitions Because They Are Changes to Legal Status or Identification*

¶40    Having settled the question of this court's power to adjudicate non-adversarial name-change petitions as changes to legal status or identification, we turn to sex-change petitions. We hold that sex-change petitions are likewise within the judiciary's jurisdictional purview. Sex-change petitions are closely analogous to name-change petitions because they are both changes to a person's legal status or identification. *See, e.g.*, *In re Heilig*, 816 A.2d 68, 82 (Md. 2003) (stating that actions to change incorrect information on a person's birth certificate "relate principally to the legal status or identification of an individual"). At birth, a third party gives a person's name and designates their sex. But a person experiencing gender dysphoria later in life may seek to update their legal status or identification by petitioning for a name or sex change. These changes are not just symbolic; they help avoid the confusion that can result when people hold themselves out as having one name or as being one sex but have government identification that says differently.[19]

¶41    Other courts have observed the similarity between name changes and sex changes and have deduced from it that the procedures to effect such changes should also be similar. *See, e.g.*, *Radtke v. Misc. Drivers & Helpers Union Loc. No. 638 Health, Welfare, Eye & Dental Fund*, 867 F. Supp. 2d 1023, 1025–26, 1033 (D. Minn. 2012) (explaining that Wisconsin Statutes section 69.15(1) provides that a birth-certificate amendment could be made by the state registrar if a court issued an order providing for "name change with sex change," and consequently mentioning that a Wisconsin state court decision granted such order); *In re McDannell*, 2016 WL 482471, at *8 (Ct. Com. Pl. Del. Feb. 5, 2016) (holding that "since the Court of Common Pleas is vested with the authority to change names, it is only logical that it is a court of competent jurisdiction to consider the petition [for sex change]" when both changes are

---

learned from the legislative acts granting name changes, it is that for a limited time our territorial legislature performed a judicial function, which it expressly disclaimed in the decade leading up to, and in, the Utah Constitution.

[19] Indeed, condoning such confusion by refusing a valid petition for a name or sex change would obviate the very purpose of legal identification. *See supra* ¶ 35.

stated together in a regulation); *In re Change of Birth Certificate*, 22 N.E.3d 707, 708–09 (Ind. Ct. App. 2014) (explaining that the courts have authority to adjudicate both changes because of general statutory treatment of "additions to or corrections in a certificate of birth"); *In re Heilig*, 816 A.2d at 82–83 (equating the two changes). We do the same.

¶42    The dissent resists the analogy between name changes and sex changes, *see infra* ¶¶ 181–83, suggesting that name change proceedings are a unique "carve-out." *Infra* ¶ 183. But such is not the nature of reasoning by analogy. Our analogy rests on the *function* shared by name- and sex-change petitions—that is, changes to legal status or identification. Buttressing our analogy is that the statute positions name and sex change jointly, UTAH CODE § 26-2-11, and that other courts before us have found the analogy compelling and relevant. And in another exchange with the dissent's author, we explained that "analogies only require 'similar[ity] in *some* ways.' Requiring identical circumstances obviates our ability to use analogies." *Ipsen v. Diamond Tree Experts, Inc.*, 2020 UT 30, ¶ 19 n.13, 466 P.3d 190 (first alteration in original) (emphasis added) (quoting *Analogy*, BLACK'S LAW DICTIONARY (11th ed. 2019)). By way of example, in the past we held that "parental termination proceedings" are "'analogous to [a] court's termination of the marriage relationship between a husband and wife.'" *D.A. v. State (In re W.A.)*, 2002 UT 127, ¶ 22, 63 P.3d 607 (alteration in original) (quoting *In re Interest of M.L.K.*, 768 P.2d 316, 319 (Kan. Ct. App. 1989)). We do not see these two proceedings as identical. Instead, we base the analogy on the fact that "[i]n both custody and termination proceedings, the court principally determines where and with whom a child should or should not live." *In re Interest of M.L.K.*, 768 P.2d at 319. The same is true in this case. The district court is called to approve a change in a designation both in the name- and sex-change context. Likewise, our search here is for *analogies* to situations that *would have* been understood to be "included in the constitutional grant of judicial power to the courts," *In re Gestational Agreement*, 2019 UT 40, ¶ 18, such that we can appropriately apply the existing common law to those situations. We do not search for our

forebearers' specific understanding of the current situation.[20] If we had that, we would not need to use analogies.

¶43 In summary, deciding a petition for sex change, much like one for a name change, involves adjudication of a change in the legal status or identification of an individual. Our progenitors intended for the adjudication of a person's legal status or identification to be "a substantive power . . . included in the constitutional grant of judicial power to the court." *Id.* And so, "it is appropriate for our courts" to adjudicate changes to the legal status or identification of an individual—specifically, name- and sex-change petitions—even if they lack adversariness.[21] *See id.*

---

[20] In further support of the analogy, we note that this court spoke broadly in *In re Gestational Agreement*, recognizing that "[c]ertain functions that our courts perform may be both entirely non-adversarial and still appropriately fall within the 'judicial power.'" 2019 UT 40, ¶ 13.

[21] The dissent chides us for not inviting adversarial or amicus briefing. *Infra* ¶¶ 198–200. But we ordered supplemental briefing on several key constitutional questions. The order solicited the views not only from the petitioners but also from the Attorney General's Office on the questions presented. All supplied supplemental briefing, and, notably, the views of the Attorney General in its amicus brief were largely in line with the views expressed by the court today. The dissent is advocating for yet another round of briefing, which would significantly delay the resolution of this three-year-old matter. That is something we are unwilling to do.

But our disinclination to engage in another round of briefing must not be misunderstood as a prioritizing of certain interests over others. We do not outright reject the possibility that certain sex-change petitions may involve adverse interests. Even though lack of adversariness is not a bar to our jurisdiction in changes to legal status or identification, adverse interests may certainly play a role, though not in the way the dissent suggests: If a third party's rights are affected by a court's order in a name- or sex-change petition, the third party may have standing to file suit with respect to the specific interest affected. *See, e.g., Parents for Priv. v. Dallas Sch. Dist. No. 2*, 326 F. Supp. 3d 1075, 1081–82 (D. Or. 2018) (implicitly finding standing for cisgender students and their parents who sued the school district to enjoin it from enforcing its

(continued . . .)

Therefore, we have jurisdiction to resolve this appeal, and we do so now.

## II. UTAH COURTS HAVE AUTHORITY TO ADJUDICATE SEX-CHANGE PETITIONS

¶44    Having established our jurisdiction over this case, we turn to whether Utah courts have authority to hear sex-change petitions. By authority here we mean a framework that allows Utah courts to adjudicate a particular matter—in this case, sex-change petitions. Such framework can be statutory- or common-law-based. This question is different than our jurisdictional inquiry above in Part I, which focuses on whether a Utah court has judicial power to hear a non-adversarial case, like a name- or sex-change petition.

¶45    The district court here held that it lacked authority to adjudicate the petitions and denied them. In its order denying Mr. Childers-Gray's petition, it explained that there is "no statute in the State of Utah which sets forth either standards or procedures under which the court may consider such" petition. The district court concluded that this legislative silence meant that the "standards or procedures" "have simply not yet been determined." And in denying Ms. Rice's petition, the district court stated that because of these reasons, "it does not have the authority to grant the request." Appellants argue that district courts do have the authority to adjudicate sex-change petitions. We agree with appellants and conclude that the district court erred.

¶46    The legislature has provided through statute that an individual can petition for a sex change and that district courts have jurisdiction to decide such a petition. The plain language of the statute is "the first step of statutory interpretation." *State v. Malo*, 2020 UT 42, ¶ 22, 469 P.3d 982 (quoting *Garrard v. Gateway*

---

policy allowing transgender students to use the "restrooms, locker rooms, and showers that match their gender identit[ies]" on a number of claims (excluding a claim against federal defendants for violation of the Administrative Procedure Act)). In other words, if there comes a time when adverse interests ripen, the judicial system will address those rights. We see no reason in prohibiting our jurisdiction over sex-change petitions merely in anticipation of currently unripe interests.

*Fin. Servs., Inc.*, 2009 UT 22, ¶ 11, 207 P.3d 1227). Here, the plain language of Utah Code section 26-2-11 presupposes judicial authority to adjudicate sex-change petitions. Utah Code section 26-2-11(1) states that "[w]hen a person born in this state has a name change or sex change approved by an order of a Utah district court . . . a certified copy of the order may be filed with the state registrar with an application form provided by the registrar." This language unambiguously assumes there is judicial authority over the adjudication of name- and sex-change petitions. It purports to grant the district courts no new powers. Thus, all that Utah Code section 26-2-11(1) does is, as the Attorney General eloquently put it in its amicus briefing, "assume[] that courts have preexisting jurisdiction to address name- and sex-change petitions." Our "judicial humility . . . requires us to refrain from diminishing" this assumption. *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1753 (2020).

¶47 The statute aids courts in the exercise of their jurisdiction to decide petitions for name and sex changes, and though it does not provide a test to do so, this is not a bar to our authority. That neither Utah Code section 26-2-11 nor any other statute contains explicit standards or procedures for petitions for sex change is of no moment because we find that "the legislature did not intend" such silence to obviate the assumption that district courts have the authority to adjudicate sex-change petitions. *See Cox v. Laycock*, 2015 UT 20, ¶ 41, 345 P.3d 689.

¶48 Approaching this gap-filling assignment, we "seek the intent of the legislature," *id.* ¶ 42, because "[i]t is the duty of this court, according to its best knowledge and understanding, to declare the law as it finds it, and determine the intent and purpose thereof from the language used by the Legislature in expressing such purpose and intention." *Eames v. Bd. of Comm'rs*, 199 P. 970, 972 (Utah 1921). We do so by "analyz[ing] the act in its entirety and harmoniz[ing] its provisions in accordance with the legislative intent and purpose." *Laycock*, 2015 UT 20, ¶ 42 (quoting *Mariemont Corp. v. White City Water Improvement Dist.*, 958 P.2d 222, 225 (Utah 1998)).

¶49 The legislature's choice to address name and sex change in tandem is a determinative feature of how district courts should address sex-change petitions and of our gap-filling mission. Of much importance in this decision is the original statutory text from 1975: "Whenever a person born in this state has their name *and/or* sex change approved by an order of a court [of any State or

U.S. Territory,] . . . a certified copy of the court order may be filed with the office of the state registrar upon an application form provided by such registrar." 1975 Utah Laws 222 (emphasis added). The statute then went on to direct the Board of Health to "establish fees to be received for preparation of . . . amended birth certificates provided in [the original statutory provision]." *Id.*

¶50 The legislature knowingly and purposefully combined name and sex changes together. "[W]hen a word or phrase is transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it." *Maxfield v. Herbert*, 2012 UT 44, ¶ 31, 284 P.3d 647 (citation omitted) (internal quotation marks omitted). When the legislature transplanted "name change" from the common law, it statutorily planted both "sex change" and "name change" in the latter's "old soil." Accordingly, it meant for the same type of evaluation to control in both changes. And so we fill the gap in standard for sex-change adjudication with the common-law principles that control name-change adjudication, with the appropriate adjustments, to "give effect to the legislature's intent in light of the purpose that the statute was meant to achieve." *Monarrez v. Utah Dep't of Transp.*, 2016 UT 10, ¶ 11, 368 P.3d 846 (quoting *Biddle v. Wash. Terrace City*, 1999 UT 110, ¶ 14, 993 P.2d 875). In filling this statutory gap with common-law procedure, we are merely fulfilling our judicial duty to give effect to—not to usurp—the statute.[22]

_____

[22] Our cases state that our common-law authority is not dependent on or limited by a statutory provision unless it clearly says so. *See, e.g.*, *Anderson v. Bell*, 2010 UT 47, ¶ 16 n.5, 234 P.3d 1147 (explaining that not "every instance that a statutory scheme and the common law converge" will "necessarily mean the legislature has abolished the common law"), *superseded on other grounds by statute*, UTAH CODE § 20A-9-502; *Williamson v. Farrell*, 2019 UT App 123, ¶ 17, 447 P.3d 131 (holding that district courts "retain common-law authority" to adjudicate declaratory judgments "even apart from their authority set out in" statute). Indeed, "we assume, absent a contrary indication, that the legislature intends its statutes to work in tandem with our case law, and we reconcile the common law with statutory law whenever possible." *Hill v. Nakai* (*In re Est. of Hannifin*), 2013 UT 46, ¶ 36, 311 P.3d 1016 (Durham, J., dissenting) (relying on *Navajo Nation v. State* (*In re Adoption of A.B.*), 2010 UT 55, ¶ 33, 245 P.3d

(continued . . .)

¶51    In the name-change context, the Utah Code works in tandem with our common-law authority to adjudicate name changes. *See supra* ¶¶ 36–39. Utah Code section 42-1-1 enumerates the content of a name-change petition, and section 42-1-2 tells the court when it may grant a name-change order. Its plain language requires the district court to determine, among other things, whether the petitioner has presented adequate proof that *proper cause* exists for granting the name change. *Id.* But it is our case law that imbues the term "proper cause" with meaning, using common-law precedents. Indeed, we have held that "proper cause" means that a petition is not "sought for a wrongful or fraudulent purpose." *In re Porter*, 2001 UT 70, ¶ 8, 31 P.3d 519 (quoting *In re Cruchelow*, 926 P.2d 833, 834 (Utah 1996)). This standard is not mentioned in the statute, but it does not matter because the statute, as this court explained in *In re Porter*, "merely provide[s] a codified process to aid [the] common law right to adopt another name at will." 2001 UT 70, ¶ 8; *see also In re Cruchelow*, 926 P.2d at 834.

¶52    Similarly, we have injected meaning into statutory tests based on common-law principles in other areas, such as marital status and declaratory judgments. *See Whyte v. Blair*, 885 P.2d 791, 794–95 (Utah 1994) (holding that "in determining whether a relationship satisfies the requirements of [the common-law marriage statute], numerous factors should be considered," before turning to explain these factors; as common-law principles, these factors are distinct from the enumerated statutory elements and indicate the kind of evidence that may serve to meet the statutory elements); *Williamson v. Farrell*, 2019 UT App 123, ¶ 17, 447 P.3d 131 (mentioning that the "four 'threshold elements' for

711; *Olseth v. Larson*, 2007 UT 29, ¶ 39, 158 P.3d 352; *Bishop v. GenTec Inc.*, 2002 UT 36, ¶ 10, 48 P.3d 218). But, "[i]n the absence of applicable constitutional or statutory authority, Utah courts employ the common law." *Spackman ex rel. Spackman v. Bd. of Educ.*, 2000 UT 87, ¶ 20, 16 P.3d 533; *see also* UTAH CODE § 68-3-1 (adopting the common law of England); *State v. Rowan*, 2017 UT 88, ¶ 30, 416 P.3d 566 (Himonas, J., concurring) (explaining that if this court repudiated the state exclusionary rule, there would be "a void that would have to be filled by our courts' exercising their common law authority unless and until the legislature chose to intervene").

declaratory judgment actions" used by courts "do not appear anywhere in the Act").

¶53    We are not "mak[ing] pure policy out of whole cloth." *Infra* ¶ 255. The fact that a field of law, such as sex-change petitions, is not governed by its own common law is no bar to our authority. Our cited cases do not stand for the proposition that when a term is "transplanted" with its "old soil" to a new legal context, *only* that term may be planted in that "soil." Rather, our only established limitation is that we do not engage in a common-law analysis that conflicts with statutory guidance. *See Rawcliff v. Anciaux*, 2017 UT 72, ¶ 14, 416 P.3d 362 ("[T]he common law assists in defining the scope of the [fiduciary] duty, as long as the duty itself is identified by the plain language of the statute and our common law does not conflict with any statutory guidance on the scope of that duty.") None of this disagrees with the dissent that our case law "presuppose[s] the existence of established bodies of common law to be *retained*, or to avoid *abolishing*." *Infra* ¶ 248. Of course, the common law must exist in order for a court to engage with it, but such a proposition does not preclude our ability to apply traditional bodies of common law to analogous and statutorily related terms. Doing so is not "mak[ing] policy out of whole cloth" but rather is applying existing name-change common law to the statutorily and precedentially related sex-change field.[23]

---

[23] Because there is no common law specific only to sex-change petitions, the dissent posits that the "administrative concept" of sex change applies. *Infra* ¶ 278. The dissent relies on *New Park Mining Co. v. State Tax Comm'n*, 196 P.2d 485 (Utah 1948), and *Fed. Deposit Ins. Corp. v. Phila. Gear Corp.*, 476 U.S. 426 (1986), to support its theory that "[w]here our legislature uses terms that have a settled 'administrative interpretation' in a particular field, that interpretation is understood to be carried forward in the statute." *Infra* ¶ 277. But the Office of Vital Records and Statistics has never made such an interpretation. Further, the Office is not tasked with making any decisions regarding sex designations; rather, it responds without discretion to court orders pursuant to Utah Code section 26-2-11(2). There is no room for any administrative interpretation under this statutory regime. Further, sex is not designated in the first instance by the Office; rather, sex is designated (primarily) by medical professionals who

(continued . . .)

¶54    Neither are we running afoul of the non-delegation doctrine. As discussed in detail above, *supra* ¶¶ 31–39, the legislature has recognized the jurisdiction of the courts to adjudicate non-adversarial changes to legal status or identification. We are not "suggesting that there is no legislative standard that governs" sex-change petitions, *infra* ¶ 306, simply because we may properly apply the common law associated with name-change petitions. The legislature may choose to enact a substantive standard for sex changes at any time, but so far it has not done so.[24] Section 26-2-11 is a statute enacted in aid of the court's common law authority. And should the legislature find issue with our decision today, it has the authority to override the common law with statute. Thus, we are not overstepping our constitutionally-delegated powers but rather acting with the authority the legislature has passed to the courts under section 26-2-11. We find additional support for our conclusion in the manner that other jurisdictions, including those with similar statutes, have addressed their authority to adjudicate sex-change petitions.

¶55    The Maryland Court of Appeals (Maryland's highest court) addressed a statute that ordered the secretary of health to amend a birth certificate "[u]pon receipt of a certified copy of an order of a court of competent jurisdiction indicating the sex of an individual born in this State has been changed . . . ." *In re Heilig*, 816 A.2d 68, 82 (Md. 2003) (alteration in original) (quoting MD. CODE ANN., Health – General, § 4-214(b)(5) (West 2002) (amended 2015)).[25] The Court explained that "the statute, along with other statutes in the subtitle of which it is a part, evidences a clear

---

presumably are not versed in the nuances of administrative definitions in the law.

[24] The legislature unquestionably knows how to place substantive restrictions on our exercise of common law power. For example, with respect to name-change petitions, the legislature has provided in Utah Code section 77-41-105(8)(a) that a court may only grant a name change of someone on the sex and kidnap offender registry "if the name change is not contrary to the interests of the public." *See also infra* ¶ 80.

[25] In 2015, Maryland opted to allow persons to change their sex designation on their birth certificate through an administrative process, without a court order. *See* 2015 Md. Laws 2538 (codified at MD. CODE ANN., Health – General, § 4-214(b)(5) (West 2021)).

recognition by the General Assembly that a person's gender can be changed and that there are courts with jurisdiction to consider and determine whether that has occurred." *Id.* at 82.

¶56    The Indiana court of appeals dealt with a statute vaguer than section 26-2-11 in *In re Change of Birth Certificate*, 22 N.E.3d 707, 709 (Ind. Ct. App. 2014). The Indiana statute allowed "[t]he state department [to] make additions to or corrections in a certificate of birth on receipt of adequate documentary evidence." *Id.* at 708 (quoting IND. CODE § 16-37-2-10(b)). The court found that this language "provides general authority for the amendment of birth certificates, without any express limitation (in the statute or elsewhere) regarding gender amendments." *Id.* at 709. The court then relied on that statute, "as well as the inherent equity power of a court of general jurisdiction," to hold that trial courts have "authority to grant" sex-change petitions. *Id.*; *see also In re Clemmer*, 135 N.E.3d 168, 2019 WL 5382509, at *1 (Ind. Ct. App. Oct. 22, 2019) (granting a name- and sex-change petition).

¶57    We recognize that not all courts have found authority in such generally articulated statutes as did the Maryland and Indiana courts. But we find those courts' decisions distinguishable. In *In re McReynolds*, the Texas Court of Appeals interpreted a statute that provided that to prove their identity and age when applying for a marriage license, a person may present "a court order relating to the applicant's name change or sex change." 502 S.W.3d 884, 887 (Tex. Ct. App. 2016) (quoting TEX. FAM. CODE § 2.005(b)(8)). The Texas court of appeals opined that because the legislature enacted procedures for name-change petitions but not for sex-change petitions, it did not "intend[] to create a new justiciable right of action for a sex change order" and that the legislature "would not have left it to the judicial branch to define the right's substantive elements and procedures." *Id*. To support its outcome, the court then revisited and distinguished several prior Texas decisions that presupposed such authority. *Id.* at 889–90. But, as the court of appeals itself explained, its decision did not foreclose sex changes in the state. *Id.* at 885 n.2. Unlike in Utah, Texas law does not seem to require a court order to amend a birth certificate. Rather, Texas Health and Safety Code section 191.028(b) provides for an administrative procedure to amend a birth certificate. The statute prescribes that "[a]n amending certificate may be filed to complete or correct a record that is incomplete or proved by satisfactory evidence to be inaccurate. The amendment must be in a form prescribed by the department." TEX. HEALTH & SAFETY CODE ANN. § 191.028 (West 2019); *see also*

*McReynolds*, 502 S.W.3d at 885 n.2. Additionally, the decision ignores the endurance of the common-law right of a person to change their name and, consequently, their legal status, even when there is no legislation on the matter. Therefore, the basis for adjudicating sex-change petitions is different in Utah.

¶58 At least one Ohio court has also held that courts may not adjudicate sex-change petitions. *See In re Ladrach*, 513 N.E.2d 828, 832 (Stark Cnty. Ohio Prob. Ct. 1987). But Ohio law is manifestly different than Utah law. Indeed, an Ohio statute grants the *executive* the authority to amend birth certificates for error correction. *See* OHIO REV. CODE ANN. § 3705.22 (West 2021) (providing that a birth certificate shall be amended once the director of health establishes the alleged facts requiring the amendment). Only if one seeks to amend the same data a second time is a court order required. *See id.* And so, in Ohio, a person does not need a court order to change their birth certificate (the first time around), and the case law from Ohio is immaterial. As we explain below, Ohio's executive, however, does not allow such change. *See infra* ¶ 59 n.26.

¶59 Bottom line, we have common-law authority to adjudicate sex-change petitions because they are petitions to change one's legal status or identification, just like name-change petitions. And we have the authority to adjudicate name-change petitions. This conclusion is supported by the legislature's assumption in Utah Code section 26-2-11 and is further reinforced by decisions in other jurisdictions. We accordingly hold that Utah district courts have authority to adjudicate sex-change petitions.[26]

---

[26] We also note that, to our knowledge, only four states in the entire union—Idaho, Kansas, Ohio, and Tennessee—do not permit transgender individuals to change their sex designation. They do so through specific prohibitory or limiting statutes. *See F.V. v. Barron*, 286 F. Supp. 3d 1131, 1136 n.4 (D. Idaho 2018); Kyle C. Velte, *Mitigating the "LGBT Disconnect": Title IX's Protection of Transgender Students, Birth Certificate Correction Statutes, and the Transformative Potential of Connecting the Two*, 27 AM. U. J. GENDER SOC. POL'Y & L. 193, 213 (2019) ("Tennessee bars transgender people from correcting their birth certificate. The Kansas Division of Vital Statistics takes the position that it lacks the authority to correct birth certificates for gender transition. In Ohio, although state law provides that birth certificates may be amended with a

(continued . . .)

## III. THE POLITICAL QUESTION DOCTRINE
## AND ARTICLE V OF THE UTAH CONSTITUTION

¶60    Having concluded that district courts have the jurisdiction and authority to adjudicate sex-change petitions, we move on to determining whether their doing so violates the political question doctrine or article V, section 1 of the Utah Constitution.

¶61    First, we must ask whether adjudicating sex-change petitions is a nonjusticiable political question. Second, we ask whether adjudicating sex-change petitions is unconstitutional under the "Separation of Powers" clause of the Utah Constitution. *See* UTAH CONST. art. V, § 1. The district court answered both questions in the affirmative, finding that there is "no statute in the State of Utah which sets forth either standards or procedures under which the court may consider such" petition, and that setting standards or procedures would be a legislative task and not a judicial one.

¶62    The focus of both the district court and our supplemental briefing question was whether the adjudication of sex-change petitions is a political question—that is, whether it is an "interference in matters wholly within the control and discretion of other branches of government," *Skokos v. Corradini*, 900 P.2d 539, 541 (Utah Ct. App. 1995) (citing e.g., *Baker v. Carr*, 369 U.S. 186 (1962))—given the "absence of" "procedural and substantive criteria for granting of a sex-change order." Relatedly, we asked the parties to brief whether, when district courts adjudicate sex-change petitions, they "exercise . . . functions appertaining to either" the legislative or executive departments of government, thus violating the separation-of-powers requirement in article V, section 1 of the Utah Constitution. Appellants, of course, argued that there is no constitutional violation. And the Attorney General, representing the State, declined to answer the question, citing our presumption of constitutional validity "based on fundamental separation-of-powers precepts." (Internal quotation marks omitted.)

court order, courts in that state refuse to issue such orders." (citations omitted)). But this last observation about Ohio seems only partially correct since, as we explain above, a court order is needed there only to amend a birth certificate a second time around. *See supra* ¶ 58.

¶63    Ultimately, our answer to both queries is a resounding no.

¶64    Article V, section 1 of the Utah Constitution and the political question doctrine both focus on the proper roles of each branch of government and aim to curtail interference of one branch in matters controlled by the others. *See Skokos*, 900 P.2d at 541. Indeed, we have referred to article V, section 1 as the "Separation of Powers Clause of the Utah Constitution." *Friends of Great Salt Lake v. Utah Dep't of Nat. Res.*, 2017 UT 15, ¶ 16, 393 P.3d 291. Article V "regulates and guides the apportionment of authority and function between the branches of government." *Vega v. Jordan Valley Med. Ctr., LP*, 2019 UT 35, ¶ 15, 449 P.3d 31. Similarly, the political question doctrine is "a tool for maintenance of governmental order," *Baker*, 369 U.S. at 215, that is "rooted in the United States Constitution's separation-of-powers premise." *Skokos*, 900 P.2d at 541. It "prevents judicial interference in matters wholly within the control and discretion of other branches of government." *Id.* The United States Supreme Court has identified a political question issue, in part, as involving

> a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government . . . .

*Baker*, 369 U.S. at 217.

¶65    Utah courts' adjudication of sex-change petitions neither involves a nonjusticiable political question nor violates article V, section 1 of the Utah Constitution. Our constitution grants the district courts, as general jurisdiction courts, the authority to adjudicate matters that affect a citizen's legal rights. *See* UTAH CONST. art. VIII, §§ 1, 5.

¶66    In adjudicating sex-change petitions—requests for a change to one's legal status or identification—district courts exercise one of the basic tenets of their judicial role: their common-law authority. That is because, as we explain above, *supra* ¶ 50, the legislature intertwined sex-change petitions with name-change petitions and planted the "sex-change" adjudication firmly in the name-change common-law adjudication's "old soil."

*See Maxfield v. Herbert*, 2012 UT 44, ¶ 31, 284 P.3d 647 (quoting Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 COLUM. L. REV. 527, 537 (1947)). The common law is "a subject lodged firmly within the court's sphere." *Yazd v. Woodside Homes Corp.*, 2006 UT 47, ¶ 20, 143 P.3d 283. "It is the responsibility of the judiciary to examine those causes of action which it has created, to alter them when appropriate, and to abolish them when necessary. The basic evolutionary provisions of the common law have not been repealed." *Norton v. Macfarlane*, 818 P.2d 8, 17 (Utah 1991).[27] Indeed, "common-law pronouncements . . . play a role in governing a district court's handling" of common-law matters, *Williamson v. Farrell*, 2019 UT App 123, ¶ 17, 447 P.3d 131, such as personal legal status changes.

¶67    And yes, often, our judicial "characteristic roles . . . may have significant political overtones." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986). But that does not mean we or our district courts can simply "shirk" those roles by announcing them nonjusticiable. *Id.* History provides us with a relevant example: In 1889, our territorial supreme court adjudicated a naturalization petition of a "native of the Hawaiian Islands." *In re Kanaka Nian*, 21 P. 993, 993 (Utah 1889). In that procedure—which, similar to the one we adjudicate today, asked for a change of legal status—our predecessor court did not shy away from adjudicating the question whether "the native inhabitants of the Hawaiian islands belong to the white or African race," and engaged in the science of the time on the matter. *Id.* While we do not endorse that analysis, we see it as an example of our long-standing commitment to effectuate the judicial task laid upon us by the legislature, despite the sensitivity of the issues involved.

¶68    The money line here is this: The exercise of common-law authority, when not abrogated by statute, neither runs afoul of the political question doctrine nor violates the separation-of-

---

[27] But the "[j]udicial power to alter, abolish, and create causes of action does not, of course, restrict the right of the Legislature to have the last word with respect to [the] law, at least insofar as the Legislature does not transgress constitutional limitations on its powers." *Norton*, 818 P.2d at 17; *see also Cruz v. Wright*, 765 P.2d 869, 871 (Utah 1988) (holding that the legislature can "alter[] or even abolish[] certain rights which existed at common law").

powers requirements of article V, section 1. A contrary conclusion would mean a doomsday for our historic judicial function. In the background looms our presumption of constitutionality, which reinforces our holding here. We "apply a presumption of validity [to a challenged statute] so long as there is a reasonable basis upon which both provisions of the statute and the mandate of the constitution may be reconciled." *Richards v. Cox*, 2019 UT 57, ¶ 12, 450 P.3d 1074 (alteration in original) (citation omitted). A statute violates the constitution only when it "*clearly* violates a constitutional provision." *Vega*, 2019 UT 35, ¶ 12 (emphasis added). Accordingly, "a party seeking to challenge the constitutionality of a law" faces a heavy burden and must "provide a sufficient basis" for such challenge, and not merely "a 'murky' basis for setting it aside." *South Salt Lake City v. Maese*, 2019 UT 58, ¶ 96, 450 P.3d 1092 (Lee, A.C.J., concurring). In this case, no party—other than the district court, *sua sponte*—has argued that Utah Code section 26-2-11 is unconstitutional, let alone met their burden to set it aside. And, with all due respect to the district court, its conclusory decision did not do that either. Regardless, pursuant to rule 25A(b) of the Rules of Appellate Procedure—which grants the Attorney General permissive intervention "[a]ny time a party challenges the constitutionality of a statute"—this court called for the views of the Attorney General in its August 23, 2019 supplemental briefing order. As noted above, the Attorney General declined to answer whether the statute was unconstitutional and instead cited the presumption of constitutionality existing when no parties have actually made such a challenge. *See supra* ¶ 62.

¶69 The dissent disagrees. We discern three arguments it makes to support its contrary position:[28] (1) sex-change petitions are akin to "issuing or amending a government record, license, or permit," *see infra* ¶ 154, which are executive functions; (2)

---

[28] The dissent does not explicitly challenge the constitutionality of section 26-2-11, yet its arguments are rooted in our constitutional principles of separation of powers and the scope of "judicial power." Perhaps the dissent knows that its propositions, properly framed, would not withstand our presumption of constitutionality. *See supra* ¶ 68. Regardless, because the effect of accepting these arguments is to conclude that section 26-2-11 is unconstitutional, we address them as such.

adjudicating sex-change petitions means we undo all limits on our judicial role, *infra* ¶¶ 188–90; and (3) this court runs afoul of the nondelegation doctrine by engaging in "an act of judicial legislation." *See infra* ¶ 305.

¶70 We can easily dispose of these arguments. All are premised on assumptions we rebutted above. As for the first argument, the dissent casts approvals of "sex change" as "licensing" because the "law opts for that form of regulation." *Infra* ¶ 154 n.73 (quoting *Carter v. Lehi City*, 2012 UT 2, ¶ 47, 269 P.3d 141). Consequently, it argues that we are without power to address such issues because we are "foreclosed from exercising executive power." *Infra* ¶ 154. But we are not seeking to order changes to an individual's permit or license. We are operating under the substantive grant of power to adjudicate changes to legal status or identification and filling a gap which the legislature has implicitly asked us to address. *See supra* ¶¶ 47–48. And nowhere do we find evidence that the "law opts for that form of regulation" in changes to an individual's legal status or identification. The dissent offers no explanation for its collapsing of the terms "legal status or identification" and "issu[ing] or amend[ing] any government record, license, or permit," *see infra* ¶ 189, but we find that areas of the law traditionally regulated by the executive's permitting and licensing function are distinguishable from matters involving legal status or identification.[29] Further, the dissent's argument is based on its

---

[29] The analysis in *Carter*, cited by the dissent at *infra* ¶ 154 n.73, directs readers to Utah Code section 58-1-103 (2012), which created the Utah Division of Occupational and Professional Licensing within the executive's Department of Commerce. 2012 UT 2, ¶ 47 n.35. This area of the law does not contemplate changes to an individual's legal status or identification but rather regulates occupations and professions in order to "protect[] the health and safety of the public." *See* UTAH CODE § 58-1-301(5). Other areas of the law that "opt[] for that form of regulation" include driver licenses and concealed firearm permits, both of which are regulated by the Utah Department of Public Safety, presumably for public safety purposes. *See* UTAH CODE §§ 53-3-103, 53-5-703. And the laws concerning construction and fire codes, *see id.* §§ 15A-1-201 to 210; *id.* §§ 15A-1-401 to 403, also "opt[] for" permitting and licensing regulation in order to "safeguard[] life

(continued . . .)

assertion "that the statute was plowing no new ground, and thus that the contemplated order for an amendment to a birth certificate is to be based on the same type of sex designation made at birth." *Infra* ¶ 141. But that assumption, as we explain below, *infra* ¶¶ 75–81, is wrong. Without such standard, the theory the dissent proffers is irrelevant.

¶71 The second argument is likewise premised on faulty assumptions. It overlooks the historical substantive power of the courts to adjudicate name changes and thus, by analogy, sex changes. *Infra* ¶ 189. And further, our decision today bears little threat of opening the jurisdictional floodgate to all non-adversarial matters because it is inherently limited by the language of the statute before us and by the analogy we draw between name and sex changes. *See supra* ¶¶ 40–43.

¶72 The third argument also holds no water. The dissent suggests that this court runs afoul of the nondelegation doctrine by engaging in "an act of judicial legislation" by seeking to fill any gap left open by the legislature. *Infra* ¶ 305. Such is not the case here. As we explained above, *supra* ¶¶ 46–47, Utah Code section 26-2-11 is a statute enacted specifically in aid of our common-law authority, and the "core, governing principle" in adjudicating sex-change petitions has already been identified through the common law of name-change petitions. Thus, because name-change and sex-change petitions are analogous in function, we are not overstepping our judicial role when we apply the common law of name-change petitions as the "core governing principle" in adjudicating sex-change petitions.

¶73 We thus conclude that Utah Code section 26-2-11 and the district courts' adjudication of sex-change petitions violate neither the political question doctrine nor any separation-of-powers principles. Hence, Utah courts do not violate the Utah Constitution when adjudicating sex-change petitions.

---

and property." *Id.* § 15A-1-403(1)(a)(ii). Certainly, legal status or identification matters may include public safety functions, but while licensing and permitting appear to be based primarily on public safety purposes, such is not the primary function of legal status or identification. *See supra* ¶ 35.

## IV. THE TEST FOR SEX-CHANGE PETITIONS

¶74    Although Utah courts have the authority to adjudicate sex-change petitions, we have not, until now, had the opportunity to review a district court's decision to grant or deny one. That means that we have never articulated a test by which Utah courts should decide sex-change petitions. We take that step today. To do so, we borrow from our common-law jurisprudence about name-change petitions and adapt it to fit sex-change petitions. We conclude that, as a general rule, sex-change petitions should be granted if (1) they are not "sought for a wrongful or fraudulent purpose," *In re Porter*, 2001 UT 70, ¶ 8, 31 P.3d 519 (citation omitted), and (2) they are supported by objective evidence of a sex change, which includes, at minimum, evidence of appropriate clinical care or treatment for gender transitioning or change by a licensed medical professional. But before we detail how we reach this test and explain it, we respond to the dissent's suggested test.

*A. Sex-Change Petitions Are Not Limited to Mistake or Sex-Reassignment Surgery*

¶75    In refuting the dissent's proffered test, we first explain how the dissent erroneously reads a substantive standard for "sex change" into a simple, non-substantive statute. Then, for the sake of completeness, we show how its proposed standard is unworkable and cannot reflect the intent of the legislature.

¶76    The dissent takes a wrong turn at the outset of its analytical expedition. It reads into the language of the statute a substantive standard for approving a sex change.[30] Focusing on the word "sex," it posits that "[t]he term ['sex'], in this context, is plain" and "sex" in this context "refer[s] to biological sex." *Infra*

---

[30] The dissent initially concedes that "[t]he statute itself does not expressly articulate a 'substantive standard,'" *infra* ¶ 141, presumably to set up its jurisdictional argument that we are engaged in a "novel" "'gap-filling' role," *infra* ¶ 245, by simply giving effect to the statute and voice to the common law. Nonetheless, it implies throughout its argument on the merits that "sex" — rather, "biological sex" — acts as a standard intended by the legislature. *See, e.g., infra* ¶¶ 204-06. Indeed, the statement that we are attempting to "establish a *new* concept of gender identity," *infra* ¶ 200 (emphasis added), implies that the "new concept" replaces an existing one.

¶ 217. From there, the dissent reasons that a person can only change their "biological sex," as indicated on the birth certificate, by showing that their initial sex designation was essentially a mistake or, possibly, that they have undergone sex-reassignment surgery. *Infra* ¶ 223.

¶77     As we have repeatedly noted, the statute does not contain an express substantive standard; rather, it functions as an aid to the court in the exercise of its common-law authority.[31] Utah Code section 26-2-11(1) provides that when a person "has a name change or sex change approved by an order of a Utah district court or a court of competent jurisdiction of another state or a province of Canada," that person may file with the state registrar a certified copy of the order, along with a standard application form. Upon receipt of a complete application, order, and fee, the registrar "shall . . . register it and note the fact of the amendment" on the original birth certificate. UTAH CODE § 26-2-11(2)(a). The amendment then "become[s] a part of the original certificate." *Id.* § 26-2-11(2)(b). So, the statute acknowledges that Utah district courts have authority to approve a name change or sex change. And it tells the state registrar what it must do with such an order. That is literally all the statute says and does.

¶78     Nothing in this text suggests a legislative intent that a court approve a sex change only if the petitioner proves their initial sex designation was a mistake or they have completed sex-reassignment surgery. In fact, the plain language demonstrates a legislative intent to *omit* such a standard. If a petitioner submits a complete application, the state registrar "shall" register a sex change "approved by an order of a Utah district court *or a court of competent jurisdiction of another state or a province of Canada.*" Clearly, the legislature cannot control the standard for "sex" or "sex change" applied by any other jurisdiction.[32] Yet the state

---

[31] And as we have repeatedly pointed out, *supra* ¶¶ 47, 50-51, 54, the legislature, in deciding that a person may seek to change the sex designation on their birth certificate, intended to omit a substantive standard from the statute, and in doing so expected the courts to fill the gap. Otherwise, we would be left with a meaningless statute.

[32] Canadian courts have similarly been ordering changes to birth certificates to reflect an individual's gender identity and, in the process, have rejected the narrow view of "sex change"

(continued . . .)

registrar must respect it.[33] Consequently, and with the greatest of respect to the dissent, there is nothing in Utah Code section 26-2-11 that suggests that the legislature intended Utah courts to apply a very narrow standard for "sex change" while simultaneously

offered by the dissent. *See F.C. v. Alberta (Vital Statistics)*, 2014 ABQB 237, paras. 4–7, 65 (Can.); *XY v. Ontario (Minister of Government and Consumer Services)*, 2012 HRTO 726, [2012] O.H.R.T.D. No. 715 (Can. Ont. Human Rights Trib.).

[33] The dissent responds that "Utah law is the substantive law that governs the content of Utah vital records" when foreign courts adjudicate a sex change to a Utah birth certificate because "[n]othing in the statute . . . indicates that the legislature was conferring power on the courts of other states to impose their substantive law" on the content of a Utah birth certificate. *Infra* ¶ 288. This interpretation is erroneous for at least three reasons. First, the statute's plain language unambiguously extends respect and reciprocity to court orders of sister jurisdictions. Otherwise, if the dissent were correct, a foreign court would be required to apply the dissent's non-articulated standard for sex change (which the dissent argues it could not do anyway, since it claims the issue is non-justiciable). Second, the dissent does not explain how the state registrar would know whether to accept the foreign court order. The statute provides the state registrar with no discretion to evaluate a foreign court's application of Utah law. And third, the legislature knew how to specify elsewhere within the Vital Statistics Act when the state registrar should limit its reciprocity to Utah law. *See* UTAH CODE § 26-2-28(1) (requiring the registration of any person "adopted under the laws of this state"); *id.* § 26-2-17(5) (providing for the immediate transportation outside of the death registration district of any dead body or part thereof when it "has been donated under the Revised Uniform Anatomical Gift Act or similar laws of another state"). It did not do so in section 26-2-11.

In short, we point to the concurrence's observation that "the legislature was not so concerned with setting a substantive standard by its use of the terms 'name change' and 'sex change' as it was with identifying the kinds of birth certificate amendments subject to the statute." *Infra* ¶ 123.

extending the broadest possible reciprocity to foreign jurisdictions.[34]

¶79 The original statutory text further solidifies our view that the legislature intentionally omitted from the statute a standard for "sex change." That text provided that "[w]henever a person born in this state has their name *and/or* sex change approved by an order of a court [of any State or U.S. Territory], a certified copy of the court order may be filed with the office of the state registrar upon an application form provided by such registrar."[35] 1975 Utah Laws 222 (emphasis added). The statute then went on to direct the board of health to "establish fees to be received for preparation of . . . amended birth certificates provided in section 26-15-16.5, [the original statutory provision]." *Id.* Combining name change and sex change together like this ("name and/or sex change") and the reference to amended birth certificates reinforce the idea that "sex" refers to the designation on the birth certificate; it does not speak to the standard

---

[34] The dissent warns that our decision here is a "big deal" with "sweeping effects on our society." *Infra* ¶ 236. We disagree—Utah courts have been deciding this issue for many years without our guidance. *See infra* ¶ 103 n.53. In fact, our decision today gives more certainty to a process that, thus far, has not upended the fabric of society. All we can say for sure is that this issue is certainly a "big deal" for Mr. Childers-Gray and Ms. Rice. Their lives have been put on hold simply by chance—the district court in which they submitted their petitions just happened to misinterpret the statute, denying the petitioners a path to take advantage of section 26-2-11 in the way petitioners in other districts have been able to do. Today we put an end to their wait.

[35] As we explain above, *supra* ¶ 2 n.3, the current statute has undergone some minor linguistic changes. Specifically relevant here, the current statute reads: "[w]hen a person born in this state has a *name change or sex change* approved . . . ." UTAH CODE § 26-2-11 (emphasis added). No party has argued that such changes matter to our interpretation of the statute. However, the dissent engages with the meanings of "sex" and a "'change' to birth certificate 'sex' designation" in 1975, *infra* ¶¶ 213-19, and we find the original legislative use of the "and/or" phrase particularly illustrative of the incongruity of the dissent's position, and we highlight it accordingly.

underlying whether the court should or should not grant the order.

¶80 And finally, the legislature has explicitly shown that it can and does articulate standards in the name- and sex-change context, even if it did not do so here. In Utah Code section 77-41-105(8), the legislature provided a clear substantive limitation for registered sex and kidnapping offenders petitioning to change their names. This limitation prohibits a Utah court from granting a name change unless it finds that "the name change is not contrary to the interests of the public." UTAH CODE § 77-41-105(8)(a).

¶81 In sum, the plain language of the statute compels the conclusion that the legislature deliberately omitted from the statute any standard for approving a sex change. In so doing, it expected the judiciary to exercise its common-law authority to create such a standard. And we do so today, considering all indicia of legislative intent and persuasive authority that we can muster. *See infra* Parts IV(B) & (C).

¶82 Further, the dissent's fundamental misreading of the statutory language leads it to engage with the term "sex" in a manner that not only does not fit the statutory language, but plainly ignores it. *See State v. Rushton*, 2017 UT 21, ¶ 11, 395 P.3d 92 ("[W]ords or phrases may appear unambiguous when read in isolation, but become ambiguous when read in context. This is why 'we read the plain language of the statute as a whole, and interpret its provisions in harmony with other statutes in the same chapter and related chapters[,] . . . avoid[ing] any interpretation which renders parts or words in a statute inoperative or superfluous in order to give effect to every word in the statute.'" (alterations in original) (citation omitted)).

¶83 And even if the dissent were correct in its reading, it would not satisfactorily answer the question we address here because we do not agree with the dissent's understanding of the term "sex." Even if the legislature intended for the phrase "sex" to be a standard (and it did not), the dissent's definition of biological sex does not necessarily exclude sex that has been changed in conformance with an individual's gender transition.

¶84 It is remarkable that a simple, three-letter word can inspire such widespread, passionate debate. We are not tasked with charting the course for the evolution of language itself, but we are obligated to interpret a word or term as it was intended by the legislature at the time of drafting. Here, that does not necessarily mean determining "whether the term 'sex' as used in a

1975 statute governing the terms of a birth certificate can be understood as a reference to the concept of 'gender identity' that has evolved in recent years." *Infra* ¶ 213. The inquiry is rather much simpler and does not require a hindsight view of the evolving concept of gender identity—we should be asking, merely, what the legislature meant by "sex" in the birth certificate context.

¶85     No matter which side of the "culture war," *infra* ¶ 212, one occupies, it appears generally understood that, in most instances, "sex" as designated at birth is based on a medical observation of genitalia and physical characteristics. *See supra* ¶ 4 n.5. But even if we were to concede that "sex" means "biological sex," the concept very likely extends beyond what a cursory physical examination of an infant can reveal. We allude to the dissent's presentation of dictionary definitions of "sex" existing at the time of Utah Code section 26-2-11's enactment, *see infra* ¶ 214 n.100, in conceding that "sex" was *primarily* defined in terms of "structural and functional differences" between males and females (including reproductive functions).

¶86     However, we are not convinced that a standard of "biological sex" would preclude the adopted sex of transgender individuals. It is worth noting that while the dictionary definitions of "sex" provided by the dissent have some focus on physiological differences between males and females, many definitions focus also on "psychological," "behavior[al]", or "character" differences, *infra* ¶ 214 n.100, which are not necessarily tied exclusively to physiology or observable characteristics at birth. At the very least, "biological sex" itself is ambiguous and may mean more than the sex designated by examination at birth.

¶87     The dissent's conception of "biological sex" in the birth certificate context arises from its understanding that, typically, "a person's sex is determined at birth by an anatomical examination by the birth attendant." *Infra* ¶ 216 n.102 (quoting *In re Ladrach*, 513 N.E.2d 828, 832 (Stark Cnty. Ohio Prob. Ct. 1987)).[36] But the

---

[36] Of course, as the dissent points out, some infants are born with ambiguous genitalia, which require more thorough examinations for sex designation, perhaps beyond external physical characteristics. *See infra* ¶ 216 n.102. However, such occurrences requiring examination by medical specialists are rare.

(continued . . .)

"anatomical examination" done at birth contemplates only the observable genitalia, which is limited at the neonatal stage. Of course, secondary sex characteristics, such as those that may be altered by hormone therapy, do not begin to develop until later in life. And certainly, "a baby has no capacity for expression of gender identity." *Infra* ¶ 216. So even if we look only to the observable physiological indicators of sex to guide us, many transgender individuals would still lie within the dissent's definition, given that they may later undergo sex-reassignment surgery, hormone therapy, or other treatment to bring their physical appearances into alignment with their gender identities.[37] *See, e.g.,* Saru Matambanadzo, *Engendering Sex: Birth Certificates, Biology and the Body in Anglo American Law*, 12 CARDOZO J.L. & GENDER 213, 219 (2005) (noting that surgical procedures often serve to "bring [an individual's] 'biological sex' into line with their gender identity"). It does not seem that the dissent would disagree with this logic. *See infra* ¶ 223 (stating that "a basis for a 'change'" in an individual's sex designation "might be met where a person can demonstrate that the biological indicators of sex have been altered").

---

*See, e.g.,* Elizabeth Reilly, *Radical Tweak — Relocating the Power to Assign Sex*, 12 CARDOZO J.L. & GENDER 297, 299 (2005) (providing an estimate that intersex births occur in 1.7% of live births (citing ANNE FAUSTO-STERLING, SEXING THE BODY: GENDER POLITICS AND THE CONSTRUCTION OF SEXUALITY 92–95 (2000)); Alice Domurat Dreger, *"Ambiguous Sex" — Or Ambivalent Medicine? Ethical Issues in the Treatment of Intersexuality*, 28 HASTINGS CTR. REP. 24, 26 (1998) (noting that the frequency in which "sex is doubtful because of the external genitalia" is "roughly 1 in 1,500 live births"). Given the rarity of such births, and with all due respect to those individuals, we find it is unnecessary to contemplate these cases in our analysis. It appears the dissent may agree. *See infra* ¶ 226 (stating that the "'sex' designation on a birth certificate is an objective determination based on *observation of physical characteristics*" (emphasis added)).

[37] For example, hormone therapy "is an effective step for enhancing feminine or masculine secondary sex characteristics (e.g., voice, facial hair, breast tissue, muscle mass)." Dean Spade, *Documenting Gender*, 59 HASTINGS. L.J. 731, 755 (2008).

¶88    But if the dissent defines the term "biological sex" as encompassing observable sex characteristics *and* genetically controlled sex chromosomes, the statute would be rendered nonsensical. In the birth certificate context, sex is generally determined by an external "anatomical examination," not by an examination of the individual's chromosomal makeup.[38] And the legislature could not have intended to include consideration of sex chromosomes in its conception of "sex" in a statute regarding name and sex changes because sex chromosomes are immutable and no therapy, treatment, or procedure exist to alter them (at least not currently, and certainly not in 1975). *See, e.g.,* Julie A. Greenberg, *Defining Male and Female: Intersexuality and the Collision Between Law and Biology*, 41 ARIZ. L. REV. 265, 294 (1999) ("[T]he only sex indicators that are truly fixed are chromosomes . . . .").

¶89    Additionally, if we were to view "biological sex" as including the immutable genetic makeup of an individual, we would unearth another absurdity. This standard would leave open only the possibilities that a sex change could be approved because of a "discovery of a mistake in the biological sex designation made at the time of a child's birth, or a showing that the biological features of an intersex person have developed differently than expected at birth."[39] *Infra* ¶ 223. But if "sex" on a

---

[38] Except in rare cases involving ambiguous genitalia. *See supra* ¶ 87 n.36.

We also note that chromosomal examinations have their own limitations, as evidenced by the story of world-class hurdler Maria Patiño. Ms. Patiño was banned from competing in the 1985 World University Games after a sex chromatin test revealed she had the chromosomal makeup of a male (XY). Julie A. Greenberg, *Defining Male and Female: Intersexuality and the Collision Between Law and Biology*, 41 ARIZ. L. REV. 265, 273 (1999). Ms. Patiño was unaware that she had a condition that caused her "external morphologic sex, phenotype, and self-identification" as a female to conflict with her chromosomal make-up as a male. *Id.*

[39] We do not accuse the dissent of making or relying on the argument that "biological sex" includes genetic indicators of sex. Notably, the dissent recognizes that its "biological sex" standard "also might be met where a person can demonstrate that the biological indicators of sex have been altered, as by sex-reassignment surgery." *Infra* ¶ 223. Rather, we use the dissent's

(continued . . .)

birth certificate indicates a purely biological trait and not an identifier of legal status, then why does one need a court order to change it?[40] And, again, why does the statute not differentiate between "name change" and "sex change" if the former is a legal classification and the latter is biological?

¶90    We have said in the past, including in an opinion penned by the author of today's dissent, that we could not possibly attribute "absurdity" to our legislature because such "construction" is "so far beyond the realm of the conceivable." *Graves v. N.E. Servs., Inc.*, 2015 UT 28, ¶ 71 n.10, 345 P.3d 619. And in this case, a construction that "sex" means "biological sex" including genetics (one's chromosomal makeup) would be "so

language to highlight why any definition of "biological sex" would ultimately fail in this context.

[40] The Utah Vital Statistics Act generally requires health care professionals to directly file certificates based on purely medical observations. *See, e.g.*, UTAH CODE § 26-2-5(3) (requiring a "birthing facility administrator or his designee" or the "attending physician or nurse midwife" to fill out, sign, and file a birth certificate with "medical information"); *id.* § 26-2-14 (requiring an "institution administrator or his designated representative" or a physician to "complete, sign, and file [a] fetal death certificate"); *id.* § 26-2-13 (requiring a "funeral service director," or in some cases a "health care professional," to complete and file a certificate of death). By contrast, the Act requires a court order in only three circumstances: (1) to provide a birth certificate for an adopted foreign child, *id.* § 26-2-28; (2) to "establish[] the fact, time, and place of a birth or death that is not registered," *id.* § 26-2-15; and (3) to approve a "name change or sex change" amendment to a birth certificate. *Id.* § 26-2-11. These situations all deal with the establishment of an individual's legal status or identification, independent from any medical observation.

Again, the dissent argues that "sex" can only be changed due to "discovery of a mistake in the biological sex designation made at the time of a child's birth, or a showing that the biological features of an intersex person have developed differently than expected at birth." *Infra* ¶ 223. Since these two conditions are both fundamentally medical observations, we can assume that, if the legislature had intended this result, it would have simply allowed a health care professional to complete and file the amendment.

absurd that we are certain that 'the legislative body which authored the legislation could not have intended it.'" *State v. J.M.S. (In re J.M.S.)*, 2011 UT 75, ¶ 41, 280 P.3d 410 (Lee, J., concurring) (quoting *State ex. rel. Z.C.*, 2007 UT 54, ¶ 13, 165 P.3d 1206).

¶91 So, to put it simply, biological sex, as it is understood in the birth certificate context, may transform according to how a transgender individual chooses to respond to their gender dysphoria. But we take this opportunity to caution against relying even on the term "biological sex" as defined by observable external attributes. Transitioning from male to female or female to male is a process, not a switch. We must avoid relying on terms that may lead us toward setting a threshold for completion of a transition, because that is a line we are not equipped to draw. Even relying on the term "sex-reassignment surgery," *infra* ¶¶ 219, 223, 240, as a threshold would be unhelpful because it is a vague standard. Transgender individuals have an array of surgical options by which they can effectuate their transition, if that is indeed the route they wish to take. These options include facial reconstruction, orchiectomy (removal of gonads), vaginoplasty, mammoplasty, mastectomy, hysterectomy, vaginectomy, phalloplasty, *see In re Heilig*, 816 A.2d 68, 78 (Md. 2003); *In re Harris*, 707 A.2d 225, 226 (Pa. Super. Ct. 1997), and "surgical procedures of non-genital, or non-breast, sites (nose, throat, chin, cheeks, hips, etc.) conducted for the purpose of effecting" the appearance of the adopted sex. *O'Donnabhain v. C.I.R.*, 134 T.C. 34, 38 (T.C. 2010) (citation omitted). Further, there appears to be little inter- and intra-jurisdictional consensus on the exact definition of "sex-reassignment surgery." Some jurisdictions use the term as an umbrella term for all gender-affirming surgical procedures. *See, e.g.*, *Fields v. Smith*, 653 F.3d 550, 552 (7th Cir. 2011) ("'Sexual reassignment surgery' means surgical procedures to alter a person's physical appearance so that the person appears more like the opposite gender." (quoting the Wisconsin Inmate Sex Change Prevention Act, WIS. STAT. § 302.386(5m) (2010))); *O'Donnabhain*, 134 T.C. at 38 (relying on the World Professional Association for Transgender Health's Standards of Care, under which "sex reassignment surgery[] consist[s] of genital sex reassignment and/or *nongenital* sex reassignment" (emphasis added)); *Smith v. Rasmussen*, 249 F.3d 755, 757 (8th Cir. 2001) (noting that "sex reassignment surgery" involves "several different surgical procedures" including "breast reduction and contouring" and "phalloplasty"). Others use it to refer specifically

to procedures altering the primary sex organs. *See, e.g., Campbell v. Kallas*, 936 F.3d 536, 539 (7th Cir. 2019) (using the term "sex-reassignment surgery" to refer to "surgeries that replace an individual's existing genitals with approximations of those of the opposite sex," in a case analyzing an Eighth Amendment claim). Some jurisdictions do not even use the term. *See, e.g., Hare v. Minn. Dept. of Hum. Servs.*, 666 N.W.2d. 427, 431–32 (Minn. Ct. App. 2003) (interpreting the term "gender reassignment services" as an umbrella term for all "treatment necessary to address gender dysphoria"); *Good v. Iowa Dept. of Hum. Servs.*, 924 N.W.2d 853, 856–57 (Iowa 2019) (interpreting the term "gender-affirming surgery" to refer specifically to procedures altering an individual's "sex characteristics"). All this is to say we are judges, not medical professionals, which is why our standard relies on licensed medical professionals to establish that an individual petitioner has received what the medical professional deems to be appropriate treatment.[41] We also note that while we take the time to respond to the dissent's engagement with the definition of "sex," we emphasize again that "sex" was not intended to designate a standard in this statute.

¶92    But despite all the dissent's guesswork about the legislature's intent that "sex" means "biological sex," it matters not because the legislature did not use those words. And "[j]udges are not free to overlook plain statutory commands on the strength of nothing more than suppositions about intentions or guesswork

---

[41] But we do understand that health care treatment is expensive, and not all individuals are capable of affording or accessing the kind of treatment that would effectively change an individual's external sex characteristics. Further, the cost of sex-reassignment surgery is "much higher" for transgender men than women. *Heilig,* 816 A.2d at 78. "One commentator has asserted that a male-to-female operation costs an average of $37,000, whereas the average female-to-male operation costs $77,000." *Id.* (citing Aaron C. McKee, *The American Dream – 2.5 Kids and a White Picket Fence: The Need for Federal Legislation to Protect the Insurance Rights of Infertile Couples*, 41 WASHBURN L.J. 191, 198 (2001)). Given these high costs *and* disparate impacts on transgender men versus transgender women, we can imagine that any standard for "sex change" that relies on surgical intervention would be vulnerable to equal protection challenges.

about expectations." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1754 (2020). "We look to laws." Official Transcript of Oral Argument at 60:17–20 (Kagan, J.), *Bostock*, 140 S. Ct. 1731 (2020); Transcript of Oral Argument at 60:21-22 (Sotomayor, J.), *Bostock*, 140 S. Ct. 1731 (2020) ("We don't look to predictions. We don't look to desires. We don't look to wishes. We look to laws.")

¶93 When we look to the law here, we see a statute that clearly presupposes a district court's authority to adjudicate a "sex change." We also see a clear and deliberate omission of any legislative standard by which a court should do so. Accordingly, we exercise our "judicial power" to effect the intent of the legislature by fulfilling that statutory gap with our established common law, which is precisely what the statute, properly read, calls for.

### B. Not Sought for a Wrongful or Fraudulent Purpose

¶94 The first prong in the test we articulate adopts the common-law jurisprudence regarding name-change petitions. Generally, sex-change petitions—just like name-change petitions—should be granted if they are not "sought for a wrongful or fraudulent purpose." *See In re Porter*, 2001 UT 70, ¶ 8. We adopt this prong because name changes and sex changes— along with the policy reasons for allowing or disallowing them— are similar. We detail these similarities below before we outline the test we have historically applied to adjudicate name-change petitions.

¶95 A name change and a sex change are both changes to one's personal legal status or identification. *Supra* Parts I(B) and (C). Like with a legal name, a person is assigned a sex designation at birth, and it appears on their birth certificate. Like with a legal name, a person, later in life, may not identify themselves with their birth sex designation.

¶96 The policies underlying the authority of courts to approve name changes apply as forcefully to sex changes. The aim of facilitating such changes is to promote clarity and avoid confusion. *See In re Porter*, 2001 UT 70, ¶ 11. A "legal name change . . . actually prevent[s] the daily confusion and public confrontations which presently plague [a person's] dealings with the public" when their chosen name is different than the one that appears on their government identification. *In re Harris*, 707 A.2d at 228.

¶97 The same is true for sex changes. A person's sex designation can govern various interactions with the government and with the public. Government agencies use sex designation "to validate a transgender person's identity when being used to access social benefits, services, or other forms of identification." Bryanna A. Jenkins, Note, *Birth Certificate with a Benefit: Using LGBTQ Jurisprudence to Make the Argument for a Transgender Person's Constitutional Right to Amend Identity Documents*, 22 CUNY L. REV. 78, 97 (2019). An Alaska trial court has described the problem succinctly in the context of driver licenses:

> By not allowing transgendered individuals to change their sex designation, their license will inaccurately describe the discernable appearance of the license holder by not reflecting the holder's lived gender expression of identity. Thus, when such individuals furnish their license to third-persons for purposes of identification, the third-person is likely to conclude that the furnisher is not the person described on the license.

*K.L. v. Alaska Dep't of Admin., Div. of Motor Vehicles*, No. 3AN-11-05431 CI, 2012 WL 2685183, at *7 (Alaska Super. Ct. Mar. 12, 2012).

¶98 Ms. Rice's own experience supports this account. In her sex-change petition, she stated that, as a transgender woman whose birth certificate designates her sex as "male," she is "subject to invasive and embarrassing scrutiny, including pat-downs, because her documentation doesn't match who [she is]." Matching her identification documentation with her identity would significantly reduce any confusion and any misinformed treatment. Gone unchecked, such treatment can prevent transgender people from effectively participating in the public arena, including voting.[42] *See* Julie Moreau, *Strict ID Laws Could*

---

[42] It is true that

> applying protective laws to groups that were politically unpopular at the time of the law's passage . . . [such as] transgender [people,] . . . often may be seen as unexpected. But to refuse enforcement just because of that, because the parties before us happened to be unpopular at the time of the law's

(continued . . .)

*Disenfranchise 78,000 Transgender Voters, Report Says*, NBC NEWS (Aug. 17, 2018, 12:05 PM), https://www.nbcnews.com/feature/nbc-out/strict-id-laws-could-disenfranchise-78-000-transgender-voters-report-n901696.

¶99   Having established the similarities between name-change and sex-change petitions, we now turn to the test this court applies when adjudicating name-change petitions. This court's case law outlines "very broad limits" to a person who wants to select "the name by which he [or she] is known." *In re Porter*, 2001 UT 70, ¶ 11; *see In re Cruchelow*, 926 P.2d 833, 834 (Utah 1996). And we have held that name-change petitions "should generally be granted." *In re Cruchelow*, 926 P.2d at 834 (citation omitted). This court has also held that one proper cause for a name-change petition is to conform a person's legal name to their identity. *See In re Porter*, 2001 UT 70, ¶ 11; *see also In re Cruchelow*, 926 P.2d at 834.

¶100   A court may deny a name-change petition only for a "substantial reason" backed by "factual support." *In re Cruchelow*, 926 P.2d at 834. We have explained that such reasons include a *factually proven* "unworthy motive": fraud. *In re Porter*, 2001 UT 70, ¶ 7 (citation omitted). On the other hand, a court may *not* deny a petition because of "[u]nsupported generalizations and speculation," including worries that the change could create confusion or misunderstanding,[43] complicate government recordkeeping and notice requirements, cause substantial mischief, or create a chilling effect on potential future litigants. *In re Porter*, 2001 UT 70, ¶¶ 7, 9–11; *see In re Cruchelow*, 926 P.2d at 834–35.

---

passage, would not only require us to abandon our role as interpreters of statutes; it would tilt the scales of justice in favor of the strong or popular and neglect the promise that all persons are entitled to the benefit of the law's terms.

*Bostock*, 140 S. Ct. at 1751.

[43] We repeat that the contrary is often true—confusion or misunderstanding is very likely to occur if an individual's legal sex designation does not match their external manifestations of gender identity. *See supra* ¶¶ 40, 96–98.

¶101   With these principles in mind, we have twice reversed denials of name-change petitions. We first did so in *In re Cruchelow*. There, we reversed a district court's denial of an inmate's request to change his name, while in custody, to reflect his newly adopted religious beliefs. *In re Cruchelow*, 926 P.2d at 835. We held that "unsupported generalizations and speculations" about confusion in the prison's records and the Board of Pardons proceedings are not sufficient to deny such change. *Id.* We accordingly remanded the case to the district court for a hearing to consider any evidence supporting the court's concerns. *Id.*

¶102   Then, in *In re Porter*, we reversed a district court's decision to deny the appellant's petition to change his name to "Santa Claus." 2001 UT 70, ¶ 13. Porter argued that he needed the name change because he resembled the "fictional character" and did numerous activities using that persona. *Id.* ¶¶ 6, 12. The district court found that, if allowed, the name change would "create confusion" and "misunderstanding" and "could allow for substantial mischief," and deter others from suing Porter. *Id.* ¶ 9. We reversed. We explained that there was no evidence to support the district court's concerns and, even if there were, these concerns were not enough to deny a name-change petition. *Id.* ¶¶ 11–13. We held that we do not sit as arbiters of the prudence of names chosen at will. And because Porter already held himself out as Santa Claus, "[a]llowing him to legally change his name to reflect his practice of doing so is more likely to avoid greater confusion." *Id.* ¶ 11. We remanded with instructions to enter the name-change order. *Id.* ¶ 13.

¶103   Because name and sex changes are analogous, we hold that—like a name-change petition—a sex-change petition "should generally be granted unless sought for a wrongful or fraudulent purpose." *See id.* ¶ 8 (quoting *In re Cruchelow*, 926 P.2d at 834). And, as long as a petitioner complies with the second prong of the test we announce today, *infra* ¶ 105, a court may deny a sex-change petition only for "substantial reason" backed by "factual support."[44] *In re Cruchelow*, 926 P.2d at 834.[45]

---

[44] Below we note that the district court acted inappropriately when it made general, slippery-slope arguments about appellants' petitions. *See infra* ¶¶ 117–18. The dissent raises similar arguments in stating that our "decision will have far-reaching implications." *Infra* ¶ 144 ("It seems destined, for example, to affect spaces

(continued . . .)

traditionally reserved for cisgender girls and women—sex-segregated sports leagues, school locker rooms, and shelters designed as safe spaces for victims of sex abuse." (footnotes omitted)).

We reject this line of argument with hammer and tongs. In fact, other courts have addressed arguments like those made by the dissent and thoroughly rejected them. *See*, *e.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 614 (4th Cir. 2020) ("The Board does not present any evidence that a transgender student, let alone [Appellant], is likely to be a peeping tom, rather than minding their own business like any other student."), *reh'g en banc denied*, 976 F.3d 399 (4th Cir. 2020), *petition for cert. filed*, No. 20-1163 (Feb. 19, 2021); *Adams by and through Kasper v. Sch. Bd. of St. Johns Cnty.*, 968 F.3d 1286, 1299–1301 (11th Cir. 2020) (noting that "[Appellant's] presence in the boys' bathroom does not jeopardize the privacy of his peers in any concrete sense"); *Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 534–36 (3d Cir. 2018) (finding that "the appellants unconvincingly tr[ied] to equate mere presence in a space with harassing activity" and thus failed to meet their burden of establishing that a transgender student's presence in bathrooms and locker rooms constituted sexual harassment); *Hecox v. Little*, 479 F. Supp. 3d 930, 979–81 (D. Idaho Aug. 17, 2020), *appeal docketed*, No. 20-35813 (9th Cir. Sept. 17, 2020) (addressing the "compelling evidence that equality in sports is *not* jeopardized by allowing transgender women who have suppressed their testosterone for one year to compete on women's teams," quoting favorably the statement that "there is a medical consensus that the difference in testosterone is generally the primary known driver of differences in athletic performance between elite male athletes and elite female athletes," and noting that the "policies of elite athletic regulatory bodies across the world, and athletic policies of most every other state in the country" undermine arguments like the dissent is making here (citations omitted) (internal quotation marks omitted)). This leaves the dissent's ideas not only unsupported but rejected by judicial fact-finding and legal analysis.

We note, importantly, that we do not intend to minimize feelings and emotions that individuals may have about transgender people in traditionally cisgender spaces, but there is no legal basis for us to ignore the "needs, humanity, and decency of transgender" people either. *See Boyertown*, 897 F.3d at 532. And

(continued . . .)

*C. Evidence of Appropriate Clinical Care or Treatment For Gender Transitioning or Change, Provided by a Licensed Medical Professional*

¶104 Even though name and sex changes are similar in purpose, they are not identical. At birth, a person's name is given at the whim of a non-medical party (usually a parent). But a person's initial sex designation is inherently a medical evaluation made according to objective observation at birth, typically by a medical professional. *See F.V. v. Barron*, 286 F. Supp. 3d 1131, 1136 (D. Idaho 2018) ("Sex determinations made at birth are most often based on the observation of external genitalia alone.").

¶105 We believe that, much like a sex designation made at birth, a change in sex designation should be accompanied by objective evidence. As a result, we hold that a petitioner must present, at the minimum, evidence of appropriate clinical care or treatment for gender transitioning or change, provided by a licensed medical professional.[46] We do not require any specific

_____

if the rights of cisgender individuals are affected, those individuals may have their day in court once their issues are ripe. *See supra* ¶ 43 n.21.

Ultimately, our decision today does not direct the State to allow transgender individuals to change their official documents—the legislature has already decided that in Utah Code section 26-2-11. It is our role to interpret that statute, and that is what we have done today. Nothing more.

[45] Clearly, the legislature may adopt a different rule for sex-change petitions. That definition would, of course, need to conform to constitutional standards that we need not address here.

[46] The dissent claims that our standard will allow for "a birth certificate amendment upon a showing of any care or treatment." *Infra* ¶ 308. This claim is unfounded. The licensed medical professional that provides such evidence has professional ethical commitments, and the evidence of appropriate clinical care or treatment for gender transitioning or change provided by them must be in keeping with those commitments.

And while we need not engage with the medical standard, we note that our review of a dozen Utah district court cases, *see infra* ¶ 111, shows that the relevant standard used by medical professionals is offered in the Diagnostic and Statistical Manual of

(continued . . .)

procedure or treatment. Instead, the licensed medical professional should provide that the appropriate clinical care or treatment conforms with the relevant medical standard of care for gender dysphoria.[47]

¶106   This standard is prudent based on several authorities: a Utah statute defining "gender identity," federal requirements for sex change, case law from other jurisdictions, and the decisions of Utah district courts.[48]

---

Mental Disorders, Fifth Edition (DSM-5) (a standard endorsed by our legislature in another context, *see infra* ¶ 107 n.49). The factsheet regarding "Gender Dysphoria" states that "[f]or a person to be diagnosed with gender dysphoria, there must be a marked difference between the individual's expressed/experienced gender and the gender others would assign him or her, and *it must continue for at least six months*." AM. PSYCHIATRIC ASS'N, GENDER DYSPHORIA (2013) (emphasis added),https://www.psychiatry.org/File%20Library/Psychiatrists/Practice/DSM/APA_DSM-5-Gender-Dysphoria.pdf; *see also Boyertown*, 897 F.3d at 522 ("A transgender [man] is therefore a person who has a *lasting*, *persistent* male gender identity, though that person's sex was determined to be female at birth." (emphasis added)); Cécile A. Unger, *Hormone therapy for transgender patients*, 5 TRANSLATIONAL ANDROLOGY & UROLOGY 877, 878 (Dec. 2016), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5182227/pdf/tau-05-06-877.pdf (noting that the World Professional Association for Transgender Health's recommended criteria for hormone therapy includes "*persistent* well-documented gender dysphoria . . . diagnosed by a mental health professional well versed in the field" (emphasis added)).

[47] We do not address in this opinion the issue of non-binary sex designation because it was not raised by the parties, who each seek a binary sex designation change. We leave this question for an appropriate case.

[48] The dissent refers to our "evolving" use of the term "gender identity." *Infra* ¶ 149. We do not argue that "sex" means "gender identity." The "sex" designation on a birth certificate is a datum of legal status. And consistent with many other state and federal authorities, *see infra* ¶ 107–11, our test allows a person to change

(continued . . .)

¶107   First, the Utah legislature has opined in another context about what evidence is sufficient to prove one's gender identity. The Utah Fair Housing Act addresses how one can show their gender identity:

> A person's gender identity can be shown by providing evidence, including, but not limited to, medical history, care or treatment of the gender identity, consistent and uniform assertion of the gender identity, or other evidence that the gender identity is sincerely held, part of a person's core identity, and not being asserted for an improper purpose.

UTAH CODE § 57-21-2(16).[49] We find this statutory test for proving one's gender identity suggests a legislative intent as to how one might prove why a change to the sex designation on their birth certificate is proper.[50]  Still, the test we articulate today is bound by the historical limitations of our non-adversarial adjudications, such as name-change petitions, to which we analogize. As explained above, our jurisprudence requires that a petitioner show that a sex change is not sought for "wrongful or fraudulent

---

that legal status by presenting objective evidence of professional medical treatment of the "gender identity."

[49] The DSM-5—endorsed in Utah Code section 57-21-2—defines gender as the "public[ly] (and usually legally recognized) lived role as a boy or girl, man or woman." AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS: DSM-5, at 451 (5th ed. 2013). Utah Code section 57-21-2(22) says that "sex" means "gender."

[50] The dissent takes issue with our consideration of the Utah Fair Housing Act's language, insisting that we have "identifie[d] no basis for extending [that statute's] definition of 'sex'" to the statute before us today. *Infra* ¶ 227. This appears to be a misplaced criticism of our analysis—we do not purport to extend the definitions contained in the Fair Housing Act across any boundaries separating bodies of law. Rather, we are exercising our duly granted authority to create a test where the legislature intentionally left a gap. Accordingly, we look to the Fair Housing Act not in reliance on its language, but merely for guidance in creating the test.

purposes." *Supra* ¶ 103. In the sex-change context, we cannot see how that showing would not require objective evidence. But we reject the possibility that a petitioner might prove a change to their sex designation through evidence of "consistent and uniform assertion of the gender identity," but not because this is not objective evidence (it may well be); rather, we focus only on the determination provided by a licensed medical professional because it mirrors how sex is typically initially designated at birth. *See supra* ¶¶ 4 n.5, 105. Showing a change to one's sex designation by providing evidence of appropriate clinical care or treatment for gender transitioning or change by a licensed medical professional is exactly the kind of objective evidence that our jurisprudence requires. As such, it is all we require today.[51]

¶108 Second, when considering a sex change, federal authorities have a requirement like the one that we announce today. The Social Security Administration guidelines, "Changing Numident Data for Reasons other than Name Change," accept as proof of sex change, among other things, "medical certification of appropriate clinical treatment for gender transition." *Program Operations Manual System, RM 10212.200 Changing Numident Data for Reason other than Name Change*, Soc. Sec. Admin. (June 13, 2013), https://secure.ssa.gov/poms.nsf/lnx/0110212200. These requirements specify which licensed physicians can provide such a statement (a doctor of medicine or a doctor of osteopathy) and ask the physicians to include in their "original signed" statement full details about themselves, to include "language stating the

---

[51] Evidence of one's medical history may certainly be used to make this showing. However, we have privacy concerns about requiring any evidence of medical history beyond the immediate treatment for gender transitioning or change, so we do not require any.

We note here that the appellants before us seek a change in sex designation because they do not identify with the designation given to them at birth. They do not challenge the *initial* designation as incorrect. A future petitioner may seek a change in sex designation simply because the initial sex designation was clearly erroneous—perhaps due to a scrivener's error or improper medical observation. In such a case, medical history or other similar evidence may provide the necessary evidence to prove the change in sex designation, but we need not decide that issue here.

physician has either treated the individual in relation to the individual's change in gender or has reviewed and evaluated the medical history of the individual in relation to the individual's change in gender and that the physician has a doctor/patient relationship with the individual," and to declare that their statement is made "under penalty of perjury under the laws of the United States that the foregoing is true and correct." *Id.* The Social Security Administration's requirements note, however, that "[s]urgery is no longer required to change the sex field on the [Administration's database]." *Id.*

¶109 The Social Security Administration is not alone. The State Department also allows for sex change on a person's passport, even before a person has completed the treatment for "transition." *Change of Sex Marker,* U.S. DEP'T OF STATE, https://travel.state.gov/content/travel/en/passports/need-passport/change-of-sex-marker.html (last visited April 21, 2021). The State Department also asks for proof of "appropriate clinical treatment" for sex changes on a person's passport. *Id.* What clinical treatment is appropriate is up to the physician: The "physician determines what appropriate clinical treatment is according to acceptable medical practices, standards and guidelines, and certifies that [the applicants] have had appropriate clinical treatment for transition to either male or female." *Id.* The State Department, however, specifies that "[s]urgery is not a requirement to get a U.S. passport." *Id.* (emphasis omitted).

¶110 Third, courts in other jurisdictions that lack statutory guidance have also required objective evidence. The Indiana Court of Appeals held that "the ultimate focus [of a sex-change petition] should be on whether the petition is made in good faith and not for a fraudulent or unlawful purpose." *In re Change of Birth Certificate,* 22 N.E.3d 707, 710 (Ind. Ct. App. 2014) (holding that the appellant in that case "made an adequate showing in support of his petition" because "[h]e presented ample medical evidence regarding his gender transition"). Delaware and Maryland have also articulated an objective medical standard requirement, but with a connection to sex-reassignment surgery.[52]

---

[52] Unlike the Delaware and Maryland courts, we hold that, although sex-reassignment surgery may be evidence of sex change, it is not required. Other authorities agree. The Indiana

(continued . . .)

*See In re McDannell*, 2016 WL 482471, at *4 (Del. Ct. Com. Pl. Feb. 5, 2016); *In re Heilig*, 816 A.2d at 86.

¶111 Fourth, different Utah district courts have been adjudicating sex-change petitions in recent years based on such objective evidence. Appellants presented, and we have reviewed, twelve Utah district court decisions issued between 2014 and 2017 approving sex changes. All but two of the decisions include factual findings of objective medical evidence provided by a licensed medical professional.[53] *See In re Davis*, No. 173900047, at 2 (Utah Dist. Ct. Second Dist. Mar. 27, 2017) (finding that "[p]etitioner has been treated and is following" the medical standards of care given to the petitioner by a licensed physician and "has undergone irreversible genital reassignment surgery");

---

Court of Appeals noted that a sex-reassignment surgery is not required for a successful sex-change petition. *In re Change of Birth Certificate*, 22 N.E.3d at 710 n.4; *see also In re Name & Gender Change of R.E.*, 142 N.E.3d 1045, 1052–53 (Ind. Ct. App. 2020) (ordering the lower court to grant the appellant's sex-change petition even though the appellant had not undergone a physical sex change). Likewise, federal authorities explicitly say that sex-reassignment surgery is not required. *See supra* ¶¶ 108–09. Nor is sex-reassignment surgery mentioned anywhere in Utah law. We thus hold that "evidence of appropriate clinical care or treatment for gender transitioning or change" need not include sex-reassignment surgery. This rule is prudent given that there "is no medical consensus that sex reassignment surgery is a necessary or even effective treatment for gender dysphoria." *Gibson v. Collier*, 920 F.3d 212, 223 (5th Cir. 2019); *see also Boyertown*, 897 F.3d at 522 ("Treatment for children and adolescents who experience gender dysphoria includes social gender transition and physical interventions such as puberty blockers, hormone therapy, and *sometimes* surgery." (emphasis added)).

[53] In *In re Leavitt*, the district court simply stated that it had "considered the documents filed with the [c]ourt, [and] the evidence presented at the hearings," and found "adequate factual basis" to grant the petitioner's sex-change petition. Case No. 153900411, at 1–2 (Utah Dist. Ct. Third Dist. June 8, 2015). In *In re Caldwell*, Case No. 143800043, at 1–2 (Utah Dist. Ct. Eighth Dist. Oct. 31, 2014), the district court's order did not contain findings of fact but approved the sex change.

*In re Cohen*, No. 163902596, at 2 (Utah Dist. Ct. Third Dist. Jan. 3, 2017) (noting petitioner's treatment under the relevant medical standards, as evidenced by a licensed medical professional, without specifying the treatment); *In re Manzanares*, No. 163901747, at 2 (Utah Dist. Ct. Third Dist. Sept. 14, 2016) (same); *In re Fairbourn*, No. 163901213, at 2 (Utah Dist. Ct. Third Dist. Aug. 18, 2016) (same); *In re Hardy*, No. 153400814, at 2 (Utah Dist. Ct. Fourth Dist. Aug. 10, 2016) (same); *In re South*, No. 163400140, at 2 (Utah Dist. Ct. Fourth Dist. July 8, 2016) (same); *In re Walton*, No. 163700026, at 2 (Utah Dist. Ct. Seventh Dist. June 6, 2016) (same); *In re Ivory*, No. 153300116, at 2 (Utah Dist. Ct. Third Dist. Feb. 2, 2016) (same); *In re Carmichael*, No. 153902067, at 2 (Utah Dist. Ct. Third Dist. Jan. 4, 2016) (same); *In re Collins*, No. 153902244, at 3 (Utah Dist. Ct. Third Dist. Dec. 3, 2015) (same and adding that petitioner had "undergone hormonal replacement therapy," "has been receiving female hormones for decades," and had "undergone gender reassignment surgery"). Although these decisions have no precedential value, they show how workable an objective medical standard is and how it is connected intrinsically with a "proper cause" evaluation of a sex-change petition.

¶112 And so, to conclude, sex-change petitions "should generally be granted unless sought for a wrongful or fraudulent purpose." *See In re Porter*, 2001 UT 70, ¶ 8 (quoting *In re Cruchelow*, 926 P.2d at 834). They must also include, at minimum, objective evidence of appropriate clinical care or treatment for gender transitioning or change, provided by a licensed medical professional.

## V. THE CASES BEFORE US

¶113 These cases should be remanded with instructions to grant the petitions for sex change without any further hearing for three reasons.[54]

¶114 First, in both cases, the district court granted appellants' petitions for name change, finding no "wrongful or fraudulent purpose." *See In re Porter*, 2001 UT 70, ¶ 8, 31 P.3d 519; *In re Cruchelow*, 926 P.2d 833, 834 (Utah 1996). When a name change is connected to a person's sex change (as it is in these cases), we can conclude that the requested sex change has no "wrongful or fraudulent purpose" if the requested name change does not.

---

[54] In this section we refer to the cases separately.

¶115 Second, the petitioners here complied with the objective medical standard that we describe above. Both petitioners provided letters from a doctor "stating that each of them had been treated for Gender [Dysphoria] and undergone 'the appropriate clinical treatment' for the gender transition." The doctors' letters complied with the Social Security Administration standard we detailed above.[55] *See supra* ¶ 108. In Ms. Rice's case, the district court "declined to make findings on these issues" but noted that two licensed physicians diagnosed and treated her for "Gender Dysphoria" "in accordance with" relevant medical standards.

¶116 Third, the district court's orders were based on a legal mistake. In Ms. Rice's case, the court only proffered its view that "the procedure for obtaining a sex/gender marker change must be set forth by the legislature and the Court is prohibited from invading the legislature's prerogative on this issue. Thus, the request to change Petitioner's legal sex/gender marker is not a properly justiciable question." But its denial of Mr. Childers-Gray's petition, issued eight days before that, revealed "[u]nsupported generalizations" and concerns—considerations that our case law strictly prohibits. *See In re Porter*, 2001 UT 70, ¶ 7. The court proclaimed that "[r]egardless of the sincerity or the intensity of the desire of any individual to display any particular physical appearance, some biological facts are not subject to voluntary modification." The court then continued on what we can generously describe as a page of hypotheticals and slippery-slope arguments with no factual basis.

---

[55] And while we do not require that each petition complies with the Social Security Administration standard, we do recognize that such compliance is one way to meet the requirements of our test.

CHIEF JUSTICE DURRANT, concurring in part, dissenting in part, and concurring in the judgment

¶117 We emphatically disavow such language and propositions. "Ours is a society of written laws. Judges are not free to overlook plain statutory commands on the strength of nothing more than suppositions about intentions or guesswork about expectations." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1754 (2020). As for the district court's declaration that "some biological facts are not subject to voluntary modification," the reader must be clinically aware by now that the sex change we are discussing has less to do with biology than with identity. *See supra* ¶¶ 84–91. And as for the hypotheticals suggested by the district court, we generally frown upon unsupported slippery-slope arguments. *See, e.g., Ipsen v. Diamond Tree Experts, Inc.*, 2020 UT 30, ¶ 18, 466 P.3d 190. We disapprove of them even more when they are used to curtail common-law-based individual rights. *See In re Porter*, 2001 UT 70, ¶ 7.

¶118 Consequently, we hold that appellants have met the requirements we outlined above and that their petitions for sex change should be granted.

## CONCLUSION

¶119 The adjudication of sex-change petitions lies squarely within the power granted to Utah courts by the Utah Constitution. Our district courts have the authority to adjudicate such petitions without any constitutional impediment. In order to prevail on such a petition, a petitioner must: (1) show the petition is not made for any "wrongful or fraudulent purpose," and (2) include objective evidence about the sex change reflecting the petitioner's identity, at minimum, in the form of evidence of appropriate clinical care or treatment for gender transitioning or change, provided by a licensed medical professional.

¶120 Mr. Childers-Gray and Ms. Rice have met these requirements. Therefore, we reverse and remand this case with instructions to enter orders granting their sex-change petitions.

───────────

CHIEF JUSTICE DURRANT, concurring in part, dissenting in part, and concurring in the judgment:

¶121 Our task with this statute, as with any, is to endeavor to discern legislative intent. We have traditionally employed a number of tools in conducting this inquiry. We begin with the words of the statute themselves and, where appropriate, look to the structure of the statute, both internally and in relation to other

CHIEF JUSTICE DURRANT, concurring in part, dissenting in part,
and concurring in the judgment

relevant statutes. A central focus of the debate between the majority and the minority here is whether in using the term "sex change" the legislature intended to set a substantive standard for when a birth certificate may be amended to reflect a different sex, or rather, whether the legislature intended only to establish the procedural mechanism for effecting a birth certificate amendment, using the terms "sex change" and "name change" merely to identify the two types of amendments for which that mechanism may be employed.

¶122 I am persuaded by the majority's argument that the legislature did not intend its use of the term "sex change" in section 26-2-11[56] to be read as a substantive standard. I so conclude for a number of reasons.

¶123 First, I am convinced by the majority's argument regarding the broad reciprocity required by the statute.[57] Under the statute, the registrar is required to amend a birth certificate upon receipt not only of an order from a Utah district court, but upon receipt of an order from other states or even Canadian provinces. This is so regardless of the particular substantive standards employed by these states or provinces with respect to name or sex changes.[58] This is not an instance of other jurisdictions forcing their substantive law on Utah. It is an election by the Utah legislature to defer to the law of other states and provinces with respect to name and sex changes on birth certificates. It suggests to me that the legislature was not so concerned with setting a substantive standard by its use of the terms "name change" and "sex change" as it was with identifying the kinds of birth certificate amendments subject to the statute. It further suggests to me that the legislature intended the statute to function as a somewhat routine procedural mechanism by which a birth certificate amendment may be effected, rather than as a substantive direction as to what constitutes a sex change. Further, the statute says nothing about the legal effect of a name or sex designation on a birth certificate.

---

[56] UTAH CODE § 26-2-11.

[57] *Supra* ¶ 78.

[58] *Supra* ¶ 78 n.33.

CHIEF JUSTICE DURRANT, concurring in part, dissenting in part, and concurring in the judgment

¶124   Second, I find an important interpretive clue in the statute's structure. As the majority notes, the terms "sex change" and "name change" are bundled together.[59] The legislature makes no attempt in the statute to distinguish them in any way, including with respect to the standard of proof. Certainly, a sex change is far more momentous than a name change. An individual's sex is considerably more consequential, both in substance and legal implication, than an individual's name. But the fact that these two kinds of changes are very different matters, both in magnitude and legal consequence, does not appear, given how the statute is structured, to be the focus of the legislature. Rather, the legislature appears to be focused on the way in which they are similar—they are both identifiers on a birth certificate. My reading of the statute suggests that for purposes of birth certificate amendment, and I emphasize this limited scope, the legislature intended that name changes and sex changes be treated in the same way, including in the standard of proof to which they are subject. The statute certainly includes nothing to suggest they should be treated differently.

¶125   My third reason for joining the majority on this point is also tied to the coupling of name change with sex change in the statute. Certainly no one is suggesting that the term "name change," as used in the statute, constitutes a substantive standard. I think it unlikely, given the coupling of the two terms, that the legislature intended the term "sex change" to constitute a substantive standard and not the term "name change." In sum, I conclude that, although the statute does not purport to set forth a substantive standard, either with respect to a name change or a sex change, the legislature did, by coupling the terms, evince an intent that they be treated in a similar manner, including in the substantive standard to which they are subject.

¶126   While it seems clear, at least to me, that the legislature intended that both kinds of birth certificate amendments be subject to the *same* standard of proof, the question remains *what* standard the legislature intended. The answer is an easy one with respect to a name change. The standard for such a change is set forth in section 42-1-2. A person seeking to have a name change recognized by the state must establish that the change is sought

---

[59] *Supra* ¶ 79.

CHIEF JUSTICE DURRANT, concurring in part, dissenting in part, and concurring in the judgment

for "proper cause." As the majority notes, we have interpreted "proper cause" in the name change context to require that the change not be "sought for a wrongful or fraudulent purpose."[60]

¶127 The legislature has passed no such statute with respect to those seeking to have a sex change recognized by the state. Given the structure of section 26-2-11, which couples name and sex changes and makes no attempt to suggest they should be subject to different standards, I think it reasonable to conclude that the legislature intended to impose no greater burden on those seeking a name change on their birth certificate than those seeking a sex change on their birth certificate. This may or may not be good policy, but that is of no consequence for our interpretive task. Our role is to ascertain legislative intent. And I see nothing in the language or structure of the statute suggesting that the legislature intended that the two types of birth certificate amendments be subject to different standards of proof. I would therefore employ the same proper cause standard the legislature has explicitly adopted for name changes to those seeking to have their birth certificate amended to reflect a sex change. And I would interpret the term "proper cause" for purposes of a sex change amendment to a birth certificate in the same way we have interpreted that term in the name change context—to require that the petitioner show the change is not sought for a wrongful or fraudulent purpose.

¶128 While everything I have written to this point is consistent with and supportive of the majority opinion, I do part paths in some respects.

¶129 I would not, as does the majority, invoke our common law authority in this case, except to the extent that I would look to our caselaw on the question of how we have interpreted the statutory standard of proper cause in the name change context. In other words, I do not think it necessary for us to rely upon the majority's argument that, by presupposing a district court's authority to order name and sex changes the legislature "conferr[ed] on sex-change adjudication the common-law

---

[60] *Supra* ¶ 51.

CHIEF JUSTICE DURRANT, concurring in part, dissenting in part,
and concurring in the judgment

authority existing with respect to name-change adjudication."[61] I
see the problem more as one of statutory interpretation.

¶130   In summary, my view of the appropriate interpretation
of the statute  proceeds as follows: (1) although the structure of
section 26-2-11 indicates  a legislative intent  that name and sex
change amendments to a birth certificate be subject to the same
procedural mechanism and the same standard of proof, the
statute does not provide that standard; (2) section 42-1-2 does,
however, provide a standard for a name change – proper cause;
(3) in light of the legislature's apparent intent that name and sex
changes be treated uniformly, I would apply this same proper
cause standard to those seeking to amend their birth certificate to
reflect a sex change. In other words, rather than looking to the
common law, I would look to section 42-1-2 for the appropriate
standard. Although the majority does rely upon section 41-2-2 for
the first part of its proposed standard, it relies solely upon the
common law for the second part.[62]

¶131   The majority articulates its two-part standard in this
way: first, sex-change petitions "should generally be granted
unless sought for a wrongful or fraudulent purpose";[63] and
second, "they are supported by objective evidence of a sex change,
which includes, at minimum, evidence of appropriate clinical care
or treatment for gender transitioning or change, provided by a
licensed medical professional."[64] I would characterize the
applicable standard differently. In order to more closely parallel
the statutory standard for name changes, I would stop at the
majority's first prong. So my proposed standard would simply be
that a person seeking a birth certificate amendment to reflect a sex
change must establish that the change is sought for proper cause.
And I would interpret the term "proper cause" as does the
majority, and as our court has done in the past, to mean that the
change is not sought for a wrongful or fraudulent purpose.

---

[61] *Supra* ¶ 16.

[62] *Supra* ¶ 18.

[63] *Supra* ¶¶ 103, 112 (citations omitted).

[64] *Supra* ¶ 18.

ASSOCIATE CHIEF JUSTICE LEE, dissenting

¶132 But rather than requiring objective evidence of treatment as an independent second requirement, I would characterize such evidence as one category of evidence that may be employed by a petitioner in order to establish proper cause. And I would conclude that the two petitioners in the case before us have provided more than ample evidence, medical and otherwise, of proper cause. So I would not set forth a definitive minimum standard for what must be shown to establish proper cause by a petitioner seeking a sex change amendment to a birth certificate. The structure of section 26-2-11, which presupposes the authority of the court to issue name and sex change orders without providing a standard of proof, as well the legislature's use of the broad "probable cause" standard in section 42-2-1 (which I argue is the most likely candidate for the legislature's intended standard for sex changes) both suggest a legislative intent that district court judges be accorded broad discretion with respect to these matters. I would allow the parameters of the scope and nature of the evidence necessary to establish proper cause under section 26-2-11 to develop over time, as district court judges exercise this broad discretion.

¶133 I have made my best effort to read the tea leaves of the legislature's intent in passing section 26-2-11. And I have great respect for the scholarly and thorough opinions authored by Justice Himonas and Associate Chief Justice Lee. They are both sincere attempts to answer a difficult interpretative question. But it should be noted that, despite our best efforts, in the end it is, as it should be, the legislature that has the last word. If it disagrees with the interpretations of section 26-2-11 we have advanced in these three opinions, the legislature of course has the power to amend the statute or pass an altogether different statute. And in the event it decides to do either, these opinions should prove helpful in that effort because, taken together, they provide a rigorous and in-depth exploration of both sides of the issues in this important area of the law.

---

ASSOCIATE CHIEF JUSTICE LEE, dissenting:

¶134 I endorse the values of personal dignity and individual determination. And I give voice to those values in the respect I pay to others. I have paid and will pay such respect in my personal interactions with transgender persons—in using their preferred names and pronouns and otherwise respecting their right of self-determination.

¶135    I have personal, moral grounds for so doing. Yet this is not a case about personal interactions or individual morality. It is a case about government records, and the legal grounds for amending them. Those grounds are controlled by law. And the law in question leaves no room for the decision made by this court today.

¶136    Since 1975 the Utah Code has provided for a court order directing an amendment to a birth certificate's "sex" designation. For decades this designation has been understood as a reference to biological sex—a determination made at birth, based on physical observation. But the petitioners ask us to transform the designation of biological sex into a designation of gender identity. They assert that their gender identity is not in line with their biological sex at birth. And they ask us to reform our law in a manner allowing an amended entry on their birth certificates reflecting their gender identity instead of their biological sex.

¶137    Today a majority of our court accepts that invitation. It takes the statutory reference to sex as an invitation for our court to inject new meaning into the statute by making common-law policy in this field. *Supra* ¶ 16. And it exercises that policymaking power by establishing a new law that is as permissive as any law in any state in the union, under a right to an amended birth certificate for any person who has received "appropriate clinical care or treatment for gender transitioning or change." *Supra* ¶ 112.

¶138    The court claims to be establishing an "objective" standard based on medical evidence. *Supra* ¶ 112. But the majority's standard does not require a medical diagnosis or prescribe an objective benchmark. It provides for an amendment to a birth certificate whenever a petitioner asserts that he or she has received "appropriate" care or treatment for "gender transitioning." *See supra* ¶ 112; *see also supra* ¶ 105 n.46 (citing the DSM-5 criteria for diagnosis of "gender dysphoria" but stating a standard that requires no diagnosis but only a showing of "appropriate clinical care or treatment"). This is not the statutory concept of sex for a Utah birth certificate. It is a complete transformation of that longstanding concept by a majority of this court.

¶139    I dissent from this decision. It is a double departure from longstanding limits on our judicial power. The court is exceeding the bounds of our jurisdiction in deciding a case in which there is no adverse party—only a request from those

seeking an amendment to their birth certificates. And it is overriding the terms of the Utah Code in treating a reference to a change in the biological sex determination made at birth as an invitation for our courts to make new law in an exercise of common-law policymaking power.

¶140 This decades-old statute is not a delegation of common-law policymaking power. It is a reflection of the settled understanding of the concept of sex as reflected on a birth certificate. The underlying concept is clear with regard to the designation made at birth, as the majority itself concedes. *See supra* ¶ 85 (acknowledging that it is "generally understood" that the designation of sex at birth "is based on a medical observation of genitalia and physical characteristics"); *supra* ¶ 89 n.40 (noting that Utah law contemplates that "health care professionals" will submit birth "certificates based on purely medical observations"); *supra* ¶ 104 (conceding that "a person's initial sex" designation is based on "a medical evaluation made according to objective observation at birth"). And the same concept should be understood to be carried forward to the analysis of the basis for an order for an amendment to that same designation.

¶141 The statute itself does not expressly articulate a "substantive standard" for entry of the order. *See supra* ¶ 54. But the statute does speak to the type or "kind[] of birth certificate" designation that is subject to change under the statute. *Supra* ¶ 78 n.33. And the lack of any further standard accordingly cuts against the notion of legislative delegation of common-law policymaking power. It suggests that the statute was plowing no new ground, and thus that the contemplated order for an amendment to a birth certificate is to be based on the same type of sex designation made at birth.

¶142 This follows from the canon of consistent meaning—the presumption that the established meaning of a word in a given body of law carries over to other uses of the same term used elsewhere within that same law. *See Cannon v. McDonald*, 615 P.2d 1268, 1270 (Utah 1980). It is also reinforced by the non-delegation doctrine set forth in our case law, *see State v. Briggs*, 2008 UT 83, ¶¶ 13–14, 199 P.3d 935, and the settled presumption that our legislature is not hiding "elephants in mouseholes." *Rutherford v. Talisker Canyons Fin., Co., LLC*, 2019 UT 27, ¶ 53, 445 P.3d 474 (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)). A delegation of common-law power to reform the traditional

concept of biological sex would be a large elephant. And a statute speaking only to the effect of a court order is a tiny mousehole.

¶143 The problem is reinforced (not averted) by the fact that the statutory reference to a change in a person's "sex" designation is "combined" with a reference to "name change." *Supra* ¶ 50. There is in fact a "common law" understanding of "name change." But there is no common law governing any change to the sex designation on a birth certificate. And the majority opinion in this case is not applying an established common-law standard (under the law of name changes or otherwise); it is formulating its own new standard out of whole cloth. For that reason the cited distinction cuts against the majority's approach. The legislative decision to "combine" an established common-law term with a term that has an established meaning in statutory administration indicates an intent to attribute common-law meaning to the common-law term and statutory meaning to the statutory term.

¶144 The court's contrary conclusion is no small matter. On its face, the majority decision is limited to birth certificates. But a birth certificate is an indicator of a person's sex when presented to our schools[65] and other institutions. And the majority decision will have far-reaching implications in these and other spaces. It seems destined, for example, to affect spaces traditionally reserved for biological girls and women—sex-segregated sports leagues,[66] school locker rooms,[67] and shelters designed as safe

---

[65] *See* UTAH CODE § 53G-6-603(1) (conditioning enrollment in public schools on presentation of "a certified copy of the student's birth certificate, or other reliable proof of the student's identity and age, together with an affidavit explaining the inability to produce a copy of the birth certificate.")

[66] This is a difficult issue that is sure to be affected by our decision. And clearly there are interests on the other side of the ledger. *See Soule v. Conn. Ass'n of Sch.'s*, No. 3:20-CV-00201-RNC (D. Conn. filed Feb. 12, 2020) (alleging that the practice of permitting biological males to compete in female athletic competitions violates Title IX); H.B. 1572, 111th Gen. Assemb., Reg. Sess. (Tenn. 2019) (proposing that publicly funded schools require that "each athlete participating in . . . athletic or sporting event[s] participate[] with and compete[] against other athletes based on the athlete's biological sex as indicated on the athlete's

(continued . . .)

spaces for victims of sex abuse.[68] In these and other spaces, the court's sweeping standard puts a heavy thumb on the scale of a

---

original birth certificate issued at the time of birth"); H.B. 500, 65th Leg., 2nd Reg. Sess. (Idaho 2020) (codified at IDAHO CODE ANN. § 33-6203 (West 2020) (requiring public schools to designate athletic teams "based on biological sex").

[67] *See A.H. ex rel. Handling v. Minersville Area Sch. Dist.*, 408 F.Supp.3d 536, 544, 582 (M.D. Pa. 2019) (holding that the plaintiff, whose birth certificate was "formally changed from male to female" was entitled "to use the restroom corresponding to her gender identity on all school-field trips"); *M.A.B. v. Board of Educ. of Talbot Cnty.*, 286 F.Supp.3d 704, 709–10 (D. Md. 2018) (alleging that a school's locker room policy, which requires students to use a locker room that is consistent with their biological sex, violates Title IX, the Equal Protection Clause, and the Maryland Declaration of Rights); Ann. E. Marimow, *Battle Over Transgender Student Rights Moves to High School Locker Rooms*, WASH. POST (Apr. 26, 2018), https://www.washingtonpost.com/public-safety/battle-over-transgender-student-rights-moves-to-high-school-locker-rooms/2018/04/25/b319365a-3f29-11e8-974f-aacd97698cef_story.html (discussing the significance of the battle over high school locker rooms).

[68] *See McGee v. Poverello House*, 1:18-CV-00768-LJO-SAB, 2019 WL 5596875, at *1–2, 9 (E.D. Cal. Oct. 30, 2019), ECF No. 46 (complaint filed by a group of homeless women against organizations that provided temporary shelters for those "who have suffered . . . sexual abuse"; asserting claims arising from a decision to allow a transgender person who was born a male but identified as a female "to shower with" the sex-abuse-victim plaintiffs); Joseph Brean, *Forced to Share a Room with Transgender Woman in Toronto Shelter, Sex Abuse Victim Files Human Rights Complaint*, NAT'L POST (Aug. 2, 2018), https://nationalpost.com/news/canada/kristi-hanna-human-rights-complaint-transgender-woman-toronto-shelter (discussing a human rights complaint by a sex-abuse victim against a Toronto shelter for "admitt[ing] a male bodied transgender into the safety of [her] home, bedroom and safe spaces," causing "stress, anxiety, rape flashbacks, symptoms of post-traumatic stress disorder and sleep deprivation").

range of sensitive matters of enormous significance to our society.[69]

¶145    The question of whether and how to balance these interests in the adoption of a *new* law in this field is a matter for the Utah legislature. That is a political body representing a wide range of ideologies and interests, with the manner and means of amending the laws on the books based on input from a diverse constituency and a wide range of views—through committee hearings, open debate, and a public vote.[70] This court is in no such

---

[69] The district court catalogued a series of these matters—raising concerns about the effects of a birth certificate amendment based on a person's "gender identity" on "insurance rates," "preferred contracting" (under affirmative action laws), athletic competitions, prisons, and more. Yet the majority brushes these concerns aside as "suppositions" and "guesswork," or "slippery-slope arguments with no factual basis." *Supra* ¶¶ 116–17. It also criticizes me for identifying a range of parallel concerns, suggesting that I have somehow crossed a line as an advocate for "the interests of the State." *Supra* ¶ 3.

This is unfair and unfounded. No adverse party has been given the opportunity to present any adverse position on the merits in this case. And with that in mind, Judge Hyde and I are both engaged in a similar endeavor—not in arguing for a preferred disposition or advocating for any particular view, but in identifying the third-party interests that are resolved by but have not been heard by the court. In my view it is not a vice but a virtue for a judge to highlight these concerns in the course of challenging the propriety of our exercise of jurisdiction.

The majority's approach on these matters is also riddled with irony. On one hand, the court insists that the traditional adversary model is no jurisdictional barrier to its determination to reach the merits of the question presented. On the other hand, the court takes the opposite tack when it comes to its analysis of the questions presented on the merits—asserting that any contrary concerns are off the table, as unbriefed by any adversary party. The court can't have it both ways. Either adverseness is required or it isn't.

[70] Our Utah legislature is certainly in a position to extend our law to capture "gender identity" instead of "sex" on an amendment to a birth certificate, or to take other measures aimed

(continued . . .)

position[71]—least of all in a "case" like this one, in which the court has heard from only one side of this difficult problem.

¶146    We lack the judicial power to make this decision in a case in which there is only a petitioning party and no adversary. Our courts have long been limited to the adjudication of adversary proceedings—cases involving the establishment of a petitioning party's rights at the expense of an adversary. The court overrides that longstanding limit—and the decades of precedent that establish it—in holding that our courts now have the authority to resolve any *ex parte* request for a change to any matter of "legal status or identification." *Supra* ¶ 15. This new standard of jurisdiction is limitless. It obliterates the long-settled line between executive and judicial power.

---

at balancing the competing interests implicated by this case. But to date, it has not done so. In 2018 and 2019, the legislature considered proposed amendments to the birth certificate law. H.B. 153, 2019 Leg., Gen. Sess. (Utah 2019); S.B. 138, 2018 Leg., Gen. Sess. (Utah 2018). And in the 2021 session, it considered a bill that would have regulated the eligibility of transgender persons to participate in sex-segregated sports in Utah. H.B. 302, 2021 Leg., Gen. Sess. (Utah 2021). None of these proposals was enacted into law or even came to a final floor vote. And none of these bills proposed to allow a birth certificate amendment based on evidence of appropriate care or treatment for gender transitioning or change.

Our court is thus getting ahead of the people's representatives in the legislature. And it is doing so without the benefit of any open, public debate or opportunity for input from competing stakeholders.

[71] Increasingly our society is giving in to this impulse. Too often we are caving to the pressure to "solv[e] political differences . . . through litigation rather than through legislation and elections." *See In re Trump*, 958 F.3d 274, 293 (4th Cir. 2020) (Wilkinson, J., dissenting), *vacated as moot by Trump v. D.C.*, 141 S. Ct. 1262 (2021). This is troubling. It is a "profoundly anti-democratic development," *id.*—a perilous shift of power from the people and their representatives to a body of unelected officials whose black robes have long given us the appearance of impartiality. That appearance is fragile. We should do all we can to retain it.

¶147 Prudential considerations would call for an order for adversary briefing even if the constitutional limits on our power did not. When other courts have been faced with the prospect of resolving an important legal question with briefing from only one side, they consistently have appointed an amicus to represent and advance the views of the missing opposition. This seems crucial in a case like this one, in which there clearly are interests on both sides, and the court is resolving them as a matter of common-law policymaking. The decision to plow ahead without adversary briefing is unwise even if it is not an excess of our power.

¶148 The majority's decision may be perceived by some as a triumph of freedom and self-determination. It cannot be applauded, however, as a triumph for our Utah laws or constitution. The majority is effectively rewriting a statute enacted by the legislature in 1975. And it is doing so in a case in which we lack any adverse party or adversary briefing—under a novel formulation of our courts' jurisdiction that effectively overrides the long-settled limits on the judicial power.

¶149 I respectfully dissent from this decision. I explain my reasoning further in the paragraphs below. First, I develop the basis for the conclusion that we should not be resolving this matter in a proceeding in which there is no adverse party and no adversary briefing. Second, I demonstrate that the statute approving an order for a change to the designation of a person's "sex" on a birth certificate is speaking to biological sex and is not delegating to this court the power to establish an evolving standard of "gender identity." Finally, I close with some final observations about the nature of my objections to the extraordinary decision made by the court today.

## I.     JURISDICTION

¶150 "The powers of the government" of the State of Utah are "divided into three distinct departments"—the legislative, executive, and judicial. UTAH CONST. art. V, § 1. Each branch is given distinct powers under the terms of the Utah Constitution.

¶151 The "[l]egislative power" is delegated to the Utah Legislature under article VI. *Id.* art. VI, § 1. Such power is the authority to enact legislation by "bill or joint resolution . . . passed . . . with the assent of the majority of all the members elected to each house of the Legislature." *Id.* art. VI, § 22. Subject to further terms and conditions set forth in article VI, the legislature has the power to "promulgat[e] . . . laws of general applicability . . . based on the weighing of broad, competing policy considerations."

*Carter v. Lehi City*, 2012 UT 2, ¶ 34, 269 P.3d 141; *see also Rampton v. Barlow*, 464 P.2d 378, 381 (Utah 1970) (speaking of the legislative power as "the authority to make laws").

¶152 The "executive power" in Utah is delegated to five "elective constitutional officers": "Governor, Lieutenant Governor, State Auditor, State Treasurer, and Attorney General." UTAH CONST. art. VII, § 1. The Governor is given the specific "executive power" to "see that the laws are faithfully executed," *id.* art. VII, § 5, while the Attorney General is designated as "the legal adviser of the State officers" and directed to "perform such other duties as provided by law." *Id*. art. VII, § 16. These executive powers involve decisions based on "individualized, case-specific considerations as to whether the acts of a particular person fall within the general rule adopted by the legislature." *Carter*, 2012 UT 2, ¶ 47. Executive power thus "encompasses prosecutorial or administrative acts aimed at applying the law to particular individuals or groups based on individual facts and circumstances." *Id.* ¶ 34.

¶153 The "judicial power" under our constitution is "vested in a Supreme Court, in a trial court of general jurisdiction known as the district court, and in such other courts as the Legislature by statute may establish." UTAH CONST. art. VIII, § 1. This power "is generally understood to be the power to hear and determine controversies between adverse parties and questions in litigation." *Citizens' Club v. Welling*, 27 P.2d 23, 26 (Utah 1933). The judicial power is thus distinct from the legislative or executive power. We have long held that our courts "have no power to decide abstract questions or to render declaratory judgments[] in the absence of an actual controversy directly involving rights" of adverse parties. *Univ. of Utah v. Indus. Comm'n of Utah*, 229 P. 1103, 1104 (1924). This is because the promulgation of such general, abstract rules is a legislative prerogative.[72]

¶154 Our courts are similarly foreclosed from exercising executive power. We do not apply the law to individual parties, as

---

[72] *See Baker v. Carlson*, 2018 UT 59, ¶ 13, 437 P.3d 333 (recognizing that the "two key hallmarks of legislative power" are "the promulgation of laws of general applicability" and the "weighing of broad, competing policy considerations" (citations and internal quotation marks omitted)).

by issuing or amending a government record, license, or permit.[73] Those are inquisitorial functions, which our courts are ill-equipped to perform. The judicial power is the power to adjudicate rights in an adversary posture. Our courts establish the rights of petitioning parties upon the satisfaction of responding parties.

¶155     This is a fundamental tenet of the separation of powers under the Utah Constitution. It has deep roots in our Anglo-American legal tradition, tracing at least as far back as Blackstone's Commentaries. Blackstone put the point in terms of "three constituent parts" of a judicial proceeding: "the *actor*, or plaintiff, who complains of an injury done; the *reus*, or defendant, who is called upon to make satisfaction for it; and the *judex*, or judicial power."[74]

¶156     This formulation became embedded in our American law from the beginning of the republic.[75] It is also a deeply rooted

---

[73] *See Carter v. Lehi City*, 2012 UT 2, ¶ 47, 269 P.3d 141 ("[T]he executive [power] encompasses not just prosecutorial decisions involving proposed sanctions, but parallel acts like permitting or licensing in circumstances where the law opts for that form of regulation.").

[74] 3 WILLIAM BLACKSTONE, COMMENTARIES *25; *see also* 1 EDWARD COKE, THE FIRST PART OF THE INSTITUTES OF THE LAWES OF ENGLAND 39a (London 1628) ("[I]n every judgment there ought to be three persons, actor, *reus*, and judex."); Caleb Nelson, *Sovereign Immunity as a Doctrine of Personal Jurisdiction*, 115 HARV. L. REV. 1559, 1568 & n.29 (2002) ("For centuries, Anglo-American lawyers have thought that the very existence of most kinds of judicial proceedings depends upon the presence (actual or constructive) of adverse parties."); *id.* at 1568 n.29.

[75] *See* The Hon. John Marshall, *Speech Delivered in the House of Representatives, of the United States, on the Resolutions of the Hon. Edward Livingston* (Mar. 7, 1800), in 4 THE PAPERS OF JOHN MARSHALL 82, 96 (Charles T. Cullen ed., 1984) (interpreting the judicial power over a "Case[]" in Article III of the United States Constitutional to require "parties to come to court, who can be reached by its process, and bound by its power; whose rights admit of ultimate decision by a tribunal to which they are bound to submit"); *United States v. Ferreira*, 54 U.S. 40, 46 (1851) (stating that certain determinations of treaty claims were not cases

(continued . . .)

in our Utah law on the separation of powers. For many decades this court repeatedly has held that the judicial power is marked by and limited to the disposition of controversies, or in other words the resolution of adverse interests.[76] We have emphasized the

---

because, among other reasons, the United States was not authorized to appear as a party to oppose the claim); *Marye v. Parsons*, 114 U.S. 325, 330 (1885) ("[N]o court sits to determine questions of law *in thesi*. There must be a litigation upon actual transactions between real parties, growing out of a controversy affecting legal or equitable rights as to person or property."); *California v. San Pablo & T.R. Co.*, 149 U.S. 308, 314 (1893) ("The duty of this court, as of every judicial tribunal, is limited to determining rights of persons or of property which are actually controverted in the particular case before it."); *United States v. Duell*, 172 U.S. 576, 588 (1899) (concluding that the District of Columbia Court of Appeals could review a decision of the Commissioner of Patents; stating that "the proceeding in the court [of appeals]" on an appeal in an interference controversy "presents all the features of a civil case—a plaintiff, a defendant and a judge"); *Muskrat v. United States*, 219 U.S. 346, 361 (1911) (stating that the judicial power "is the right to determine actual controversies arising between adverse litigants, duly instituted in courts of proper jurisdiction").

[76] *See Univ. of Utah v. Indus. Comm'n of Utah*, 229 P. 1103, 1104 (Utah 1924) (concluding that "[e]ven courts of general jurisdiction have no power to decide abstract questions or to render declaratory judgments, in the absence of an actual controversy directly involving rights"); *Citizens' Club v. Welling*, 27 P.2d 23, 26 (Utah 1933) (establishing that the judiciary has the "power to hear and determine controversies between *adverse parties and questions in litigation*" (emphasis added)); *Salt Lake City v. Ohms*, 881 P.2d 844, 849 (Utah 1994) (recognizing that the "judicial power of courts" is "generally understood to be the power to hear and determine controversies between adverse parties"); *Judd v. Drezga*, 2004 UT 91, ¶ 37, 103 P.3d 135 (explaining that the "judicial power is 'the power to hear and determine controversies between adverse parties and questions in litigation'") (quoting *Timpanogos Planning & Water Mgmt. Agency v. Cent. Utah Water Conservancy Dist.*, 690 P.2d 562, 569 (Utah 1984)); *State v. Guard*, 2015 UT 96, ¶ 59, 371 P.3d 1 (clarifying that under our judicial power "we

(continued . . .)

"duty" of this court "to vigilantly follow the strictures" of the constitutional limits on our power. *Utah Transit Auth. v. Local 382 of Amalgamated Transit Union*, 2012 UT 75, ¶ 26 289 P.3d 582.

¶157 These bedrock limitations on the judicial power have come under recent challenge. In an article in the Yale Law Journal, James E. Pfander and Daniel D. Birk identified examples of purportedly non-contentious matters heard historically by our courts, including cases involving bankruptcy petitions, receiverships, warrants, and petitions for pensions and citizenship. James E. Pfander & Daniel D. Birk, *Article III Judicial Power, the Adverse-Party Requirement, and Non-contentious Jurisdiction*, 124 YALE L.J. 1346 (2015). These authors cited these and other examples in support of the view that the judicial power is not limited to the resolution of "adverse" disputes. *Id.* at 1346 (asserting that the judicial power encompasses "power over disputes between adverse parties" and "power over ex parte and other uncontested proceedings"). They thus challenged the viability of an established justiciability doctrine by contending that the federal courts may "plausibly" be viewed to have been "given . . . the authority to exercise judicial judgment in the administration of federal law 'cases' on an ex parte or non-contentious basis" as assigned by Congress. *Id.* at 1425.

¶158 Two members of our court have echoed this challenge in recent cases. Noting that our courts have long been involved in some proceedings that have the "potential to lack adverse parties," two justices have suggested that our Utah Constitution may not limit our courts to the disposition of adverse controversies. *In re Gestational Agreement*, 2019 UT 40, ¶ 63, 449 P.3d 69 (Pearce, J., joined by Himonas, J., concurring). Citing matters like "adoptions, name changes, probate, and guardianship matters," which may be uncontested, they have suggested that our longstanding requirement of adverseness may be a mistaken relic in our case law, not a constitutional command. *See id.* ¶¶ 63–71 (questioning "whether the adversity that so often exists in judicial proceedings is constitutionally required").

---

resolve *concrete disputes* presented by parties" (emphasis added)); *State v. Robertson*, 2017 UT 27, ¶ 40, 438 P.3d 491 (stating that the judicial power "is limited to resolving specific disputes between parties as to the applicability of the law to their actions" (citation and internal quotation marks omitted)).

¶159 Today's majority finds "much to commend" in this challenge to our longstanding precedent in this important field. *Supra* ¶ 20 n.13. And it proceeds to the conclusion that we have jurisdiction to resolve the "case" before us despite the lack of adverseness—even while insisting that there is no need for us to "reach the issue" of whether to abandon our longstanding case law. *Supra* ¶ 20 n.13.

¶160 The court's holding, however, effectively erases the traditional, longstanding requirement of adverseness. In its place, the court introduces a new standard: Our courts may exercise jurisdiction over any petition aimed at changing a party's "legal status or identification." *Supra* ¶ 21. But this new standard has no bounds. It opens the door to judicial resolution of any of a range of matters falling within the power of the executive.

¶161 This is troubling. It is also unsupported by the cited examples of purportedly non-adversary proceedings. The cited examples are adversarial in the above-noted sense—they involve the adjudication of a petitioning party's rights at the expense of a responding party. That is all that is required to justify the exercise of judicial power. Adverse *argument* is not required, just the disposition of adverse *interests*.

¶162 This is clear from the above-noted Blackstone formulation—in the requirement of an "*actor*, or plaintiff, who complains of an injury done," and a "*reus*, or defendant, who is called upon *to make satisfaction for it*." 3 WILLIAM BLACKSTONE, COMMENTARIES *25 (third emphasis added). Our courts have power to resolve this sort of controversy or clash of adverse interests. We exercise judicial power when we establish one party's interest *at the expense of* another party (who makes "satisfaction" of the pleading party's interest).

¶163 This is not what our court is being asked to do here. Here we are being asked to alter or establish these plaintiffs' rights under the law in general. No adverse party's rights are extinguished or adjudicated in the course of the requested decision. And that renders this a non-judicial proceeding—a matter akin to a request for issuance of or amendment to a government document, license, or permit.

¶164 We should dismiss this case for lack of jurisdiction under this deeply rooted understanding of the judicial power. And even if we could somehow overcome this barrier as a matter of our jurisdiction, we should nonetheless order adversary briefing as a matter of discretion or prudence.

ASSOCIATE CHIEF JUSTICE LEE, dissenting

¶165    I highlight the grounds for my conclusions below in (a) noting that the historical understanding of the judicial power requires a disposition of adverse interests (but not always adverse argument); (b) explaining that the cited examples of non-contentious proceedings fit this understanding of adverseness; (c) demonstrating that historical name-change proceedings do not establish a basis for the court's novel formulation of the judicial power—a formulation that effectively overrules decades of our precedent; and (d) emphasizing the prudential need for notice and adversary briefing even if it is not required for our exercise of jurisdiction.

A.    The Judicial Power and the Disposition of Adverse Interests

¶166    Not every judicial act involves a disposition after adverse *argument* by opposing parties. Our courts have long been involved in proceedings in which opposing interests are forfeited or waived. And the judicial resolution of these matters may be viewed to "fall within the 'judicial power'" despite the lack of adversary briefing. *In re Gestational Agreement*, 2019 UT 40, ¶ 13, 449 P.3d 69.

¶167    This provides a credible basis for skepticism of the notion of a requirement of adverse *argument*. But it is no basis for repudiation of the adverseness requirement altogether. It just highlights the need for clarification of the nature of the requirement.

¶168    The clarification is highlighted in a recent article responding to Pfander and Birk's Yale Law Journal piece. In the response article, Ann Woolhandler addresses the "non-contentious" litigation examples identified by Pfander and Birk. She notes that the historical cases distinguish two aspects of adverseness: (a) "a requirement of adverse legal interests that will be affected by a decree"; and (b) "a requirement of adverse advocacy interests or adverse legal arguments."[77] And she establishes that only the former is required as a matter of historical practice.

¶169    A judicial case involves the disposition of adverse interests upon notice and an opportunity for those interests to be

---

[77] Ann Woolhandler, *Adverse Interests and Article III*, 111 NW. U. L. REV. 1025, 1032 (2017).

heard. But a court's jurisdiction does not disappear if adverse parties fail to or agree not to appear in opposition.[78] The failure to appear does not make the case non-adversarial; it just makes it uncontested.[79]

### B.      Uncontested Proceedings as Adverse

¶170    Judges resolve uncontested adversary proceedings with regularity. Collection actions are a common example. Other examples include some of the historical cases cited as exceptions, like uncontested adoptions and probate proceedings. An uncontested adoption is an adversary proceeding in the sense that there is a petitioning party (the adoptive parents) whose rights are established at the expense of an adverse party (the birth parents, whose rights are terminated). A probate action is also adversary — it is initiated by notice to the public of the pendency of an action in which any and all claimed interests in the *res* (the estate) are adjudicated.[80]

¶171    Such actions are thus adverse in the sense that a plaintiff's rights are established at the expense of a defendant.

---

[78] *See id.* at 1032–35 (explaining that the exercise of judicial power requires "adverse legal *interests* that will be affected by a decree;" notice to adverse parties; an *opportunity* for adverse argument; and a request for entry of a judgment (emphasis added)).

[79] *Id.* at 1032–33 ("A prototypical case involves some issues as to which the parties have both adverse legal interests as well as adverse arguments. Adverse legal arguments, however, are clearly not sufficient for a case, nor are they always necessary. By contrast, adverse legal interests are necessary and often sufficient. . . . [A] case requires a clash of legal interests but does not always require a clash of argument.").

[80] *Id.* at 1034 (noting that "in rem-type proceedings necessarily include the potential for a form of default, just as in personam actions do"); *id.* at 1043 (explaining that "non-contentious," "in rem-type proceedings" "all responded to a need to resolve conflicting claims to property that were difficult to adjust by agreement, provided service comporting with procedural due process, and could affect claims to the property even if parties failed to appear" and that "those with adverse interests frequently appeared to make adverse arguments").

There is an "*actor*, or plaintiff" and a "*reus*, or defendant," and the "*judex*, or judicial power" involves the establishment of the plaintiff's legal interests at the expense of or upon "satisfaction" by the defendant. 3 WILLIAM BLACKSTONE, COMMENTARIES *25. None of this requires adverse legal *argument*, however; the defendant's interests may be disposed of by waiver or default.

¶172    The Woolhandler article demonstrates that the historical examples in the Pfander and Birk piece are along these lines—and do not establish that adverseness is not an element of traditional judicial power.[81] As to bankruptcy petitions and receiverships, Woolhandler explains that these are forms of *in rem* jurisdiction, in which the courts were resolving disputed interests in a given matter upon notice and opportunity for adverse argument.[82] As to petitions for the determination of a right to a pension, the author cites the determination in *Hayburn's Case* that an *ex parte* determination of a claim by a pensioner would *not* be an act in a "judicial nature,"[83] and emphasizes that many of the historical cases were resolved by "commissioners" rather than judges exercising judicial power under Article III.[84] Finally, the author concedes that petitions for naturalization of citizenship are perhaps the "best example" of non-contentious jurisdiction.[85] But she emphasizes that judicial disposition of these petitions involved a recognition of a petitioning party's rights (citizenship) at the expense of an adversary (the sovereign)—an adversary

---

[81] I am not "overlook[ing] the arguments set forth in the cited articles. *Supra* ¶ 30. I have considered them carefully. I just find the Woolhandler account more complete and more persuasive— and more in line with long-settled tenets of our jurisprudence.

[82] Woolhandler, *supra* n.77 at 1036.

[83] *Id.* at 1056; *see also Hayburn's Case*, 2 U.S. 408, 410 (1792); HENRY M. HART, JR., & HERBERT WECHSLER, THE FEDERAL COURTS & THE FEDERAL SYSTEM 86 (7th ed. 2015) (stating that "Hayburn's Case . . . seems to reject rather decisively Congress' effort to enlist federal courts to act as administrative agencies by applying law to fact outside the context of a concrete dispute between adverse parties.").

[84] Woolhandler, *supra* n.77, at 1056.

[85] *Id.*

construct requiring "notice to" and "potential appearance by" the United States government as the obvious "adverse party."[86]

¶173    This basis for federal jurisdiction over naturalization proceedings is reflected in the territorial court's decision in *In re Kanaka Nian*, 21 P. 993 (Utah 1889)—a case cited by the majority in support of its assertion of jurisdiction. *See supra* ¶ 67. This was indeed a proceeding in the territorial court involving a petition for naturalization of citizenship. But it provides no support for the majority's assertion of jurisdiction over all changes to "legal status or identification" despite a lack of adverse interests. The United States government was the adverse party in that case. This was an adversary proceeding in which the applicant's citizenship was established upon satisfaction of any contrary claim by the government. Counsel "were heard for and against the admission of the applicant." *Id.* at 993; *see also id.* at 994 (noting that the petition "was opposed . . . on the ground that [the petitioner] did not appear to be possessed of sufficient intelligence to become a citizen").

¶174    This view of naturalization proceedings is likewise reflected in the Supreme Court's opinion in *Tutun v. United States*, 270 U.S. 568 (1926). There the Court noted that "[t]he United States is always a possible adverse party" in naturalization proceedings. *Id.* at 577. And that framing is consistent with the traditional understanding of adverseness—as a requirement of adverse interests, not adverse argument.[87]

---

[86] *Id.*

[87] The majority responds by asserting that the "distinction between adverse 'argument' and 'interests' swallows itself" because "a court could always identify a 'possible' adverse party for any matter before it." *Supra* ¶ 27. But this misses the point of the requirement of adverseness—and of the distinction between adverse interest and adverse parties. An adverse proceeding arises not upon "mere speculation of possible adverse interests," *supra* ¶ 27, but in a controversy in which the petitioning party's interests are established at the expense of the responding party's rights. When the government establishes a petitioning party's rights in the abstract—in a non-adversary proceeding, as in the issuance or amendment of a government record, license, or permit—it is exercising executive power. The judicial power is

(continued . . .)

¶175 This framework is also reinforced by our own precedent, most recently in *In re Gestational Agreement*. In that case we reinforced the longstanding general rule that our courts lack jurisdiction "in 'the absence of any justiciable controversy between adverse parties.'" 2019 UT 40, ¶ 12 (quoting *Carlton v. Brown*, 2014 UT 6, ¶ 29, 323 P.3d 571). But we upheld the jurisdiction of our courts to decide on the enforceability of an uncontested gestational agreement under the Utah Uniform Parentage Act. In so doing, we analogized such a proceeding to an uncontested adoption—a proceeding long heard by our Utah courts. *See id.* ¶¶ 14–15 (noting that the territorial and early Utah courts adjudicated uncontested adoptions). And with that historical practice in mind, we held the adjudication of parental rights would fall within the scope of the judicial power as understood "by the framers of our constitution" despite the lack of any contest or adverse argument by birth parents. *Id.* ¶ 13.

¶176 The *Gestational Agreement* majority did not use the express terminology of "adverse interests" and "adverse argument." But the court's holding is clearly rooted in these settled principles. The court first noted that uncontested adoptions are non-adversarial in the sense that the birth parents have agreed in advance to waive their right to present adverse *argument* as to their interests in the child. *See id.* ¶ 14–15 (noting that biological parents were required to give advance consent to the termination of their rights in founding-era uncontested adoption proceedings). Next, it indicated that an adoption order nonetheless involves a disposition of adverse *interests*—in an order establishing the adoptive parents' rights at the expense of (or upon termination of) the biological parents' rights.

¶177 The *Gestational Agreement* court thus held that the original understanding of the judicial power encompasses the authority to hear uncontested cases involving "the termination

_____

different. It involves the establishment of a petitioning party's rights at the expense of an adverse party.

This is not "the dissent's distinction." *Supra* ¶ 27. And it is not a principle emanating from a recent "law review article." *Supra* ¶ 26. It is the core premise of the judicial power established by centuries of jurisprudence. And that premise is overridden by the majority today.

*and* creation of parental rights." *Id.* ¶ 16 (emphasis added). It characterized such cases as "non-adversarial." *Id.* But the proceedings in question were "non-adversarial" only in the sense that they were uncontested—or in other words lacked adverse *argument*. And the *Gestational Agreement* opinion framed the category of "non-adversarial" proceedings that it found to fall within the original understanding of the judicial power in terms that made clear that adverse *interests* were implicated. *See id.* (holding that "the judicial power includes the power to hear non-adversarial proceedings *when* these proceedings involve parental rights" (emphasis added)).

¶178 The *Gestational Agreement* opinion cannot be viewed to have abandoned the requirement of adverseness more generally. It does not stand for the proposition that our courts have the power to "adjudicate" any category of case over which we have been "granted . . . substantive power" by the legislature, "regardless of adversariness." *Supra* ¶ 25. The *Gestational Agreement* majority does the opposite. It reinforces that adverseness is the general rule. And it recognizes only a limited exception to that rule—as to a category of cases in which there are adverse interests but no adverse argument.

¶179 The majority today is erasing the careful lines drawn in *Gestational Agreement* and overriding the longstanding requirement of adverseness. In so doing it is vindicating the position staked out by Justice Pearce in his concurrence in *Gestational Agreement*—an opinion that suggested that our court has never "squarely confronted" whether "the judicial power constitutionally vested in our courts contains a general requirement of 'adversariness'" and encouraged "exploration" of the issue "in further cases." *Id.* ¶¶ 56–57 (Pearce, J., concurring)*; see also id.* ¶¶ 63, 68–70 (suggesting that there is historical evidence that both Utah and federal courts historically "presided over nonadversarial proceedings" and that this court could benefit from "additional briefing and analysis"). The majority claims to be stopping short of endorsing this position. *See supra* ¶ 20 n.13 (finding "much to commend" in Justice Pearce's concurring opinion but insisting that the court is not "conclusively deciding" whether to adopt it). But the court's expressed standard is incompatible with the *Gestational Agreement* majority. It effectively holds that adverseness is no longer required in its assertion that we can exercise judicial power over any case over which we have been "granted . . . substantive power" by the legislature. *Supra* ¶ 25.

¶180    This is not our law. A "justiciable controversy" does not always produce adversary briefing. Yet it does require the disposition of adverse interests—upon notice to and an opportunity for briefing from known adverse parties. An adversary party may forfeit its interest (by default) or waive it in advance (by consent—as with an uncontested adoption or gestational agreement). A court lacks the power to establish a petitioning party's rights, however, if it is not doing so at the expense of or upon satisfaction by a responding party.[88]

C.    Name Change Proceedings and the Court's Rejection of the Requirement of Adverseness in favor of a New General Rule

¶181    The history of name-change proceedings is no basis for a decision to abandon the longstanding requirement of adverseness. Some name-change actions amount to adverse *in rem* proceedings akin to probate matters—actions in which the petitioning party's rights are established at the expense of any adverse interests after public notice of this prospect. A prime example would be a name change action that could effect identity fraud or debt avoidance.[89] This sort of name-change action would

---

[88] I agree with the majority that "'[t]he Utah Constitution enshrines principles, not applications of those principles.'" *Supra* ¶ 34 (quoting *South Salt Lake City v. Maese*, 2019 UT 58, ¶ 70 n.23, 450 P.3d 1092). But our constitutional principles are derived in the first instance from the original understanding of the text of the constitution. And the original understanding of the judicial power has long been viewed to encompass the requirement of adverseness. We should not abandon that principle at the first sight of an "analogy" that might seem to run counter to it. *But see supra* ¶ 34 (concluding that the analogy of name-change proceedings overrides the requirement of adverseness and establishes the principle that courts have power to adjudicate non-adversarial "status" determinations).

[89] *See, e.g.*, *Brown v. Name Change,* 611 So. 2d 1355, 1355–56 (Fla. Dist. Ct. App. 1993) (remanding to the district court for an evidentiary hearing in which the prison's interests could be considered in a name change case filed by an inmate *ex parte* and ruled on by the district court without any input from the prison); *In re Change of Name of DeWeese*, 772 N.E.2d 692, 694 (Ohio Ct. App. 2002) (explaining that one reason for requiring notice in a name change proceeding is to prevent fraud).

ASSOCIATE CHIEF JUSTICE LEE, dissenting

be an adverse proceeding in which the court would give notice to any adverse parties.[90]

¶182   Other name-change proceedings are less consequential, and less obviously adverse. In a run-of-the-mill name-change action, the petitioner is simply changing a surname to reflect an adoption or marriage, or changing a first or middle name in a manner that has no potential to resolve the interests of any third parties. Such an action would not be viewed as adverse in the sense of the petitioning party's rights being established at the expense of a defendant's. And in that sense, name-change actions may seem to stand as a historical exception to the general rule of adverseness.

¶183   But that still leaves the question of the inference to draw from this historical exception. The identification of an exception need not disprove the general rule—much less require that we displace it with a new rule. Sometimes an exception is just an exception—a narrow carve-out from the scope of a general rule, or in other words a ground for refining the general rule.

¶184   That is the proper course to take where the general rule is so deeply rooted and so consistently stated. The requirement of adverseness is a longstanding limit on the judicial power. It is a fundamental protection against excesses of the judiciary, rooted in the foundations of Anglo-American government and restated by this court from the time of its founding. We should not abandon it at the first sight of an apparent aberration.

¶185   The majority does essentially that. Instead of just endorsing a name-change *exception* to the general requirement of adverseness, the majority establishes a *new general rule*—the rule that our courts can adjudicate any case over which we have been "granted . . . substantive power" by the legislature, *supra* ¶ 25, at

---

[90] *See* UTAH CODE § 42-1-2 (providing for "notice . . . of the hearing" on a name change petition as ordered by the court); UTAH REV. STAT. § 1546 (1898) ("[T]he district court may order the change of name as requested, upon proof in open court . . . that thirty days' previous notice of the hearing thereof has been given in a newspaper published or having a general circulation in the county.").

least where the decision amounts to a "change[]" in a person's "legal status or identification," *supra* ¶ 23.

¶186 The new rule stands in stark contrast to our existing rule. Our existing rule was articulated by William Blackstone, reiterated by John Marshall, and cemented by centuries of Anglo-American precedent and decades of Utah precedent. *See supra* ¶¶ 154–55, 155 n.74, 156 n.75. The new rule has no such pedigree. The court cites no case or any other legal material that holds or even suggests that our courts have the judicial power to adjudicate changes of "legal status or identification." It just asserts that this rule is somehow implicated by the history of name-change actions in our courts.

¶187 The majority claims not to be "conclusively deciding" whether to repudiate the longstanding requirement of adverseness. *Supra* ¶ 20 n.13. But the court's decision effectively—and quite clearly—overrides it. The new rule swallows the old one.

¶188 After the decision today, it can no longer be said that a non-adversarial "administrative act[] aimed at applying the law to particular individuals or groups" is solely an executive function, *Carter*, 2012 UT 2, ¶ 34, or that our courts "have no power to decide abstract questions or to render declaratory judgments[] in the absence of an actual controversy directly involving rights" of adverse parties. *Univ. of Utah*, 229 P. at 1104. Instead, the new rule is that our courts can make non-adversarial administrative decisions so long as they affect "legal status or identification." The new rule has no limiting principle. It effectively overrides decades of Utah precedent and centuries of settled practice in our Anglo-American system of justice.

¶189 Any administrative act by the executive branch can be viewed as affecting "legal status." The disposition of a party's legal rights *is* the establishment of "legal status." The new rule would thus logically encompass any of a range of the most classically executive functions—including decisions on whether and how to prosecute a suspect and whether or how to issue or amend any government record, license, or permit.[91]

---

[91] I am not "collapsing" or equating "legal status or identification" with "issu[ing] or amend[ing] any government record, license, or permit," as the majority suggests. *Supra* ¶ 70

(continued . . .)

¶190 Under today's decision, our courts are thus no longer restricted to the exercise of traditional judicial power. We share the core power of the executive branch. We can make administrative decisions heretofore restricted to the executive. And we can do so in the absence of any disposition of or opportunity for input from any adverse interests.

¶191 I dissent from this sweeping decision. The history of name-change proceedings does not provide a basis for jurisdiction over all *ex parte* "status or identification" proceedings. At most it establishes a basis for a narrow exception to our settled general rule.

¶192 For these reasons I would hold that the legislature lacks the power to delegate to the courts the power to resolve the kind of petition at issue in this case. The petitions before us ask that we establish the petitioning parties' "legal status" under the law without adjudicating any responding party's competing

---

(alteration in original). I am simply noting that licensing and permitting are settled examples of core executive power—government acts establishing a petitioning party's "legal status" in the abstract instead of at the expense of a responding party's rights. And it is the majority that has failed to explain how its new "legal status or identification" standard can be reconciled with the settled limits on our judicial power, or interpreted in a manner that preserves any distinct function for the executive.

The court insists that "areas of the law traditionally regulated by the executive's permitting and licensing function are distinguishable from matters involving legal status or identification." *Supra* ¶ 70. But it never identifies any plausible basis for distinction. The closest it comes to an attempt at a distinction is the assertion that executive "licensing and permitting" are based primarily on "public safety purposes," while judicial "legal status" determinations are not. *Supra* ¶ 70 n.29. The proposed distinction fails, however, at both ends of the divide. The executive power has never been deemed to be limited to the pursuit of "public safety purposes." And the judicial power clearly spans more than just "legal status or identification."

The court's new lines are problematic. They bear no relation to the established terms and conditions of the executive and judicial power.

interests. We thus lack the jurisdiction to entertain this petition under well-settled law. And we have the duty to assess our jurisdiction *sua sponte*, regardless of the lack of any briefing that challenges it. *See* UTAH R. CIV. P. 12(h)(2); *In re Adoption of B.B.*, 2017 UT 59, ¶¶ 121, 127, 417 P.3d 1 (Lee, A.C.J., dissenting).

¶193 It is thus no answer to note that "no party" has challenged our jurisdiction or questioned the constitutionality of Utah Code section 26-2-11 as applied to this case. *See supra* ¶ 68 (stating that "no party" has argued that we lack jurisdiction or sought to challenge the presumption of constitutionality). That is hardly surprising given that the *only* parties to this case are those that are asking us to invoke our jurisdiction in their favor. Our statutes are admittedly entitled to a presumption of constitutionality. *See South Salt Lake City v. Maese*, 2019 UT 58, ¶ 96 & n.37, 450 P.3d 1092 (Lee, A.C.J., concurring) (citing case law establishing this presumption). But the presumption is rebuttable. And it has been rebutted here as applied to a petition that runs afoul of the settled rule that our jurisdiction is limited to the disposition of adversary proceedings.[92]

D.       We Should Call for Notice and Adverse Briefing Even if Not Required to Do So

¶194 Even if adverseness were not a required component of our jurisdiction under the Utah Constitution, that would leave the question whether we should nonetheless order adversary briefing for prudential reasons. And I see little room for doubt on that question.

¶195 In resolving this case, the court is establishing a new standard of gender identity to be reflected as the designation of a person's sex on Utah birth certificates. In adopting this new standard, the court is crediting the interests and arguments of the

---

[92] The majority is missing this point in suggesting that I must "know[] that [my] propositions, properly framed, would not withstand [the] presumption of constitutionality." *Supra* ¶ 69 n.28. There is no presumption that the legislature can delegate to our courts the power that has long belonged to the executive branch. We have an independent obligation to make sure that we are not exceeding the bounds of our jurisdiction. And any presumption of constitutionality that attaches to the statute has been rebutted in my view.

petitioners at the explicit expense of a host of contrary concerns. *See supra* ¶ 103 n.44 (repudiating my recognition of the existence of interests and viewpoints belonging to groups unrepresented in the non-adversarial briefing before the court). And the court's new standard will control all future proceedings in our Utah courts and will bind the executive branch of our government (the Utah Office of Vital Records) going forward.[93]

¶196    Perhaps the majority's new standard is a good one on a policy level. It is certainly protective of one set of interests at stake—that of transgender persons who wish to have their government documents match their gender identity.[94] But there are other interests on the table, like the interests of biological women in competing only with other biological women in sports (for scholarships, records, and awards), and the privacy and safety interests of those who enter high school locker rooms or safe-space shelters for abuse victims. The court is balancing away these and other contrary concerns without any notice to or voice from any party in a position to assert these adverse interests.[95]

---

[93] *See* UTAH CODE § 26-2-11 (requiring the state registrar to make an amendment to "the otherwise unaltered original certificate" upon receiving a court order along with an application and payment of a fee.)

[94] No one can seriously dispute the important role that birth certificates play in our society. A birth certificate "records the birth of a child for vital statistics, tax, military, and census purposes." A.B.A., *Birth Certificates* (Nov. 20, 2018), https://www.americanbar.org/groups/public_education/public ations/teaching-legal-docs/birth-certificates/. It "serve[s] as proof of an individual's age, citizenship status, and identity," as a basis for a person "to obtain a social security number, apply for a passport, enroll in schools, get a driver's license, gain employment, or apply for other benefits." *Id.* And the court's new standard will have indisputable effects in these and other applications. I cannot understand why we would choose to plow forward with the sweeping change adopted today without hearing from parties in a position to highlight concerns associated with a new standard of gender identity for birth certificates under our law.

[95] At an earlier stage of the proceedings we issued an order inviting amicus briefing on the question of our "jurisdiction" to

(continued . . .)

¶197    None of the majority's historical precedents provides support for the court's decision to resolve this matter in the absence of any adversary briefing. In none of the majority's cited examples is a court balancing away adverse interests in a conclusive resolution of a disputed legal question. There is no precedent for this kind of *ex parte* resolution of a state "adoption[], name change[], probate, [or] guardianship matter[]," *In re Gestational Agreement*, 2019 UT 40, ¶ 63, (Pearce, J. concurring), or of any federal proceeding involving a bankruptcy, receivership, pension or citizenship determination. In the mine run of those cases, the law is settled, no contrary interests are being foreclosed, and the court is not establishing a new legal standard. This case is different. And the majority has cited no salient support for its decision to exercise jurisdiction in a case like this one.

¶198    On a matter of this significance and magnitude, we should invite adversary briefing even if we are not required to do so. And if no adversary should appear, we should appoint an amicus to represent the adverse interests that are unrepresented in the briefing before us.

¶199    This is a path that many other courts have followed. The United States Supreme Court has invited an amicus to represent adverse interests dozens of times. *See* Katherine Shaw, *Friends of the Court: Evaluating the Supreme Court's Amicus Invitations*, 101 CORNELL L. REV. 1533, 1594 (2016). Often it does so in circumstances like those presented here, where there has been a "lack of genuine adversary proceedings at any stage in [the] litigation," and where the outcome "could have far-reaching consequences." *Granville-Smith v. Granville-Smith*, 349 U.S. 1, 4 (1955).

---

resolve this matter. But no court ever gave any notice of the right of any party to assert any interests on the merits of the question presented for our decision. And we have no briefing of that nature. Our court is making new policy in this sensitive field without any input from anyone who may be in a position to raise concerns about the establishment of a new standard of "gender identity" for Utah birth certificates. This is surely unwise as a matter of prudential policy, even if it is not foreclosed as a matter of our jurisdiction.

ASSOCIATE CHIEF JUSTICE LEE, dissenting

¶200    Without adversary briefing, we are ill-equipped to establish a new concept of gender identity to be reflected on birth certificates in Utah. As judges on a court of law, we are in no position to analyze and weigh for ourselves the competing interests implicated by a decision of this magnitude. We do not represent a constituency of voters and we have no mechanism for asking legislative committees to elicit input from the broad range of public views on the matter. In the exercise of our appellate authority, we are entirely reliant on the adversary system. And it makes no sense for us to tread boldly into the territory of common-law decisionmaking in the absence of any adversary input—even if we had the power to do so in a case in which there is no adverse party.

¶201    This prudential course admittedly would introduce some additional "delay" in an already long-pending matter. *See supra* ¶ 43 n.21 (raising this concern). But process matters. We could and should have dismissed this case on jurisdictional grounds very early on. That decision would have put the question presented back in the legislature's lap, where it belongs. And in all events, there is no basis for our court to be making new law on a matter of this magnitude in a non-adversarial proceeding.

## II. MERITS

¶202    The majority's decision is troubling even if we assume away the jurisdictional and prudential limits on our judicial power. Our power is limited in a second, important way. We are bound by the text of the law enacted by the legislature.

¶203    The governing text was enacted in 1975, when the legislature amended our longstanding Utah Vital Statistics Act. At that time, the legislature added a provision requiring the registrar of the Office of Vital Records to issue an amended birth certificate "[w]henever a person born in this state has their name and/or sex change approved by an order of a court" upon presentation of a completed application and payment of a fee. 1975 Utah Laws 222. This provision has been recodified (in essentially identical terms) in Utah Code section 26-2-11.

¶204    The question presented goes to the meaning of the statutory reference to a person's "sex" in this context. Everyone agrees that this term refers to a person's biological sex when the birth certificate is initially created. *See supra* ¶¶ 4 n.5; 90, 104. Here we are asked to decide whether the term "sex" takes on a different meaning in the context of a "change" to the same document.

¶205    That question has a straightforward answer on the face of the statutory text. A statute that speaks only to the *effect* of an order for a change to a birth certificate sex designation cannot be read to be delegating common-law power to develop an evolved concept of "gender identity."[96] The reference to "sex" in this statute is a reference to biological sex. That is the obvious sense of "sex" that is in play in the initial sex designation on a birth certificate. And that same concept must be understood to be carried forward in a statute that states no separate standard for an order *amending* that same document.[97] This follows both from the canon of consistent meaning and the presumption that a legislature does not "alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not . . . hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

¶206    The statute thus leaves no room for the majority's evolved standard of a sex-designation based on the receipt of

---

[96] This is in fact the concept of "sex" established by the majority as the law of this state. The court can insist that it is only deeming the "sex" designation as a "datum of legal status" and not "argu[ing] that 'sex' means 'gender identity.'" *Supra* ¶ 106 n.48. But the reality remains: The "datum of legal status" adopted by the court is one that equates a birth certificate sex designation with a person's gender identity under an evolved standard established by the court.

[97] Like the Chief Justice, I interpret the governing statute as envisioning a "routine procedural" filing "by which a birth certificate amendment may be effected." *Supra* ¶ 123. And I view the statute as speaking to "the kinds of birth certificate amendments subject to the statute." *Supra* ¶ 123. Yet I see those premises as pointing in a different direction than that outlined by the Chief Justice.

The statute may not prescribe a "substantive standard" for the issuance of an order for an amendment to a birth certificate. *Supra* ¶ 123. But it does speak to the "kind[]" of designation that is subject to amendment by court order. *Supra* ¶ 123. The operative concept or type of designation at issue is a biological sex designation—not a novel determination of gender identity. And in my view, that same kind of designation should be the one at play in any request for a court order to amend this vital record.

treatment for gender transitioning or change. Nor does it yield any indication of an intent to delegate common-law policymaking power to the courts. I develop both points in greater detail below.

### A.  Plain Meaning

¶207    We have long expressed a commitment to the "plain" or "ordinary" meaning of statutory language. *See, e.g., Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 9, 248 P.3d 465. This commitment is based on a host of good reasons, all rooted in our understanding of the rule of law. Only the plain language of the statute "survived the constitutional process of bicameralism and presentment." *Graves v. N. E. Servs., Inc.*, 2015 UT 28, ¶ 67, 345 P.3d 619. And it is thus our responsibility to give voice to "the policy judgment" reached by the political branches of our government—not to "impos[e] our own will through the exercise of our limited judicial power." *Id.* ¶ 70.

¶208    We can credit the plain or ordinary meaning of the language of our law only if we understand some nuances of our human language. And those nuances cut clearly in favor of a biological concept of "sex" as that term is used in Utah Code section 26-2-11.

¶209    A starting point is the acknowledgement that the building blocks of human language are subject to ambiguity—a word can be understood to have one meaning in one setting and a different one in another. Another is the idea that our language is subject to evolution over time—words can take on new meanings through the process of "linguistic drift." These elements contribute to the ambiguity in the language of the law. But they by no means rob our language of all determinate meaning. And they do not open the door to any and all judicial "interpretations" of legal language.

¶210    Much of the law's ambiguity is "eliminated by context." *Olsen*, 2011 UT 10, ¶ 13 (quoting *Deal v. U.S.*, 508 U.S. 129, 131–32 (1993)). Legal and linguistic context can even remove ambiguities arising from evolution in the meaning of a word over time. Think of the word "sick"—a term that traditionally was understood to refer to ill health, but more recently has morphed to include the idea of an impressive or risky move by an athlete. *See State v. Rasabout*, 2015 UT 72, ¶ 59, 356 P.3d 1258 (Lee, A.C.J., concurring) (noting this evolution in the use of this word). Historical uses of "sick" would not readily be viewed in the latter sense; and a law that spoke to "sick leave" for employees surely would be understood as addressed only to the former sense.

¶211    These observations dictate a clear answer to the interpretive question presented in this case. The term "sex" may arguably be in the process of linguistic drift. Increasingly, some people speak of "sex" as a term referring not only to biology but also to gender identity. Others insist on a contrary view, holding fast to the idea that sex is and can only be a matter of biology.[98]

¶212    The clash of these two conceptions has triggered a bit of a culture war. As with so many points of conflict in our society today, the tension is heated. Each side advances its view with fervor and occasional furor—with the charge that the latter view ignores or overrides established science, or the criticism that the former position fails to afford dignity or inclusion to those whose identity is incompatible with their biological sex.

¶213    Fortunately, we are not called upon to mediate this (or any other) dimension of a culture war. We are asked only to decide the question whether the term "sex" as used in a 1975 statute governing the terms of a birth certificate can be understood as a reference to the concept of "gender identity" that has evolved in recent years. The answer to that question is clear. It cannot. And any ambiguity is resolved on the basis of both the timing and the context of the 1975 statute.[99]

¶214    The statute in question was enacted in 1975. At that time, a reference to a person's "sex" unambiguously was

---

[98] *See* GLAAD Media Reference Guide – Transgender, https://www.glaad.org/reference/transgender (last visited April 22, 2021) (defining sex as a classification based on biological characteristics and gender identity as a "person's internal, deeply held sense of their gender").

[99] My analysis is focused on the meaning of a "change" to the designation of a person's "sex" on a birth certificate. This is the relevant legal and linguistic context of the statutory language—and the context that must be taken into account in discerning the ordinary meaning of the terms of the statute. The statute, after all, cannot possibly be read to require a court order as a legal precondition to a person's right to undergo this kind of "sex change." In contemplating an order for a "sex change," the statute is clearly speaking of a "change" in the designation of a person's "sex" on a birth certificate. And my analysis is thus focused on the meaning of that kind of "sex change" in this legal context.

understood as a reference to biological sex. This is confirmed by a wide range of dictionaries in place in 1975—and even extending to the fifteen-year period after that date of enactment. All of the dictionaries we have consulted from that time period define "sex" as a biological concept.[100] None of them defines "sex" as a fluid

---

[100] *Sex*, RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE SECOND EDITION (1987) ("1. either the male or female division of a species, esp. as differentiated with reference to the reproductive functions 2. the sum of the structural and functional differences by which the male and female are distinguished, or the phenomena or behavior dependent on these differences."); *Sex*, WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY (1984) (reprt. 1988) (1984) ('1. a. The property or quality by which many living things are classified according to their reproductive functions. b. One of the two divisions, either male or female, of this classification. 2. Males or females as a group 3. a. The condition or character of being male or female b. The physiological, functional, and psychological differences that distinguish the male and the female. . . . 6. The genitalia"); *Sex*, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (reprt. 1981) (1969) ("1.a. The property or quality by which organisms are classified according to their reproductive functions. b. Either of two divisions, designated *male* and *female*, of this classification. 2. Males or females collectively. 3. The condition or character of being male or female; the physiological, functional, and psychological differences that distinguish the male and the female."); *Sex*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (reprt. 2002) (1961) ("1 : one of the two divisions of organic esp. human beings respectively designated male or female . . . 2 : the sum of the morphological, physiological, and behavioral peculiarities of living beings that subserves biparental reproduction with its concomitant genetic segregation and recombination which underlie most evolutionary change, that in its typical dichotomous occurrence is usu. genetically controlled and associated with special sex chromosomes, and that is typically manifested as maleness and femaleness. . . .").

Some of the above definitions do refer to "'psychological,' 'behavior[al],' or 'character' differences" as possible indicators of "sex" in some species. *Supra* ¶ 86. But it does not follow that a "sex" designation *on a birth certificate* would be made by reference to these sorts of differences. And it surely does not follow that this

(continued . . .)

construct tied to an individual person's identity. Only one of these dictionaries, in fact, refers to the more evolved concept of identity at all, and it does so in a definition of "gender identity."[101]

¶215     The culture-war concern about the biological concept of "sex" has thus arisen only in recent years. So any linguistic drift of this term had not developed at any time in which our legislature enacted law in this field. Neither the majority nor the petitioners have cited any authority to the contrary. And in fact at least one of the cases relied on extensively by the majority confirms my contrary conclusion. *See Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1739 (2020) (proceeding on the assumption that "the term 'sex' in 1964 referred to 'status as either male or female [as] determined by reproductive biology" (alteration in original)); *id.* at 1746–47 (openly stating that the court "agree[d]" that a person's "transgender status" is a "distinct concept[] from sex").

¶216     The biological meaning of the term "sex" here is reinforced by the legal and linguistic context of its use in this statute. The reference to the designation of a person's sex *on a birth certificate* can only be understood as a reference to biological sex. This is clear, first, as a matter of simple logic—a baby has no capacity for expression of gender identity, so only biological sex can be reflected on a birth certificate. But it is also clear as matter of the established use of this term in this legal setting. In the birth certificate setting, "sex" is an unambiguous reference to biological sex, not gender identity.[102]

---

use of the term "sex" historically was understood to refer to gender identity—or receipt of treatment for gender transitioning or change.

[101] *Gender Identity*, RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE (2d ed. 1987) ("[A] person's inner sense of being male or female, usually developed during early childhood as a result of parental rearing practices and societal influences and strengthened during puberty by hormonal changes").

[102] *See In re Ladrach*, 513 N.E.2d 828, 832 (Stark Cnty. Ohio Prob. Ct. 1987) (noting that "[i]t is generally accepted that a person's sex is determined at birth by an anatomical examination by the birth attendant," resulting in "a declaration on the birth certificate of either 'boy' or 'girl' or 'male' or 'female'"); Alice Domurat Dreger, *"Ambiguous Sex" —or Ambivalent Medicine?*

(continued . . .)

ASSOCIATE CHIEF JUSTICE LEE, dissenting

¶217    The majority cites no contrary authority—indeed, it concedes the threshold point. *See supra* ¶¶ 4 n.5; 90, 104. And I can find no basis for viewing the designation of a person's "sex" on a birth certificate as anything other than a reference to biological sex. There is thus no basis for any ambiguity in the meaning of the term "sex" in the context of a birth certificate designation. The term, in this context, is plain. Any ambiguity is eliminated by context.

¶218    That leaves only the question whether the reference to a "sex" designation on a birth certificate can be viewed to incorporate a different meaning when it comes to a "change" to that designation. And again, the answer to that question is clear. The statute itself doesn't spell out an express standard for a court to issue an order approving a change to a birth certificate "sex" designation. But that speaks volumes. In a statutory scheme that governs both the original content of a birth certificate and later changes to that content, the reference to a "change" to the original content cannot be viewed to alter the scope of the original content. The "sex" designation in both instances is the same.

¶219    This was, in fact, the widespread understanding of the concept of a "change" to birth certificate "sex" designation at the time of the initial enactment of the controlling statute. In every single state with statutes allowing an amendment to a sex designation on a birth certificate in 1975 (there were only a few), literally all of them required a change to physiological manifestations of biological sex—sex-reassignment surgery.[103]

---

*Ethical Issues in the Treatment of Intersexuality*, 28 HASTINGS CTR REP. 24, 27–28 (1998) (describing how, in cases involving ambiguous genitalia, teams of medical experts such as "geneticists, pediatric endocrinologists, [and] pediatric urologists" are assembled to determine sex based on biological factors).

[103] *See* Edward S. David, *The Law and Transsexualism: A Faltering Response to a Conceptual Dilemma*, 7 CONN. L. REV. 288, 300–04 (1974) (suggesting that it was "difficult to ascertain" where the states stood on the matter in 1974 but identifying only three states—Arizona, Illinois, and Louisiana—that allowed "birth certificate changes for transsexuals" and noting that all of them required sex-reassignment surgery); *see also In re Ladrach*, 513 N.E.2d at 830 (noting that the three states that had statutes

(continued . . .)

¶220 The majority gives an initial nod to the obvious connection between the biological concept of "sex" on the original

---

allowing birth certificate amendments based on sex change (Arizona, Illinois, and Louisiana) required surgery); Act of May 4, No. 39, 1973 Haw. Sess. Laws 50–51 ( "A new certificate of birth shall be prepared by the director of health for a person born in the State upon receipt of an affidavit by a physician that he has performed an operation on the person and that by reason of the operation the sex designation on such person's birth record should be changed"); Act of June 11, 1975, ch. 556, 1975 N.C. Sess. Laws 602, 602 (allowing a petitioner to "change the sex on his or her birth record because of sex reassignment surgery, provided that the request is accompanied by a notarized statement from a physician licensed to practice medicine stating that he performed the sex reassignment surgery or that, based on his physical examination of the individual, he or she has undergone sex reassignment surgery"); New York City Dep't of Health & Mental Hygiene Board of Health, Notice of Adoption of Amendment to Article 207 of the New York City Health Code (2018), https://www1.nyc.gov/assets/doh/downloads/pdf/notice/2018/noa-amend-article207-section207-05.pdf ("In 1971, the Board of Health [was allowed] to file a new birth certificate with a corrected gender marker . . . for a person . . . who underwent 'convertive' surgery." "[T]he requirement for convertive surgery" was not eliminated until 2014.); NAT'L CTR. FOR HEALTH STATISTICS, Pub. No. (PHS) 78-1115, MODEL VITAL STATISTICS ACT AND MODEL STATE VITAL STATISTICS REGULATIONS § 21(e) (1978), https://www.cdc.gov/nchs/data/misc/mvsact77acc.pdf (allowing birth certificate amendment when "the sex of an individual born in this State has been changed by surgical procedure"); Dean Spade, *Documenting Gender*, 59 HASTINGS L.J. 731, 768 (2008) ("Every state allowing change of sex on a birth certificate requires evidence of surgery to warrant a gender reclassification. . . .").

The majority has cited no contrary authority. It has thus conceded that its standard is not rooted in any legal standard in place when the governing statute was amended. And it has accordingly acknowledged that its decision can be viewed only as the establishment of new judicial policy by the Utah Supreme Court.

birth certificate and the statutory reference to a "change" to that designation. But it quickly abandons the connection (without acknowledging the active nature of its move).

¶221     The initial concession is the statement that the court "believe[s] that, much like a sex designation made at birth, a change in sex designation should be accompanied by objective evidence." *Supra* ¶ 105. So far, so good. Yet the very next sentence is the articulation of an entirely new concept of a change in the designation of a person's sex. After stating that it "believe[s]" that the "sex" designation on the original birth certificate is based on objective medical evidence, the court moves immediately to this: "As a result, we hold that a petitioner must present, at the minimum, evidence of appropriate clinical care or treatment for gender transitioning or change, provided by a licensed medical professional." *Supra* ¶ 105. But this is a linguistic non-sequitur. The court's new standard is by no means a "result" of the biological concept of sex that controls the original birth certificate designation. This is clear from the fact that the court nowhere attempts to tie its standard of "gender identity" to a definition of "sex."[104] In formulating its new standard, the majority is not invoking an ordinary or legal definition of "sex"—and certainly not a definition from the time period in which the statute in question was enacted. It is just asserting that there is "gap" in the statute, and leaping from that gap to the prerogative of establishing a novel meaning of the words that do appear in the statute. *See supra* ¶ 50.

¶222     There is no "gap" that is not eliminated by the context of the statute in which the term "sex" appears. A statute that refers only elliptically to an order for a "change" to the designation of a person's "sex" on a birth certificate must be viewed to refer to the same concept of sex established at the time of a child's birth.

¶223     A basis for a change in that designation could be established upon discovery of a mistake in the biological sex

---

[104] The court does refer to a definition of "sex" in a different legal setting—in a statute prohibiting discrimination on the basis of "sex" in housing. *See supra* ¶ 4 n.5. But it does not adopt the housing discrimination notion of "sex," or even its separate concept of "gender identity." *See infra* ¶ 226 (discussing this point further).

designation made at the time of a child's birth, or a showing that the biological features of an intersex person have developed differently than expected at birth. It also might be met where a person can demonstrate that the biological indicators of sex have been altered, as by sex-reassignment surgery.[105] But the statutory basis for a change in a birth certificate "sex" designation cannot be established on the mere basis of a change in "gender identity" evidenced only by "appropriate clinical care or treatment" for gender transitioning or change. This is not our law. Gender identity is not sex—at least not in the birth certificate context.[106]

---

[105] Such surgery conceivably could establish a basis for a "change" to a person's "sex" that would sustain a birth certificate amendment. I stop short of giving a conclusive answer, however, because this case comes before us in a non-adversary posture and this question is not presented for our decision in any event.

If and when our law adopts a standard along these lines, that could require us to address some of the line-drawing questions highlighted by the majority. *Supra* ¶ 91 (citing an "array of surgical options" and a disagreement among the courts as to what might qualify as "sex-reassignment surgery"). But I am not advancing a proposed standard for "sex change" based on sex-reassignment surgery. And the concern about line-drawing is at least as clearly implicated by a standard requiring courts to decide (without adversary input) whether a petitioner is seeking "appropriate clinical care or treatment for gender transitioning or change." *Supra* ¶ 105.

[106] The majority concedes that the sex determination on a birth certificate is "generally determined by an external 'anatomical examination,' not by an examination of the individual's chromosomal makeup." *Supra* ¶ 88. It also notes, however, that "sex chromosomes are immutable" and cannot be altered by "therapy, treatment, or procedure." *Supra* ¶ 88. And with that in mind, the court insists that the legislature "could not have intended to include consideration of sex chromosomes in its conception of 'sex' in a statute regarding name and sex change." *Supra* ¶ 88. On that basis, the court then proceeds to assert that "any definition of 'biological sex'" must somehow "ultimately fail in this context." *Supra* ¶ 89 n.39. Yet that does not follow. The court has identified a basis for limiting the basis for an amendment to a birth certificate sex designation to the basis for

(continued . . .)

¶224 In the paragraphs below I develop further support for this understanding in the canon of consistent meaning and the presumption that legislatures "don't hide elephants in mouseholes."

### 1. Consistent Meaning

¶225 The consistent meaning canon says that a term used in one sense in a body of law is "presumed to bear the same meaning" elsewhere. ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 170 (2012). The presumption is by no means irrebuttable. When context indicates, the same term can be understood to be used in two different ways in the same body of law. *See id.* at 172–73. Yet context can also reinforce the presumption, and the canon of

---

the initial designation—physical observation. It has not, however, identified any reason to call *that basis* for the sex designation into question.

The majority goes off on some further tangents that miss this nuance and misunderstand my position. In defending its view, the court rejects as "absurd[]" the notion that "biological sex" might "includ[e] the immutable genetic makeup of an individual." *Supra* ¶ 89. And it then argues at some length that a birth certificate sex designation must therefore be a "legal classification" and not a "biological" one, *supra* ¶ 89, and even that "any definition of 'biological sex'" must accordingly "fail in this context." *Supra* ¶ 89 n.39. I find this puzzling. No one has argued that the biological sex designation on a birth certificate should be based on a chromosomal test. The question is not presented, and I have not advanced this position. I have argued instead that the basis for an amendment to a birth certificate sex designation should be focused on the basis for the initial sex designation—physical observation of anatomical manifestations of sex. That is a legal classification *based on* a biological classification. And there is nothing absurd about it.

The question presented goes not to the basis for the biological determination (which is also the legal determination), but to whether a statute that makes clear reference to that determination can be viewed as compatible with a determination of a person's gender identity. It cannot.

consistent usage is strongest where, as here, the same term is used in closely connected ways.[107]

¶226 The connection here is unmistakable. It follows from the fact that the statute fails to speak independently of a standard for a "change" in the designation of a person's "sex"—the basis for such an order is simply presumed. In this setting, there is an implicit assumption that the "sex" designation subject to "change" is the same sort of designation being made in the first place. Where all agree that the original "sex" designation on a birth certificate is an objective determination based on observation of physical characteristics, the statutory reference to an order for an amendment to the *same designation* on the *same document* must be understood in the same way.

¶227 The majority's contrary conclusion is rooted in part in its consideration of an entirely distinct body of law—in a definition of "sex" in the Utah Fair Housing Act. *See supra* ¶ 107 n.50 (stating that the court is looking to the statute "for guidance"). Because that statute prohibits discrimination in housing on the basis of "sex," and says that "'sex' means gender," not "gender means sex," the court concludes that "the legislature, in its wisdom, conferred broader meaning on the term 'sex.'" *Supra* ¶ 4 n.5 (quoting Utah Code § 57-21-2(22)). But the court identifies no basis for extending the Fair Housing Act definition of "sex" to the use of that term in the context of birth certificate amendments. It nowhere explains, moreover, how it can get its particular "broader meaning"—"appropriate care or treatment for gender transitioning or change"—out of the Fair Housing Act. Ultimately, the Fair Housing Act definitions cut squarely against the majority's position.

¶228 The case law makes clear that the consistent meaning presumption is particularly sensitive to context. The presumption "can hardly be said to apply across the whole *corpus juris*." Scalia & Garner, *supra*, at 172. Where two bodies of law are clearly

---

[107] *See Off. of Pub. Advoc. v. Superior Court, Third Judicial Dist.*, 462 P.3d 1000, 1006 (Alaska 2020) (employing the consistent meaning canon where two statutes were "enacted close in time" and "addresse[d] related subject matter"); Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 172–73 (2012) (noting that the canon is strongest where the connection between two statutory provisions is clearest).

distinct from each other, "[t]he mere fact that" the same words are used in each area of law "is not a sufficient reason" for treating the meaning established in one body of law "as authoritative on the construction of another statute." *Rupert Cross, Precedent in English Law 192 (1961)Id.* at 172–73 (citation omitted). The further removed the two bodies of law are from each other (in subject and time of enactment), the weaker the presumption of consistent meaning. *Id.* at 173. This defeats the majority's reliance on the Fair Housing Act definition of "sex." The cited definition in the Fair Housing Act was enacted in 1989—fourteen years removed from the statute at issue here. Housing discrimination, moreover, bears little connection to birth certificate amendments. The clearly closer connection is to the use of "sex" in the initial formation of the birth certificate. For these reasons, the Fair Housing Act definition is hardly supportive of the majority's view.

¶229     The majority never explains, moreover, how it gets from the Fair Housing Act's notion that "sex means gender" to the idea that "sex means care or treatment for gender transitioning or change." It does not—even under the Fair Housing Act. The cited definition of "sex" is truncated in the quote in the majority opinion. Under the housing statute, "'sex' means gender *and includes pregnancy, childbirth, and disabilities related to pregnancy and childbirth*." Utah Code § 57-21-2(22) (emphasis added). The italicized language is significant. It indicates that even in the Fair Housing Act, the legislature isn't using "sex" (or "gender") to refer to care or treatment for gender transitioning or change, but to aspects of sex that are related to the biological indicators of sex (like pregnancy and childbirth). This conclusion is reinforced by the Fair Housing Act's separate prohibition of discrimination based on "gender identity," and the separate definition of that term as incorporating "the meaning provided in the Diagnostic and Statistical Manual (DSM-5)," which may be established by evidence of "medical history, care or treatment of the gender identity, consistent and uniform assertion of the gender identity, or other evidence that the gender identity is sincerely held, part of a person's core identity, and not being asserted for an improper purpose." *Id.* § 57-21-2(16).

¶230     This is telling. Perhaps the Fair Housing Act definitions in some way suggest that the legislature "conferred broader meaning to the term 'sex'" than the term would bear in other contexts. But there is no reason to view the housing definition to apply in the birth certificate context. And the housing

definitions, if anything, confirm that "sex," however broad, does not mean "care or treatment for gender transitioning or change."

¶231 The majority, in all events, does not ultimately apply the Fair Housing Act definition of "gender identity." It rejects that statute's requirement of proof that gender identity is "sincerely held" and "part of a person's core identity." *Supra* ¶ 107. And the court turns instead to standards of gender identity applied by the Social Security Administration, the State Department, and courts in other states.[108] *See supra* ¶¶ 108–10.

¶232 The majority's standard, moreover, does not even align with the standards promulgated by the Social Security Administration and State Department or with many of the cited standards adopted in other states.[109] The federal standards require

---

[108] The majority also refers to orders entered in twelve cases filed in our Utah district courts, asserting that such orders "show" that "an objective medical standard" is "workable." *Supra* ¶ 111. But the cited orders can hardly be viewed as representative of the standards applied by our Utah district courts. They are just a sampling of orders submitted by the petitioners in support of their proposed standard. The cited Utah orders, moreover, are not supportive of the majority's approach in any event. They do not suggest that our district courts have provided for an amendment to a sex designation on a birth certificate based on proof of "appropriate clinical care or treatment for gender transition or change." Several of them refer to completed surgery or ongoing hormone therapy, neither of which is required by the majority's new standard. *See In re Davis*, No. 173900047, at 2 (Utah Dist. Ct. Second Dist. Mar. 27, 2017) (petitioner had undergone irreversible genital reassignment surgery); *In re Collins*, No. 153902244, at 3 (Utah Dist. Ct. Third Dist. Dec. 3, 2015) (petitioner had undergone hormonal replacement therapy, had been receiving female hormones for decades, and had undergone gender reassignment surgery).

[109] The State Department also recognizes a difference between an individual who is still undergoing transition, and one who has completed that transition, although it does not require surgery as evidence that a sex transition is complete. *Change of Sex Marker*, U.S. DEP'T OF STATE, https://travel.state.gov/content/travel/en/passports/need-passport/change-of-sex-marker.html (last visited April 22, 2021).

certification of clinical treatment from a Doctor of Medicine or Doctor of Osteopathy.[110] And two of the cited state standards require sex-reassignment surgery.[111]

¶233 The majority's standard is different. Our court provides for a change in the sex designation on a birth certificate upon proof of *any* form of "appropriate clinical care or treatment for gender transitioning or change." *Supra* ¶ 18. This is not a standard rooted in the language of our Utah statute, or any plausible understanding of "sex" in this context. It is a sweeping new standard formulated by this court.[112]

---

[110] *Program Operations Manual System, RM 10212.200 Changing Numident Data for Reason other than Name Change*, SOC. SEC. ADMIN., (Jun. 13, 2013), https://secure.ssa.gov/poms.nsf/lnx/0110212200 (last visited April 22, 2021); *Change of Sex Marker,* U.S. DEP'T OF STATE, https://travel.state.gov/content/travel/en/passports/need-passport/change-of-sex-marker.html (last visited March 26, 2021).

[111] *See supra* ¶ 110; *In re McDannell*, 2016 WL 482471, at *4 (Del. Ct. Com. Pl. Feb. 5, 2016); *In re Heilig*, 816 A.2d 68, 86 (Md. 2003).

[112] The Chief Justice stops short of endorsing the majority's substantive standard. Instead of requiring proof of "appropriate clinical care or treatment for gender transitioning or change," the Chief Justice proposes to require only proof of "proper cause"—a standard (imported from the name-change setting) that forecloses petitions filed "for a wrongful or fraudulent purpose." *See supra* ¶ 131. I would not equate the concepts of name-change and sex-change for reasons explained below. *See infra* ¶¶ 270–80. But I also see problems with the Chief Justice's proposed standard on its own terms.

"Proper cause" is not a substantive standard. It does not define the relevant concept of a designation of a person's "sex." It is simply the articulation of a negative basis for rejecting a petition filed for improper reasons. And without some substantive standard or articulation of the operative concept of the designation of a person's "sex" on a birth certificate, we will be left with nothing but unbridled judicial discretion on what is "proper." *See supra* ¶ 132 (suggesting the need to let the "parameters of the scope and nature of the evidence necessary to

(continued . . .)

## 2. Elephants in Mouseholes

¶234    Even if there were some ambiguity as to the meaning of "sex" in the birth certificate context, the ambiguity could not properly be viewed as a basis for this court to establish an evolved concept of "gender identity" for birth certificate amendments. Any such ambiguity cuts the other way. A legislature that sees no reason to speak to the "standard" for issuance of an order for amendment of the sex designation on a birth certificate is not delegating policymaking power to the courts on a matter with the potential for momentous implications. It is presuming that the law is not breaking any new ground, and carrying forward the settled, static meaning of a "sex" designation on a birth certificate.

¶235    This is confirmed by another canon of interpretation—the presumption that legislatures "do[] not . . . hide elephants in mouseholes." *Rutherford v. Talisker, Canyons Fin., Co., LLC*, 2019 UT 27, ¶ 53, 445 P.3d 474 (alteration in original) (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)). This canon is premised on the understanding that legislative bodies do not "alter the fundamental details" of our law "in vague terms or ancillary provisions." *Whitman*, 531 U.S. at 468. The canon has been applied as the basis for this court's reluctance to find that our legislature altered the common law doctrine of primary assumption of risk in a statute that did not explicitly use the term "negligence" in its regulation of the liability of ski area operators. *Rutherford*, 2019 UT 27, ¶ 53. And in the federal realm, the courts have invoked the canon as the basis for the conclusion that the Food Drug and Cosmetic Act did not delegate to the Food and Drug Administration (FDA) the power to regulate cigarettes and nicotine as a "drug" in the absence of a clear statement of such intention, *see Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159–61 (2000), and that the Controlled

---

establish proper cause . . . to develop over time, as district court judges exercise . . . broad discretion").

The "proper cause" standard thus kicks the can down the road on what should count as a salient showing of a change in a person's "sex" as reflected on a birth certificate. In this sense, it is an invitation for judicial policymaking on a case-by-case basis. And it is accordingly no more defensible than the standard established by the majority.

Substances Act did not delegate to the Attorney General "broad and unusual authority" to prohibit physicians from prescribing drugs for use in physician-assisted suicide "through an implicit delegation" in the statute's "registration provision." *Gonzales v. Oregon*, 546 U.S. 243, 267 (2006).

¶236    These principles are applicable here. The delegation of common-law power to set a new, evolving standard for the issuance of an order for amendment of the sex designation on a birth certificate is a big deal. Because such sex designations have sweeping effects on our society, it is highly unlikely that the legislature would have made an "implicit delegation" of such common law power. This is quite an elephant. And the statute governing only the *effect* of such an order is a tiny mousehole.

¶237    Consider the sweeping nature of the majority's holding. In establishing a new standard for an order for a sex change designation on a birth certificate, the court cites a Fair Housing Act definition of "gender identity," standards implemented in recent years by the Social Security Administration and the United States State Department, decisions handed down in the past few years by the appellate courts of states governed by laws distinct from our Utah law (none of them involving a statute phrased as ours is), and a few unpublished orders of our Utah district courts. *Supra* ¶¶ 108–11. None of these sources defines a change in a "sex" designation on a birth certificate in the manner the court does. So the majority is not citing these authorities as somehow establishing the meaning of a change in a sex designation on a birth certificate as those terms are used in our Utah statute. It is simply referring to them in the course of an exercise of its own asserted common-law authority.

¶238    The 1975 Utah Legislature was not delegating such sweeping policymaking power to the courts. It was not hiding such an enormous elephant in the obscure mousehole of a provision governing only the effect of an order for an amendment to the sex designation on a birth certificate.

¶239    The statute applies "[w]hen a person born in this state has a . . . sex change approved by an order of a Utah district court." UTAH CODE § 26-2-11. And this statutory mousehole implies the anticipation of a mere mouse—a straightforward showing of a person's "sex change" that can be made in the same way the initial sex designation was made. If the initial sex designation on the birth certificate is based on "biological sex as evidenced by chromosomes, genitals, and other physical

characteristics," then the "change" to that designation should be understood to carry forward that same standard.

¶240    As noted above, such a showing could be made through simple, straightforward evidence—proof that the initial designation was made initially in error, that an "intersex" person's sex designation has been proven wrong over time, or that the biological markers of sex have been altered by medical interventions like sex-reassignment surgery. A change in the sex designation on a birth certificate on these grounds fits within the statutory understanding of the "sex" designation on a birth certificate. It would thus be a "mouse." But the changes endorsed by the court today are another matter. They are an enormous elephant that could not have been contemplated by the Utah Legislature in 1975.

B.        Delegation of Common-Law Policymaking Power?

¶241    The 1975 statute may not expressly articulate a "substantive standard" for the entry of a birth certificate amendment order. *See supra* ¶ 54. But it does speak to the type or "kind[]" of birth certificate designation at issue. *See supra* ¶ 123.And any supposed "gap" in the statute cannot be taken as a delegation of common-law power for the courts to update the law in accordance with our evolved views of gender identity.

¶242    The majority seeks to root its contrary conclusion in three grounds: (1) the assertion that our courts retain broad common-law power to fill in "gaps" in statutes except where the exercise of such power "conflicts with statutory guidance," *supra* ¶ 53; (2) the notion that the reference to "sex change" is "combined" with "name change," which purportedly is a delegation of authority to develop a common-law of sex change, *supra* ¶ 50; and (3) the observation that the registrar is bound to amend birth certificates in response to orders of "a court of competent jurisdiction of another state or a province of Canada"—a fact the court takes as an indication that the legislature has prescribed no standard of sex at all, but has left the matter to the courts (whether in Utah or elsewhere). *Supra* ¶ 78 (emphasis omitted).

¶243    All of these premises collapse on closer scrutiny. And the majority's analysis is undermined not only by the cases it cites, but also by the canon of constitutional avoidance (under the non-delegation doctrine).

1.        Legislative Gaps

¶244    The court's first premise is built on the notion of a "gap" in a statute that speaks only to the effect of a court order. But the supposed gap cuts against the majority's position for reasons set forth above—the gap should be filled in light of the established meaning of "sex" in the birth certificate context, under the canon of consistent meaning and the "elephants in mouseholes" canon.

¶245    The court's notion of its "gap-filling" role is a novel one in any event. It finds no support in, and is in fact undermined by, the Utah cases cited in the majority opinion.[113]

¶246    Our Utah Code and case law concededly recognize the residual authority of the common law. By statute, our legislature long ago adopted "[t]he common law of England so far as it is not repugnant to, or in conflict with, the constitution or laws of the United States, or the constitution or laws of this state, and so far only as it is consistent with and adapted to the natural and physical conditions of this state and the necessities of the people hereof." UTAH CODE § 68-3-1. And our opinions have reinforced that the common law *retains* its power "[i]n the absence of applicable constitutional or statutory authority." *Spackman ex rel. Spackman v. Bd. of Educ. of Box Elder Cty. Sch. Dist.*, 2000 UT 87, ¶ 20, 16 P.3d 533.

¶247    But the "common law" is not an invitation for courts to search for gaps in the law to fill in with judicial policy. It is an established body of case law, identifying a range of rights and duties residing outside the positive law set forth in statutes and constitutions. *See S. Pac. Co. v. Jensen*, 244 U.S. 205, 222 (1917) (Holmes, J., dissenting) ("The common law is not a brooding omnipresence in the sky, but the articulate voice of some sovereign or quasi sovereign that can be identified."); *Common Law*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("The body of law derived from judicial decisions, rather than from statutes or constitutions."). The rights and duties established in that body of case law of course are subject to evolution and development over

---

[113] In other jurisdictions, the case law may occasionally assert a prerogative of an "inherent equity power of courts of general jurisdiction" that is sufficiently sweeping to encompass the majority's approach. *See supra* ¶ 56 (quoting *In re Change of Birth Certificate*, 22 N.E.3d 707, 709 (Ind. Ct. App. 2014)). But our Utah case law leaves no room for this approach.

time. But it is a body of law, not a basis for freestanding judicial policy.

¶248 This point is established by the majority's own precedent. Absent legislative abrogation, existing bodies of common law "retain" their "authority." *Supra* ¶ 50 n.22 (quoting *Williamson v. Farrell*, 2019 UT App 123, ¶ 17, 447 P.3d 131). And we do not lightly presume that the legislature meant to abolish established bodies of common law by legislation. *Supra* ¶ 50 n.22 (citing *Anderson v. Bell*, 2010 UT 47, ¶ 16 n.5, 234 P.3d 1147). But those principles presuppose the existence of established bodies of common law to be *retained*, or to avoid *abolishing*. If and when there is no existing body of common law, there is no basis for the conclusion that the legislature meant to delegate the power to create it out of whole cloth.

¶249 Our decision in *Rawcliffe v. Anciaux*, 2017 UT 72, 416 P.3d 362, is not to the contrary. There we simply held that the common law may "assist[] in defining the scope of" common-law terms used in statutes. *Id.* ¶ 14. We did not hold that the only limit on our exercise of common-law power is that it not directly "conflict[] with" a governing statute. *Supra* ¶ 53.

¶250 There are established bodies of common law on a wide range of subjects. The first-year law student's curriculum is focused on some of these subject areas—on property, contract, and tort law, and the "common law" of crimes (though the latter is completely abolished in Utah, *see* UTAH CODE § 76-1-105). That list is by no means exhaustive. Another prime example is the law of remedies—a body of case law setting forth background standards and principles for damages and injunctive relief to be awarded across a range of claims.

¶251 In these fields, a gap in a statute may be taken as a reservation of *retained* common law power. But the same does not hold in every field of law. Some fields are purely statutory or administrative. There is no common law, for example, of hazardous waste permits, or hunting licenses, or Medicare. And there is thus no "retained" common law to fill in "gaps" in these fields. If the legislature leaves a gap in these areas, it must be filled in by reference to the language and structure of the statute—not by the invention of some new body of "common law."

¶252 This principle is established by our decision in *Mariemont Corp. v. White City Water Improvement Dist.*, 958 P.2d 222 (Utah 1998). There we confronted a "gap" in a statute governing petitions to withdraw from a water improvement

district—in a provision that allowed for withdrawal upon the filing of a petition by "a majority of the real property owners" in a particular territory, *id.* at 223, but did not speak to "whether names [could] be added to or removed from withdrawal petitions" after they had been filed. *Id.* at 226. Despite the gap, we emphasized the need to base our decision on the "language" and structure of the statute and an "attempt to harmonize the various provisions" of the statute. *Id.* at 227. And we openly repudiated the idea of a court "fashion[ing] a statutory rule out of whole cloth without having any idea of the legislature's intentions." *Id.*

¶253     The court's new standard for designation of a person's "sex" on a birth certificate is of the "whole cloth" variety.[114] There is no common law that governs this field. And there is no basis for the majority's assertion of common-law power.

¶254     The court's cited cases are not to the contrary. They undermine the majority's approach and support my position.

*Spackman ex rel. Spackman v. Board of Education*

¶255     The court did not invoke the "common law" in *Spackman* as a matter of filling in a gap in our state constitutional law—in the sense of an exercise of power to make new law as we best saw fit. In establishing standards for damages remedies for constitutional violations, we expressly held that "a court's authority to do so arises from the common law" of remedies. *Spackman*, 2000 UT 87, ¶ 20. We thus cited provisions from the Restatement (Second) of Torts and established cases on the common law of remedies. *Id.* And we nowhere indicated that a

---

[114] The majority broadly disclaims that it is making such a move. *See supra* ¶ 53. But it also fails to identify any basis for its new standard in the language of the statute or in any body of common-law. And its decision is thus by definition "out of whole cloth"—the cloth of a new court-made standard.

A threshold element of the court's new standard is borrowed from the common-law of name changes. *See supra* ¶ 18 (requiring proof that sex change petition is not for a "wrongful or fraudulent purpose"). But the core standard of "gender identity" as "sex" is rooted purely in the court's own analysis of policy considerations. This standard bears no relation to any element of a common-law name-change proceeding. And the court has identified no basis for its authority to establish such a standard.

perceived "gap" in the law was an invitation for us to make pure policy out of whole cloth. To the contrary, we established a basis for constitutional remedies by applying and extending a traditional body of common law.

*Rawcliffe v. Anciaux*

¶256    *Rawcliffe* does not support the assertion of judicial power to inject new judicial policy into a statutory scheme so long as it does not directly "conflict[] with" enacted statutes. *Supra* ¶ 53. The cited language is taken out of context. And the context undermines the majority's approach and reinforces my position.

¶257    The statute at issue in *Rawcliffe* "codified . . . common law duties" of corporate officers and directors set forth in "our precedent." *Rawcliffe*, 2017 UT 72, ¶ 14. Because the statute itself did not define the duties incorporated from the common law, our *Rawcliffe* decision followed the presumption that statutes that borrow common-law terms of art are understood to carry forward "the legal tradition and meaning" of those terms "accumulated" in historical "practice" in the case law. *Id.* (quoting *Maxfield v. Herbert*, 2012 UT 44, ¶ 31, 284 P.3d 647). In that setting, we held that the meaning borrowed from the common law could not be accepted if it "conflict[s] with" the terms of the statute. *Id.*

¶258    In so stating, we did not establish the power of a court to formulate a brand new body of common law aimed at updating or expanding the reach of a statute. We did not overrule the proscription of a court "fashion[ing] a statutory rule out of whole cloth without having any idea of the legislature's intentions." *Mariemont Corp.*, 958 P.2d at 227. And we did not hold that such power may be exercised so long as it does not "conflict with" the governing terms of a statute.

*Cox v. Laycock*

¶259    This is also clear from the *Cox v. Laycock* decision. In that case we were interpreting a provision of the Election Code that lacked a provision "describ[ing] how to fill a candidate vacancy in the case of an annulled primary election." *Cox v. Laycock,* 2015 UT 20, ¶ 41, 345 P.3d 689. Despite this gap, we did not fill it on the basis of our judicial policy preferences, or suggest that there was a basis for doing so in some sort of "common law" of election vacancy filling. We simply "analyze[d] the act in its entirety" and sought to "harmonize its provisions in accordance with the legislative intent and purpose." *Id.* ¶ 42 (quoting *Mariemont Corp.*, 958 P.2d at 225).

¶260 The *Cox* decision thus further undermines the majority's decision. If we were following the *Cox* approach, we would not be fashioning a new standard of "sex" based on our own "common law" policy preferences; we would be harmonizing the law by interpreting the statutory reference to an order for an amendment to a "sex" designation in harmony with the way the sex designation is made on the birth certificate in the first instance.

*Whyte v. Blair*

¶261 The majority cites *Whyte v. Blair* as a supposed example of our court "inject[ing] meaning" into statutes under our independent power to make common law policy. *Supra* ¶ 52. But the *Whyte* case does not support the majority's approach. Again, it contradicts it.

¶262 The statute at issue in *Whyte* abrogated a longstanding statutory prohibition of "common law marriage" in Utah. 885 P.2d 791, 793 (Utah 1994). It thus authorized our courts to enter orders recognizing a "marriage . . . not solemnized" formally under the code. UTAH CODE § 30-1-4.5. And this court interpreted the statute to incorporate (at least in part) settled "common law" standards for establishing an unsolemnized marriage. 885 P.2d at 794.

¶263 Our analysis in *Whyte* was not the assertion of independent policymaking power of the court. We were not formulating a new standard of "common law marriage," or prescribing our own view of ideal "factors" for the determination of person's marital status. We were *interpreting* a statute that incorporated the language of settled common law—and that in fact was introduced in the legislature "as a common law marriage provision." *Id.* at 793. The statute in question was interpreted as a "codification of common law marriage principles." *Id.* And we accordingly interpreted it as such.

¶264 The statute in question made broad reference to the notion of a "marriage" that was not "solemnized" under Utah Code section 30-1-4.5. It also incorporated factors long considered in the common law case law—capacity to give consent, cohabitation, mutual assumption of marital rights and duties, and reputation as husband and wife. UTAH CODE § 30-1-4.5(1). The majority is thus wrong to assert that "none" of the common law factors cited in *Whyte* "appear in" the governing statute. *Supra* ¶ 52. And in any event, *Whyte* is not a case in which the court was asserting the power to create a new common law standard. To the

contrary, we were interpreting a statutory "codification" of an established body of law as the adoption of established standards.

*Anderson v. Bell*

¶265　The majority cites *Anderson v. Bell* for the proposition that our common-law authority neither depends on nor is easily limited by statutes. *Supra* ¶ 50 n.22. That may be true, but it's irrelevant to defining the scope of our power to establish new fields of common law.

¶266　*Anderson* establishes that not "every instance that a statutory scheme and the common law converge . . . necessarily mean[s] the legislature has abolished the common law." 2010 UT 47, ¶ 16 n.5, 234 P.3d 1147, *superseded by statute on other grounds*, UTAH CODE § 20A-9-502. When a statutory definition "mirrors" a common law definition, *Anderson* endorses a presumption that the statute embraced the common law definition. *Id.* ¶ 16 & n.5. In *Anderson*, the court concluded that the statutory definition of "signature" mirrored the common law definition of that term. And it thus interpreted the statute to carry forward the common law definition. *Id.* ¶ 16.

¶267　That analysis presupposes the existence of a field of "common law." And a case defining the relationship between the common law and statutory definitions says little about the extent of our common law powers. Much less does it show that a statutory ambiguity can *create* common law powers. To the contrary, *Anderson* instructs courts on how to interpret a statute that adopts a common-law definition.

*Williamson v. Farrell*

¶268　The same goes for the court of appeals' analysis in *Williamson v. Farrell*. In applying a set of standards for the disposition of declaratory judgment actions, the court of appeals admittedly was applying "four 'threshold elements' for declaratory judgment actions" that did not "appear anywhere" in the Utah Declaratory Judgment Act. 2019 UT App 123, ¶ 17, 447 P.3d 131. But the court of appeals was not prescribing those factors anew, out of whole cloth. It was observing that these factors were deeply embedded in a body of common law case law, and interpreting a statute that authorized "declaratory judgments" but did not "contain provisions setting forth the specific elements of a proper declaratory judgment claim." *Id.* ¶ 11.

¶269     This bears little relation to the majority's analysis in this case. Here we are not dealing with a statute that incorporates a term that is transplanted from the common law. We are presented with a statute that speaks of a change in a "sex" determination on a birth certificate—a matter that has never had any common law meaning. And that forecloses the majority's reliance on any supposed common law power, under *Williamson* and under all of the other cases it relies on.

### 2.     Combination with Name Change

¶270     The majority seeks to avoid the above problems by noting that the birth certificate statute "combine[s]" together the notion of an amendment to a "sex" designation on a birth certificate with that of a "name change" amendment to the same document. *Supra* ¶ 50. Because there is an established body of case law that was incorporated into our statutory proceedings for a "name change" in Utah, the court asserts that the court must have been implicitly delegating to us the common law power to formulate a new common law standard for a birth certificate "sex change." *Supra* ¶¶ 50–51 (asserting that because the legislature "knowingly and purposefully combined name and sex changes together", there is a basis for our "common-law authority" to formulate a new standard not prescribed by the legislature).[115]

---

[115] The Chief Justice seeks to draw a different inference from the fact that "the terms 'sex change' and 'name change' are bundled together" in the statute. *Supra* ¶ 124. While recognizing that these forms of amendment are "different . . . both in magnitude and legal consequence," the Chief Justice asserts that "the legislature appears to be focused on the way in which they are similar—they are both identifiers on a birth certificate." *Supra* ¶ 124. I take the point as far as it goes. But I cannot see how the parallel structure of the statute can be viewed to dictate the application of a name-change standard to adjudication of a sex-change petition.

The designation of a person's name is different from the designation of a person's sex. And the threshold question on a petition to change either designation is whether the petition is addressed to the type or "kind[] of birth certificate amendment[] subject to the statute." *Supra* ¶ 123. A name-change amendment is thus available only if it involves a change to a person's "name," just as a sex-change amendment is available only if it involves a

(continued . . .)

¶271    This does not follow from the cases cited by the majority. Those cases, in fact, cut against its analysis.

¶272    We have certainly stated that "a word or phrase [that] is transplanted from another legal source . . . brings the old soil with it." *Supra* ¶ 50 (quoting *Maxfield*, 2012 UT 44, ¶ 31,. And the birth certificate statute does borrow *some language* from the common law—in the reference to an amendment to the birth certificate under an order for a "name change." That phrase has common law meaning. And our case law quite properly has interpreted the Utah Code to have imported the common law standard for a "name change" proceeding under our statutes. *See In re Porter*, 2001 UT 70, ¶ 8, 31 P.3d 519; *In re Cruchelow*, 926 P.2d 833, 834 (Utah 1996). It in no way follows, however, that "[w]hen the legislature transplanted" both "name change" and "sex change" in the same statute, "it statutorily planted both 'sex change' and 'name change' in the latter's 'old soil,'" much less that it meant for us to establish a "common law" standard for "sex change." *Supra* ¶ 50.

¶273    The court's syllogism is oversimplified. Our *Maxfield* opinion does not say that the use of one term imported from the common law imbues the entire statute with common-law meaning. In fact it draws a distinction between a "word or phrase" borrowed from "the common law" and a term imported from "legislation." *Maxfield*, 2012 UT 44, ¶ 31. And it states that each such legal "term[] of art" is presumed to carry "the legal tradition and meaning" of its past practice, and "the cluster of ideas that were attached to each borrowed word *in the body of learning from which it was taken*." *Id.* (emphasis added) (citation omitted). The full quote about transplants in *Maxfield* is this: "[W]hen a word or phrase is 'transplanted from another legal source, *whether the common law or other legislation*, it brings the old soil with it.'" *Id.* (emphasis added) (quoting Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 COLUM. L. REV. 527, 537 (1947)).

---

change to a person's "sex." The concepts of "name" and "sex" are thus defined by the terms of the Utah Code. And the fact that the two terms both can be said to fall within the category of "identifier" is not a reason to equate the two concepts.

¶274 This forecloses the majority's notion that the legislature "planted . . . 'sex change' in the name change's 'old soil.'" *Supra* ¶ 50. There is a common-law concept of and standard for a legal "name change." But there has never been a common-law concept of a "sex change," or a change in the legal designation of a person's "sex." This is purely a statutory term, with a "legal tradition and meaning" and "cluster of ideas" attached to it in the birth certificate context. And for that reason *Maxfield* actively undermines the majority's approach.

¶275 The majority thus identifies no support for its novel assertion that a statutory term takes on common-law meaning when "combined" with common-law terms. And the court's analysis misses a nuance in the canon of interpretation that it relies on. A threshold principle, as noted, states "[t]he age-old principle . . . that words undefined in a statute are to be interpreted and applied according to their common-law meanings." SCALIA & GARNER, *supra*, at 320. But this canon has an important counterpart—the principle that a statute that employs a term with an established meaning in a statutory field is presumed to "bear[] this same meaning" when adopted by the legislature. *Id.* at 324. This is an aspect of the "prior construction canon"—the principle that a term that has an established meaning in a "particular field of law (to which the statute belongs)" is interpreted to carry that same meaning in a statute enacted by a legislature. *Id.*; *see also Rutherford*, 2019 UT 27, ¶ 62 (stating that a term whose meaning is "firmly established" in a particular field is viewed as having been "carried forward by the legislature").

¶276 This canon is sometimes invoked when a statute is reenacted in the face of a conclusive construction of a statutory term by a court of last resort. *See* SCALIA & GARNER, *supra*, at 324. But it is not limited to this application. "It applies as well" to an established "administrative interpretation" of a legal term in a given field. *Id.* Such an interpretation is part of the statute's context. *See id.* We understand that a legal term with accepted meaning in a given field "bears this same meaning" when it is imported into a statute. *Id.*

¶277 Our Utah case law establishes this precise position. Where our legislature uses terms that have a settled "administrative interpretation" in a particular field, that interpretation is understood to be carried forward in the statute. *New Park Mining Co. v. State Tax Comm'n*, 196 P.2d 485, 486 (Utah 1948) (treating the reenactment of a tax statute addressed to "net

income from . . . property during the taxable year" as the legislative adoption of the "administrative interpretation" of this language by the Tax Commission).[116] The United States Supreme Court has likewise endorsed this view. *See Fed. Deposit Ins. Corp. v. Phila. Gear Corp.*, 476 U.S. 426, 436–37 (1986) (endorsing the same canon in the context of Congress's adoption of a statute speaking of a "deposit" in the estate tax context; holding that federal statutes adopting this language in this legal context are understood to carry forward the established understanding of the term).

¶278 The settled meaning of the "sex" designation on a birth certificate has been established at the ground level—in the administration or practice of preparing and submitting birth certificates. At that level, all agree that the administrative concept of an original birth certificate "sex" designation has long been viewed as a matter of biological sex.[117]

¶279 The administration of the statute may not require or call for an official interpretation by the Office of Vital Records. "[R]ather, sex is designated (primarily) by medical professionals who presumably are not versed in the nuances of administrative definitions in the law." *Supra* ¶ 53 n.23. But that just shows how deeply embedded the administrative practice is. The long-settled practice reflects the established administrative meaning of this term. And the lack of a need for agency interpretation just shows that the administrative practice is well-settled; it doesn't tell us that there is no understanding that should be carried forward under our law.

¶280 The majority's framework fails on this basis. As the court itself notes, the birth certificate amendment statute

---

[116] In *New Park Mining Company v. State Tax Commission*, the court ultimately resolved the case under statutory terms that it deemed neither "ambiguous [n]or uncertain." 196 P.2d 485, 487 (Utah 1948). I would also resolve this case based on the statute's plain meaning. *See supra* ¶¶ 207, 216. But the administrative construction canon would resolve this case even if the meaning of "sex" bore any meaningful ambiguity.

[117] The agreement is not limited to members of this court. Statutes and case law confirm this understanding. *See supra* ¶¶ 85; 89 n.40, 104, 219 n.103.

articulates no express standard for an order for a "change" to a birth certificate "sex" designation—it just presupposes the authority for the issuance of such an order. That, again, is telling. The "same meaning" is presumed to be carried forward in the legislature's presumption of court power to order a "change" in that same designation.

### 3.        Delegation to Courts in Other Jurisdictions

¶281     The majority also seeks to support its assertion of judicial policymaking power by noting that an amendment to a Utah birth certificate is required in response to an order for a change of a sex determination entered by "a Utah district court *or a court of competent jurisdiction of another state or a province of Canada*." *Supra* ¶ 78. A key premise of the majority's argument is the assertion that our legislature is somehow powerless to "control the standard for 'sex' or 'sex change' applied by any other jurisdiction." *Supra* ¶ 78. From that premise, the majority reasons that the legislature must have meant to "omit a substantive standard from the statute," *supra* ¶ 77 n.31, and thus to leave the development of the operative standard to the courts— whether in Utah or in other states or Canadian provinces.

¶282     The court's syllogism misses a key nuance that foils its central premise. It is undoubtedly the case that the Utah Legislature "cannot control the standard for 'sex' or 'sex change'" *for another jurisdiction's* birth certificates. *Supra* ¶ 78. But the Utah Legislature can and does control the legal standards defining the content of *Utah* birth certificates. And no other state (or province of Canada) is in a position to alter these Utah standards by entering an order under substantive standards developed in another jurisdiction.

¶283     The articulation of substantive state law is "the very essence of . . . sovereignty." *Toler v. Oakwood Smokeless Coal Corp.*, 4 S.E.2d 364, 366 (Va. 1939). Utah has a "right of supremacy" in articulating the legal framework dictating the content of Utah birth certificates. *Id.* And no other state is in a position to "force" its laws on this state.[118] *Id.*

---

[118] I see no way to conclude that the majority is not opening the door to "other jurisdictions forcing their substantive law on Utah." *Supra* ¶ 123. The majority's analytical framework does just that. If the statutory concept of a "sex" designation on a birth

(continued . . .)

¶284 The Utah Legislature has exercised the state's sovereignty in statutes aimed at prescribing the content of the vital records issued by the State of Utah. *See* UTAH CODE § 26-2-1 to 26-2-28 (providing framework for establishing the content of Utah vital records). A Utah birth certificate is thus a Utah vital record whose content is controlled by Utah law. And no other state has authority to alter the content of a Utah record by application of its contrary laws.

¶285 The Utah Legislature admittedly has directed our courts to defer to the judgments of other courts—to Canadian judgments as a matter of comity, and to judgments of the courts of other states as a constitutional matter of full faith and credit. *See* U.S. CONST. art. IV, § 1. But that isn't a delegation of power to courts in other jurisdictions to alter substantive Utah law. It is a simple recognition of the effect of those judgments.

¶286 Courts "differentiate[] the credit owed to laws (legislative measures and common law) and to judgments." *Baker v. Gen. Motors Corp.*, 522 U.S. 222, 232 (1998). "A final judgment in one State, if rendered by a court with adjudicatory authority over the subject matter and persons governed by the judgment, qualifies for recognition throughout the land." *Id.* at 223. But the principle of full faith and credit "does not compel 'a state to substitute the statutes of other states for its own statutes dealing with a subject matter concerning which it is competent to legislate.'" *Id.* at 232 (quoting *Pac. Emps. Ins. Co. v. Indus. Accident Comm'n*, 306 U.S. 493, 501 (1939)). It requires only deference to a foreign state's judgment. And that state may be required to apply Utah "statutes dealing with a subject matter concerning which" our Utah Legislature is "competent to legislate." *Id.*

---

certificate is not a matter of substantive Utah law, then the courts of each state and Canadian province retain the power to apply their own law in this arena. To sustain that conclusion, we would have to assume that the Utah Legislature was delegating substantive authority to every other state and Canadian province to regulate and alter the framework for our Utah birth certificates.

The majority's analytical framework is mistaken. A Utah birth certificate is a Utah vital record. Its terms and conditions are governed by Utah law. And neither the majority nor the Chief Justice has cited any support for their contrary views.

ASSOCIATE CHIEF JUSTICE LEE, dissenting

¶287    There is no question that the Utah Legislature is "competent" to regulate the content of our Utah vital records. Utah law controls the content of Utah vital records. And courts in other jurisdictions are thus bound to apply Utah law in the issuance of any order directing the amendment of such records.[119]

¶288    Nothing in the statute at issue here suggests otherwise, or indicates that the legislature was conferring power on the courts of other states to impose their substantive law on the content of a birth certificate on the registrar of vital records in Utah. The statute provides only that Utah citizens and institutions may avail themselves of the courts of other states and may be controlled by such decisions. That leaves open the question of which state's substantive law should govern those decisions. And there can be no question that Utah law is the substantive law that governs the content of Utah vital records.[120]

_____

[119] Courts in other jurisdictions apply our Utah law with some regularity—just as our courts do in reverse. *See, e.g.*, *Spann v. Am. Express Travel Related Servs. Co.*, 224 S.W.3d 698, 708–13 (Tenn. Ct. App. 2006) (applying Utah contract law to determine whether a "class arbitration waiver clause in . . . cardmember agreements" was unconscionable"); *Federated Fin. Corp. of Am. v. Jenkins*, 719 S.E.2d 48, 51–52 (N.C. Ct. App. 2011) (applying Utah law to determine enforceability of a contract's forum selection clause). This is simply a matter of choice of law.

[120] The majority argues past my position in its response to the above. We can take as a given that the Utah registrar lacks "discretion" in this field and is bound to give "respect and reciprocity to court orders of sister jurisdictions." *Supra* ¶ 78 n.33. We can also stipulate that the legislature could have stated more clearly its intent to have Utah law control the content of Utah birth certificates. *Supra* ¶ 78 n.33. But my threshold points remain unrefuted: (a) the statute speaks only to the full faith and credit to be given to judgments of courts of other jurisdictions; (b) the Utah registrar can give full faith and credit to such judgments without delegating to other courts the power to amend or revise our Utah substantive law; and (c) the content of a Utah birth certificate is a matter governed by Utah law.

Courts in other jurisdictions would not be bound to follow our Utah law on justiciability. *But see supra* ¶ 78 n.33 (suggesting that I am arguing that courts in other states could not rule on non-

(continued . . .)

¶289 The majority's contrary view will give rise to an unworkable patchwork of standards for Utah birth certificates. It will require the Utah registrar to reformulate and revise the framework for a Utah birth certificate each time a court establishes a new conception of a person's sex under the substantive law of another state or province of Canada.

¶290 This is no mere hypothetical. Increasingly, courts in various states are developing standards for non-binary and other gender designations on birth certificates for persons born in those states.[121] Under the majority's view, our Utah birth certificates will have to bow to and somehow incorporate these and other standards. The result will be the transformation of a Utah birth certificate into an evolving, patchwork certificate that will ebb and flow in response to orders entered under the law of other states and provinces of Canada.[122] That is not what the Utah statute was

---

adversarial petitions). But they would be bound to follow Utah law on the terms and conditions of a Utah vital record. That point stands unrefuted. And it undermines the inference drawn by the majority.

[121] *See* CAL. HEALTH & SAFETY CODE § 103430(a) (West 2021) (providing for an individual to petition for a court "order for a new birth certificate" recognizing "a change in the petitioner's gender as female, male, or nonbinary"); WASH. REV. CODE § 70.58A.500(4) (allowing the state registrar to "amend a vital record to change the sex designation of the subject of the record," including "a nonbinary option for sex designation on the record"); *Matter of Hollister*, 470 P.3d 436, 441–43 (Or. Ct. App. 2020) (determining that Oregon statute that provided for "[a] circuit court [to] order a legal change of sex" allowed for changes of "legal sex" to "male, female, or nonbinary").

[122] As the majority notes, Canadian courts have established certain rights of relevance to birth certificate designations under the Constitution of Canada and the Ontario Human Rights Code. *Supra* ¶ 78 n.32. I have no position on these cases, having no knowledge of Canadian law and having had no opportunity to review the briefs filed in the cited cases. But I do have a position on the impact of these decisions on the content of Utah birth certificates. Our Utah courts may be required to respect judgments and orders entered in Canadian courts. Canadian

(continued . . .)

mandating in requiring deference to decisions of the courts of other states.

¶291    If anything, the statutory structure cuts against the majority's approach. In placing Utah court decisions on par with the decisions of courts of other states and provinces of Canada, the legislature was indicating that the operative legal standard is *not* one to be developed by any of these courts. Instead, the standard is established by the settled understanding of a sex designation on a birth certificate—as a reference to a designation of biological sex based on physical observation.

¶292    The result is not a "meaningless statute." *Supra* ¶ 77 n.31. It is a statute that presupposes the existence of a settled understanding of the basis for a sex designation, and sees no need to articulate it in the express terms of the statute.

### 4.    Constitutional Avoidance

¶293    The majority's inferences from the purported statutory "gap" also raise serious constitutional questions. To the extent the court is asserting that there is literally "no statute," *supra* ¶ 45, that says *anything* of relevance to the operative concept of an order for a change in a "sex" designation on a birth certificate, its analysis raises serious constitutional questions under the non-delegation doctrine. And that is a further basis for questioning the majority's approach.

¶294    Our constitution gives "[l]egislative power" to the Utah Legislature. UTAH CONST. art. VI, § 1. This is the authority to make legislative policy by "bill or joint resolution . . . passed . . . with the assent of the majority of all the members elected to each house of the Legislature." *Id.* art. VI, § 22. Subject to further terms and conditions set forth in article VI, the legislature has the power to "promulgat[e] . . . laws of general applicability . . . based on the weighing of broad, competing policy considerations." *Carter v. Lehi City*, 2012 UT 2, ¶ 34, 269 P.3d 141; *see also Rampton v. Barlow*, 464 P.2d 378, 381 (Utah 1970) (speaking of the legislative power as "the authority to make laws").

¶295    The constitutional doctrine of separation of powers precludes the delegation or assignment of these powers. Under

---

human rights laws, however, do not control substantive Utah law, and do not dictate the content of Utah birth certificates.

article V, section 1, our government is "divided into three distinct departments, the Legislative, the Executive, and the Judicial." UTAH CONST. art. V, § 1. And "no person charged with the exercise of powers properly belonging to one of these departments, shall exercise any functions appertaining to either of the others, except in . . . cases . . . expressly directed or permitted" by the Utah Constitution. *Id.* This court has long held that this provision "restricts the ability of the legislature to delegate legislative functions to administrative agencies." *State v. Briggs*, 2008 UT 83, ¶ 14, 199 P.3d 935 (alteration in original) (citation omitted). And the same prohibition extends to the delegation of legislative power to the courts. "[J]udicial legislation" is foreclosed by the Utah Constitution. *State v. Johnson*, 137 P. 632, 634 (Utah 1913). So if there were truly an "absence of legislative enactment" on the nature of the change in a birth certificate sex designation anticipated by the legislature, "it would savor of [unconstitutional] judicial legislation" for our court to make new policy in this field. *Id.* at 635.

¶296    "[T]he legislature is not required to expressly authorize every administrative action, procedure, or rule" adopted by other governmental departments in the implementation of a legislative scheme. *Briggs*, 2008 UT 83, ¶ 14. But "it is prohibited from delegating 'core' or 'essential' legislative power or functions." *Id.* (citation omitted) And if and when the legislature fails even to identify a core, governing principle to control the law applied in other branches of government, there is an unconstitutional delegation of "essential legislative functions, which cannot be transferred." *Id.* (citation omitted).

¶297    The line is clearly stated, though it may admit of occasional fuzziness in application. Core "legislative policy" must be established by the legislature. *Clayton v. Bennett*, 298 P.2d 531, 535 (Utah 1956) (citation omitted). But once the core policy is established, other departments of government may be called up to prescribe rules governing the administration or "execution" of the policy. *Id.* (citation omitted)

¶298    To police this line, our court has held that rules adopted by other departments must be in furtherance of "the legislative will expressed in statutory form." *Id.* (citation omitted) "Any discretion" left to other departments must be "confined to a designated field," within which these departments are not making an "unfettered choice" but a decision based on the legislatively enacted law. *Rowell v. State Bd. of Agric.*, 99 P.2d 1, 3 (Utah 1940)

(citation omitted). Legislative enactments must thus "lay down rules and tests to guide and control" other departments of government "in the exercise of the discretion granted" to them. *Id.* at 4 (citation omitted). At a minimum, the legislature must "mark the course to be pursued, and the principles, facts, and purposes to serve as guideposts to enable" another branch of government "to carry out" *not* its "own will or judgment but that of the legislature." *Id.* Other governmental departments may thus "only effect policy mandated by statute and cannot exercise a sweeping power to create whatever rules they deem necessary." *Robinson*, 2001 UT 21, ¶ 14.

¶299 These standards have been illuminated by their application in a range of cases. This court has held, for example, that the legislature may not delegate to the courts or to other departments the unguided discretion to adopt a "definition of a crime" or prescribe "the precise punishment therefor," *Briggs*, 2008 UT 83, ¶ 14 (citation omitted); *Johnson*, 137 P. at 634 (describing such act as unconstitutional "judicial legislation"); to make a wholly discretionary judgment as to "the amount of [a] penalty" as a "sanction" for non-payment of a tax, *Tite v. State Tax Comm'n*, 57 P.2d 734, 740 (Utah 1936); or to make a policy determination as to "the standards or purposes which are to control" the fixing of prices for "surplus milk," *Rowell*, 99 P.2d at 4.

¶300 The analysis and holdings of these cases are illustrative. Because there is no common law of crimes in Utah, there is no independent power for our courts to make our own policy judgments on the basis for filling in perceived gaps in criminal enactments. To do so would "savor of judicial legislation"—in unconstitutionally supplementing the criminal code with our own policy preferences. *Johnson*, 137 P. at 635 (citation omitted). That principle holds even where our judicial moral compass may "regret[]" that there is a gap in a statute. *Id.* (noting that it is up to the legislature to decide whether to fill in such a gap).

¶301 Parallel concerns informed our decision to foreclose the legislative power to delegate to other departments the amount of a sanction for non-payment of a tax. In repudiating the constitutionality of the delegation of that power to the tax commission, we highlighted the legislature's failure to give the commission any "basis" for "ascertain[ing] the amount of the penalty." *Tite*, 57 P.2d at 740. Absent such basis, we found a

constitutional defect in any decision to give "to the tax commission the power to determine *in its own judgment* the amount of the penalty." *Id.* (emphasis added). And we viewed that as a "legislative function which could not be delegated." *Id.*

¶302    This was also the basis for our decision to strike down a purported delegation of the power to set state policy on price fixing of surplus milk. In our *Rowell* opinion, we condemned the alleged delegation of "unfettered choice" to the board of agriculture to establish legislative policy. *See Rowell*, 99 P.2d at 3 (quoting *Elite Dairy Prod's. v. Ten Eyck*, 3 N.E.2d 606, 609 (N.Y. 1936)). And we emphasized that the legislature must "mark the course to be pursued" with a set of legislative "guideposts," and could not delegate to another department the authority to carry out its "own will or judgment." *Id.* at 4. Where the "only prerequisite" to the adoption of a new policy is the "arbitrary assent" of a non-legislative body, there is a "naked delegation of legislative power," and a violation of the Utah Constitution. *Id.* at 5 (citation omitted).

¶303    The majority's decision runs afoul of these principles to the extent it relies on its own purported power to make policy as a matter of the common law. In asserting the authority to engage in its own act of policymaking, the court contends that "neither Utah Code section 26-2-11 *nor any other statute* contains explicit standards or procedures for petitions for sex change." *Supra* ¶ 47 (emphasis added). In light of the legislature's purported failure to legislate, the court asserts the broad prerogative of judicial policymaking as a matter of our "common-law authority," which in its view "is not dependent on or limited by a statutory provision" that does not expressly foreclose such power. *Supra* ¶ 50 n.22. These conclusions are mistaken not only because any supposed gap can be filled through statutory interpretation, but also because there is no such thing as a "common law" of amendments to a sex designation on a birth certificate. This is fatal under the above-cited case law. Even assuming for the sake of argument that the legislature has left a completely empty space that cannot be filled as a matter of statutory interpretation, we could not on that basis assert the right to engage in common-law policymaking.

¶304    The law on amendments to a sex designation on a birth certificate is like the criminal law. This is not a common law field—there is no common law that governs. And the purported lack of any statutory standard cannot be taken as a "naked

delegation" of policymaking power. *Rowell*, 99 P.2d at 4. The court's insistence on the existence of such power is the assertion of the authority to make "judicial legislation," *Johnson*, 137 P. at 634, which would run afoul of the Utah Constitution.

¶305 Again it is no answer to suggest that the court is just "apply[ing] the common law associated with name-change petitions." *Supra* ¶ 54. The court has borrowed a single element from the law of name changes—in the prohibition of petitions sought for a "wrongful or fraudulent purpose." *Supra* ¶ 18. But the core standard established by the court goes well beyond that threshold requirement. The new standard for a "gender identity" entry on a birth certificate is a matter of the majority's own making. That standard bears no relation to any element of a common-law name-change proceeding. It likewise bears no connection to the text of the governing statute. And for these reasons it amounts to an act of judicial legislation unbound by the terms or conditions of any common-law or any statute.

¶306 The court's reformulation of the legislature's concept of the sex designation on a birth certificate raises serious constitutional concerns. To the extent the majority is suggesting that there is no legislative standard that governs—and bare policymaking power delegated to the courts—its approach should be rejected as a matter of constitutional avoidance.

## III. CONCLUSION

¶307 Since 1975 our Utah law has provided for the issuance of a court order for amendment of the designation of a person's "sex" on a birth certificate. This is a plain reference to biological sex. It is not an invitation for judicial development of an evolved standard of "gender identity."

¶308 The majority's new standard provides for a birth certificate amendment upon a showing of any care or treatment for gender transitioning or change. This was not the law enacted by our legislature in 1975. And it is not the law this court should be adopting—least of all in a case in which we lack adversary input from any adversary party.

¶309 The legislature can certainly "override" our decision if it disagrees. *See supra* ¶ 54. But that is no reason for us to step in to do the legislature's job of amending or updating its laws. And it surely is no justification for our court's decision to override decades and even centuries of precedent on the core limits on our judicial power.

¶310     The legislature has no power to undo that decision. In a system that gives our court the final say on constitutional questions, we ourselves bear the responsibility to interpret and abide by the limits on our constitutional power. We should hold those limits sacred. We will rue the day that we cast them aside.